


FILED
4/21/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT
EE

Dmitry Shkipin

Geodoma

325 Sharon Park Dr. #416

Menlo Park, California 94025

(650) 281-6962

April 21, 2026

Attn: Honorable Lindsay C Jenkins

United States District Court Judge, Northern District Of Illinois

Courtroom: 2119

Everett McKinley Dirksen United States Courthouse

219 South Dearborn Street

Chicago, IL 60604

**Re: GEODOMA'S AMICUS CURIAE BRIEF IN SUPPORT OF CONSUMERS James Tuccori, et al. v. At World Properties, LLC, et al. Case 1:24-cv-00150 (N.D. Ill.)**

Your Honor, in pro per, I respectfully move through this letter for leave to submit an *amicus curiae* brief in support of Consumers' original Compliant and the Proposed Settlement, with respect to the federal law claims in this case.

I genuinely wish an attorney was filing this for me properly through ECF, but I could not find one able to help. Nonetheless, I feel that my *amicus curiae* brief provides unique information that may help this Court, specifically with regards with GSEs (the Fannie Mae, Freddie Mac, and the FHA) Interested Party Contributions (IPCs) Guidance (e.g., Selling Guide B3-4.1-02, Interested Party Contributions (IPCs) Maximum Financing Concessions) limits applicability toward real estate brokerage settlement services compensation, that are **the buyer's responsibility.**



I consider myself a direct competitor with NAR and NAR-affiliated MLSs, be that as it may, Geodoma is a single person company right now.

Both, NAR/NAR-affiliated MLSs and HomeOpenly/Geodoma, operate in a very limited two-sided online real estate platforms product market, populated by a few dozen entities, where we serve 1.5 million real estate agents and 130 million homeowners, as our present or potential customers. NAR-affiliated MLS Participants are also valued users on Geodoma as the relevant direct "consumers of the multilisting service." Thompson v. Metropolitan Multi-List, Inc., 934 F.2d 1566, 1571 (11th Cir. 1991)

Neither Plaintiffs, nor Defendants consent to this motion. Accordingly, I respectfully request that this Court grant leave to file an *amicus curiae* brief in this matter, which is attached.

Thank you for your time,

*/s/ Dmitry Shkipin*
Development and Operations at Geodoma
T:650-281-6962 | support@homeopenly.com

DMITRY SHKIPIN (*pro se*)
support@homeopenly.com
325 Sharon Park Dr. #416
Menlo Park, CA 94025
Telephone: 650.281.6962

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| James Tuccori, et al. | Case No.: 1:24-cv-00150 |
| Plaintiff, | **GEODOMA'S AMICUS CURIAE BRIEF IN SUPPORT OF CONSUMERS** |
| v. | |
| At World Properties, LLC, et al. | Judge: Hon. Lindsay C. Jenkins |
| Defendant. | |

## CONTENTS

TABLE OF AUTHORITIES ..................................................................................................3

BACKGROUND .................................................................................................................4

ARGUMENT .......................................................................................................................8

I.      SINCE AUGUST 17, 2024, NAR-AFFILIATED MLS PARTICIPANTS HAVE BEEN BAKING IN BUYER-PAID CLOSING COSTS INTO FEDERALLY-FUNDED LOANS AS SELLER-PAID COMMISSIONS OUTSIDE GSES IPCS CAPS..........................................................................................................................10

II.     THIS COURT HAS FULL POWER OVER TUCCORI, ET AL. CLASS SETTLEMENT AGREEMENT AND OVER ALL PRACTICE CHANGES. ...............16

CONCLUSION..................................................................................................................18

PROPOSED PRACTICE CHANGES ...............................................................................21

## TABLE OF AUTHORITIES

**Cases**

Gibson et al. ............................................................................................................. passim

Grace et al., v. NAR, et al., Case No. 4:23-cv-06352 (N.D. Cal.) ................................................. 6

Sitzer/Burnett, et al. ..................................................................................................................... 6

The PLS.Com, LLC v. NAR, et al., (C.D. Cal. 2021) ................................................................... 20

Top Agent Network, Inc. v. NAR, et al., (N.D. Cal. 2021) ........................................................... 20

Tuccori et al. ..................................................................................................................... 4, 16, 17

**Statutes**

12 C.F.R. § 1024.14(g)(1)(v) ........................................................................................................ 5

12 U.S.C. § 2607(c)(3) .................................................................................................................. 5

False Claims Act ....................................................................................................................... 8, 18

Section 1 of the Sherman Act ..................................................................................................... 4, 18

## BACKGROUND

Your Honor, because class actions settle for pennies on a dollar, Practice Changes are an integral part of the Class Settlement Agreement with homebuyers.

Some people, rightfully, will come to you and ask, "Why does this Court allow for a penny on a dollar settlement? It is not fair!" I am one of the people who understands that all settlement agreements are negotiated subject to (1) uncertain litigation outcomes, and also the down-to-the-ground fact that (2) this money is already spent.

In this lawsuit, money was stolen from Consumers (with price-fixing, false advertising, wire fraud, unlawful, unfair, fraudulent business acts and practices, etc.) The aggregate damages for the Gibson et al. class action lawsuit were estimated to exceed $200 billion before automatic trebling. (Source: https://www.housingwire.com/articles/whats-different-about-the-200b-gibson-commission-lawsuit/ ) However, NAR did not have $200 billion to settle the Gibson et al. lawsuit. Settlements with all defendants in Gibson et al., to date, total about $1 billion (Source: https://www.hbsslaw.com/cases/real-estate-broker-commissions-antitrust ). Neither does NAR have billions of USD to settle the Tuccori et al. lawsuit. NAR and NAR-affiliated MLS Participants have millions of USD, not billions. Subject to this reality, some of this money owed to Consumers can still be recovered with a "fair, reasonable, and adequate" settlement under Fed R. Civ. P. 23(e) (even though an individual Consumer who overpaid by $20,000 in real estate commissions will likely receive a $200 check from their settlement, subject to this math). This is the reality of wire fraud that involves over 1,500,000 NAR-affiliated MLS Participants nationwide. The numbers are, indeed, too big to fail.

By itself, sharing commissions between listing brokers and buyer brokers is legal if it is done without restraint of trade prohibited by Section 1 of the Sherman Act. The government cannot ban brokers from sharing fees with one another (which is expressly allowed subject to

GEODOMA'S AMICUS CURIAE BRIEF IN
SUPPORT OF CONSUMERS
Case No.: 1:24-cv-00150

lawful Real Estate Settlement Procedures Act (RESPA) 12 C.F.R. § 1024.14(g)(1)(v) and 12

U.S.C. § 2607(c)(3) broker-to-broker commissions sharing exemption) to help facilitate a sale -

the law only bans agreements that restrain trade unreasonably.

When used correctly and legally, 12 U.S.C. § 2607(c)(3) is a very helpful and beneficial

exemption, because it allows real estate brokers to share seller-paid commissions outside GSE's

IPCs limits. On Geodoma, our seller-paid commission sharing policy reads:

> "In 40 US states jurisdictions where buyer brokers are able to offer buyer rebates,
> in full compliance with the Federal Housing Finance Agency (FHFA), Fannie
> Mae and Freddie Mac (the Enterprises) guidelines, and in accordance with local
> common and customary practices, Buyer Agent Commissions amounts offered on
> Geodoma are customarily paid by the seller and are not required to be counted
> towards the IPC limits for the transaction as described in Selling Guide B3-4.1-
> 02, Interested Party Contributions (IPCs)
>
> By making a fully-optional cooperative offer of Buyer Agent Commission on
> Geodoma in 40 US states jurisdictions where buyer brokers are able to offer buyer
> rebates, the home seller agrees to pay all commissions to their seller's real estate
> broker who, in turn, makes an offer to pay the buyer's real estate broker
> commission pursuant to cooperative brokerage arrangement made in a real estate
> brokerage capacity, subject to the Real Estate Settlement Procedures Act
> (RESPA) 12 C.F.R. 1024.14(g)(1)(v) and 12 U.S.C. 2607(c)(3) exemption." (See
> https://geodoma.com/ipcs-limits )

In 40 U.S. states, buyer brokers are allowed to negotiate buyer rebates with their clients,

where "rebates are no different from simply charging a lower commission fee, and one should

ask why the ability to rebate can mitigate the disincentive to compete through lower commission

rates" according to an economic analysis paper published on the US-DOJ website titled "How

Rebate Bans, Discriminatory MLS Listing Policies, and Minimum Service Requirements Can

Reduce Price Competition For Real Estate Brokerage Services and Why It Matters" (Source:

https://www.justice.gov/atr/how-rebate-bans-discriminatory-mls-listing-policies-and-minimum-

service-requirements-can-reduce )

In U.S. states where rebates are permitted, buyer brokers can reduce the commissions paid by the homebuyers, even if Buyer Broker Compensation (BAC) is offered in "blanket" form on MLS. If MLS operates in states without rebate bans, the policy of transmitting optional "blanket" offers of Buyer Broker Compensation (BAC) is not, by itself, harmful to buyers.

The NAR rules are (were) anticompetitive for three distinct reasons:

*(1) NAR allowed buyer brokers to advertise services as "free" when, in fact, they received compensation offered via NAR-affiliated MLSs.*

*(2) Until October 2023, NAR required listing agents to make an offer Buyer Broker Compensation (BAC) (even if just $1) in order to use NAR-affiliated MLSs.*

*(3) NAR allowed NAR-affiliated MLSs to utilize blanket offers of compensation in Alaska, Oregon, North Dakota, Kansas, Oklahoma, Missouri, Louisiana, Mississippi, Alabama, New Jersey, and Tennessee, where buyer agent rebates are banned by state laws.*

The transmission of all these anticompetitive rules via local NAR-affiliated MLS systems is the primary reason why the jury in Sitzer/Burnett et al. lawsuit had, correctly, decided that the trade was being restrained and awarded Consumers almost $1.8 billion in damages (Source: https://www.forbes.com/advisor/legal/inflated-real-estate-commissions-damages/ )

In a parallel copycat lawsuit, Grace et al., v. NAR, et al., Case No. 4:23-cv-06352 (N.D. Cal.), the federal court also held that whenever MLS rules do not require the listing broker to share compensation with the buyer broker, the optional compensation rules could not form the basis of the conspiracy. Northern District of California judge, Haywood S. Gilliam, Jr., held that BAREIS' MLS rules "simply do not on their face require the results Plaintiff alleges they do" when dismissing the case against BAREIS and BAREIS-affiliated MLS Participants.

Any listings transmitted by illegal means listed as Items (1) - (3) by the NAR-affiliated

MLSs indeed constituted price-fixing of hundreds of billions of USD in closing costs and overinflated home values over the years. An insane amount of money to recover what is permitted under the law. These amounts of money simply do not exist in the real world.

When breaking the law, network effects companies can cause a great deal of trouble.

Imagine: Uber Technologies fixing prices for over 2,000,000 drivers nationwide, to earn $50 billion in revenue every year as a "hub" of a price-fixing cartel, in which drivers sign up for Uber precisely "on the understanding that the other [drivers] were agreeing to the same' pricing algorithm." (Source: https://www.justice.gov/d9/2023-11/418053a.pdf )

Imagine: Amazon Marketplace fixing prices for over 2,000,000 third-party sellers, $1.7 trillion in sales by GMV over just four years, which constitutes 60% of all sales on Amazon (Source: https://oag.ca.gov/news/press-releases/attorney-general-bonta-exposes-amazon-price-fixing-scheme-driving-costs and https://www.hbsslaw.com/cases/amazon-com-antitrust-de-coster ).

Imagine: since 2018, the Zillow Flex Program has been scamming consumers out of 5,000,000,000 with RESPA-banned 40% "success fees" paid from real estate commissions for referrals of business incident to or part of real estate settlement services involving federally related mortgage loans. (Source: https://www.hbsslaw.com/press/zillow-agent-class-action/homebuyers-sue-zillow-alleging-hidden-real-estate-sales-fees-inflating-costs )

These massive illegal sales carry significant harm above the norm. All such sales require full and unconditional compliance with the law. Not sometimes; always. When cardinal laws are explicitly breached on this scale, they must be cured with cardinal and explicit Practice Changes. The Practice Changes are not trivial or irrelevant, and this Court must be careful NOT to issue "blanket" approvals of Practice Changes requests made by powerful and highly illegal cartels.

Your Honor, your Docket is a permanent record that is to be respected and not cheated with ambiguity. The NAR cartel wants you to be blind. They think Justice is blind, and that it can be slighted. Cartels cannot be rewarded for breaking the law, not on Your Docket, not in Your Courtroom.

All of us, U.S. citizens, U.S. residents, and our welcomed and unwelcomed guests, are governed by the Article III judge, the most powerful entity (Source: https://schema.org/Organization ) next only to God. Under this Court's Constitutional Power, a meaningful loss (Source: https://www.law.cornell.edu/uscode/text/28/1332 ) can be converted into a Demand (Source: https://schema.org/Demand ) by anyone with an Article III standing to sue (Source: https://constitution.congress.gov/browse/essay/artIII-S2-C1-6-1/ALDE_00012992/ ) and also have such a Demand met with an Offer (Source: https://schema.org/Offer ) to define the outcome (Source: https://schema.org/Product ) of Justice.

I am now asking this Court to serve a more precise outcome of Justice with more precise Practice Changes in class action that the NAR cartel wants to settle for a fraction of a penny on a dollar.

## ARGUMENT

Since August 17, 2024, NAR has been involved in a massive and ongoing False Claims Act (FCA) conspiracy that they caused by a seemingly irrelevant lie. This lie is called responsibility. The NAR wants to avoid responsibility because it serves them not to have any. Lack of responsibility allows the NAR to keep the cartel intact, without any real changes. "Nothing has changed" since August 17, 2024, in how commissions are paid. (Source: https://www.cnbc.com/2025/08/26/where-real-estate-commissions-stand-a-year-after-new-rules-were-introduced.html )

Why NOT? What happened?

Well, first of all, it is True (Source: https://schema.org/True ) that nothing has changed since August 17, 2024, in how commissions are paid. The Practice Changes administered under the Gibson et al. Settlement Agreement did not produce any intended outcomes, but not because of Gibson et al. Settlement Agreement Terms were inadequate, but because these Terms are not being followed. Gibson, et al. Settlement Agreement Terms are, in fact, being deliberately and purposefully circumvented by NAR's highly specific lie. Right now. Today.

To preserve their price-fixing cartel from collapse, since August 17, 2024, NAR has lied about the Interested Party Contributions (IPCs) outcome produced by the Gibson et al. Settlement Agreement. This outcome directly relates to almost all federally funded loans in the United States. As you well know, it is highly illegal to defraud the United States government. To do so is a felony under the FCA. The FCA imposes severe penalties for knowingly submitting false claims to the federal government. Meaning, to lie to the government that funds programs for public purposes is extra harmful. Our government funds the vast majority of all mortgage loans, backed, insured, or purchased by Government Sponsored Enterprises (GSEs, such as US-HUD, Fannie Mae, Freddie Mac, US-FHA, US-FHFA, etc.)

> "The False Claims Act establishes liability for a variety of false or fraudulent conduct, including when a person "knowingly presents or causes to be presented a false claim for payment or approval," or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." ***Key words in these provisions require the false claim or statement to be "knowing" and "material."*** The False Claims Act defines "knowingly" to mean that a person or entity "has actual knowledge of the information; acts in deliberate ignorance of the truth or falsity of the information; or acts in reckless disregard of the truth or falsity of the information." In other words, the False Claims Act requires more than mere negligence or a simple mistake to hold a person liable." (Source: https://www.justice.gov/archives/opa/blog/false-claims-act-federal-housing-administration-lending )

Both "knowing" and "material" elements exist here, because NAR ***knows*** about GSEs

IPCs limits and had explicitly requested guidance from the GSEs about the applicability of IPCs limits against Gibson et al. Settlement Agreement (Source: https://www.nar.realtor/washington-report/fhfa-confirms-gses-guidance-on-ipcs ). What GSE's actually said, versus what NAR claims was said - is the lie.

The GSEs-backed loans are funded under strict rules, including Interested Party Contributions (IPCs) Guidelines. It is illegal, under these Interested Party Contributions (IPCs) Guidelines, to include costs in federally-funded loans exceeding the so-called Interested Party Contributions (IPCs) caps, aka IPCs limits (typically calculated after correctly stating all settlement charges listed for both the borrower and home seller "sides" of the Settlement Statement HUD-1 Form. Source: https://archives.hud.gov/news/2009/pr09-058-hud1.pdf ). All federally-funded mortgage loans must always be in compliance with GSEs IPCs Guidelines. If anyone wants to avoid the GSEs IPCs limits on purpose, they engage in mortgage fraud.

Since August 17, 2024, under the terms of Gibson et al. Settlement Agreement, no actual changes exist. Nobody does anything differently, ONLY because NAR deliberately aims to bypass these IPCs limits and also causes all NAR-affiliated MLS Participants to concurrently operate in non-compliance with GSE's IPCs Guidelines.

I.  **SINCE AUGUST 17, 2024, NAR-AFFILIATED MLS PARTICIPANTS HAVE BEEN BAKING IN BUYER-PAID CLOSING COSTS INTO FEDERALLY-FUNDED LOANS AS SELLER-PAID COMMISSIONS OUTSIDE GSES IPCS CAPS.**

According to NAR Settlement FAQs in Gibson, et al. lawsuit, which is True -

"Fannie Mae, Freddie Mac, and the FHA do not allow commissions to be added to the balance of the mortgages." (Source: https://www.nar.realtor/the-facts/nar-settlement-faqs )

Also, according to the same NAR Settlement FAQs in Gibson, et al. lawsuit, which is

both, False (Source: https://schema.org/False ) and a $500 billion FCA liability -

> "[Q:] Does the settlement change access to mortgages for buyers?
>
> [A:] No. Under the settlement, buyers still have the same options when it comes to compensating their agents. That is, the listing agent can compensate the buyer agent, the seller can compensate the buyer agent, or the buyer can compensate their agent directly. Buyers will still be able to get financing from Fannie Mae, Freddie Mac, and the FHA under these scenarios. The FHA confirmed this in a letter after NAR sought to affirm our interpretation of existing guidance. Likewise, Fannie Mae and Freddie Mac published *explicit confirmations that commissions for buyer agents paid by the seller would not count against the buyer.* However, none of these agencies will allow the buyer to finance a commission into the mortgage at this time. (Updated 7/8/24)" (Source: https://www.nar.realtor/the-facts/nar-settlement-faqs )

Fannie Mae, Freddie Mac, and the FHA never made any "explicit confirmations that commissions for buyer agents paid by the seller would not count against the buyer." Instead, what GSEs actually said was this:

> "Selling Guide B3-4.1-02, Interested Party Contributions (IPCs) permits interested parties (including property sellers) to make contributions to the borrower's closing costs subject to maximum limits ranging between 2% and 9% of the property value.
>
> Typical fees and/or closing costs paid by a seller in accordance with local custom, known as common and customary fees or costs, are not subject to the IPC limits described in Selling Guide B3-4.1-03, Types of Interested Party Contributions (IPCs). *If a seller or seller's real estate agent continues to pay the buyer's real estate agent commission in accordance with local common and customary practices, these amounts are not required to be counted towards the IPC limits for the transaction.*" (Source: https://singlefamily.fanniemae.com/news-events/selling-notice-real-estate-commissions-and-interested-party-contributions )

Fannie Mae, Freddie Mac, and the FHA all issued 100% accurate IPCs Guidance, because these Advisories simply re-state the existing General IPCs Guidance, that simply reads this exact same thing:

"Typical fees and/or closing costs paid by a seller in accordance with local custom, known as common and customary fees or costs, are not subject to Fannie Mae maximum financing concessions." (Source: https://selling-guide.fanniemae.com/sel/b3-4.1-02/interested-party-contributions-ipcs )

and

"Exceptions: The maximum financing concession limits above do not apply to: Financing concessions contributed by Freddie Mac as the property seller for Mortgages originated for the purchase of Freddie Mac REO properties [and] Borrower fees or costs customarily paid by the property seller according to local convention." (Source: https://guide.freddiemac.com/app/guide/section/5501.6 )

**However, in the real world, the Fannie Mae, Freddie Mac, and the FHA "Real Estate Commissions and Interested Party Contributions" April 15, 2024 Guidance simply DOES NOT APPLY to the NAR-affiliated MLS Participants, bound by the Gibson et al. Settlement Agreement. Under the Gibson et al. Settlement Agreement with home sellers: (1) homebuyers MUST negotiate and are LEGALLY responsible for PAYING buyer broker commissions when working with NAR-affiliated MLS Participants.**

As this Court is well aware, every Contract must contain these six essential elements: (1) Offer; (2) Acceptance; (3) Awareness; (4) Consideration; (5) Capacity; and (6) Legality. Gibson et al. Settlement Agreement requires homebuyers to enter into a Buyer Broker Agreement (BBA) with each NAR-affiliated MLS Participant that binds them into tangible bargained-for Consideration (even just a $1) as a payment for services rendered.

According to a recent HousingWire article, titled "Buyer owes $24K after breaching buyers broker agreement, arbitration finds," published on December 8, 2025, by Brooklee Han -

*"Arbitration awarded $24,000 to a brokerage after a buyer breached an exclusive broker agreement under new NAR rules"*

"Since August 17, 2024, when the business practice changes went into effect,

Lichtenstein said his firm has completed 381 buy side transactions, and they have ultimately looked into three contracts for issues.

"For the brokerage community, if the Buyers Broker Agreement (BBA) is written up and executed properly and the Buyer purchases, it means we will get compensated for the work we have done. That is reassuring on our end and a sigh of relief as most every other profession gets paid as they do their job and with health and 401k benefits," Lichtenstein wrote in an email. "Our pay structure is by choice, and we get out of it what we put into it. But, getting compensated is something we expect at the end of a deal."

According to Lichtenstein, at the end of 2024, he and his team were alerted by a mortgage broker that a buyer the mortgage professional knew was working with Echo Fine Properties had just presented another offer with a different buyer's broker. He said they immediately notified the buyer of the issue; however, the buyer ignored the communication, resulting in Echo filing for arbitration after the transaction had closed.

During the discovery related to the arbitration, Lichtenstein said his firm found that the day after they had alerted the buyer to the issue, one of the buyers signed an amended buyer broker agreement, swapping out the name of the original buyer for that of his mother.

Three weeks later, another amendment to the contract saw things reversed with the mother's name swapped for that of the original buyer. Through arbitration, the arbitrator concluded that the buyer broker agreement used by Echo Fine Properties is unambiguous, and its terms were clearly stated. Additionally, the arbitrator found testimony from the buyer that he did not read the agreement before signing it, that the 180-day protection period for the agreement is "excessive," and that the agent from Echo Fine Properties provided little to no benefit or help were unpersuasive.

Due to the arbitrator's findings, the buyer was found to have breached his contract by entering into a purchase agreement without the involvement of his Echo Fine Properties agent and subsequently refusing to pay the commission Echo Fine Properties was entitled to based on the buyer broker agreement. As a result, the arbitrator awarded the brokerage $24,000 due to the breached contract.

This sum represented the 3% commission agreed upon in the buyer broker contract on the purchase of the $800,000 property. Lichtenstein noted that even if only 1% of transactions have an issue, in a year with just 4 million existing home sales, that could potentially mean 40,000 arbitration cases a year, involving a purchaser owing a commission to a brokerage.

"We have no desire for this, but collections is appearing to be a new category for brokerage houses as a result of the BBA," Lichtenstein wrote. "***For purchasers, if you've committed to a [real estate agent], then don't try to pull a fast one.***

Understand how much work is involved. The brokerage community takes a client on with no guarantee of being paid unless one buys a home. Agents put in a tremendous amount of time and their knowledge and that work is what educates a client and helps to get a deal over the finish line."" (Source: https://www.housingwire.com/articles/buyer-broker-agreement-arbitration/ )

Under law, when entering into a Buyer Broker Agreement (BBA) with NAR-affiliated MLS Participants, homebuyers are fully responsible for paying their NAR-affiliated MLS Participants, who are all bound by the Gibson et al. Settlement Agreement (up until August 17, 2031, when the Gibson et al. Settlement Agreement is set to expire.)

Today, homebuyers are NOT fully aware of this responsibility, in part, because NAR continues to publish false claims that there are *"explicit confirmations that commissions for buyer agents paid by the seller would not count against the buyer."*

On the contrary, under the Gibson et al. Settlement Agreement, buyer-paid commissions very much DO "count against the buyer." The Gibson et al. Settlement Agreement was not a "favor" to either the NAR or to the NAR-affiliated MLS Participants - this was retribution for breaking the law, meant to punish the cartel for causing $200 billion in damages in collusion with 1,500,000 NAR-affiliated MLS Participants - imposed upon by millions of Consumers.

NAR continues to lie about the total fallout, produced by the Gibson et al. Settlement Agreement. NAR was FORCED to enter into a highly unfavorable Gibson et al. Settlement Agreement, because they LOST before a jury with a $1.8 billion verdict (also, subject to being multiplied by (50) U.S. states at $200 billion (x3) = $600 billion). Nobody would even give NAR a bond for an appeal against $600 billion. The Gibson et al. Settlement Agreement was nothing short of a step away from a total demise of this massive price-fixing cartel. This cartel very much continues to exist, subject to this GSEs IPCs limits applicability lie.

Nothing has changed since August 17, 2024. In fact, commissions have gone up,

according to Redfin:

> "Commissions are now at roughly the same level they were in the first quarter of 2024, when the National Association of Realtors (NAR) first announced a settlement dictating new commission rules in response to a class action lawsuit brought by home sellers.
>
> The third quarter marked the anniversary of new commission rules that went into effect in August 2024. The average buyer's agent commission fell to a low of 2.36% that quarter (Q3 2024), but has nudged slightly higher since, as a slowdown in home sales gave buyers more negotiating power.
>
> Beth Behling, a Redfin Premier real estate agent in Chicago, said commissions in her area were largely unchanged following the introduction of the new rules." (Source: https://www.redfin.com/news/commissions-q3-2025/ )



**Buyer's Agent Commissions Tick Up For Third Consecutive Quarter**

Average commission paid to U.S. real estate agents representing buyers

Source: Redfin data · Created with Datawrapper

*Since August 17, 2024, NAR-affiliated MLS Participants have been baking in buyer-paid closing costs into federally-funded loans as seller-paid commissions outside IPCs caps. Buyer broker commissions have gone up because buyers negotiate buyer-paid fees that, according to NAR's lies, "would not count against the buyer."*

**II.  THIS COURT HAS FULL POWER OVER TUCCORI, ET AL. CLASS SETTLEMENT AGREEMENT AND OVER ALL PRACTICE CHANGES.**

This Court has full jurisdiction over Tuccori et al. Class Settlement Agreement, and it is a viable option to settle this lawsuit for $56 million. The $56 million is a fair negotiated sum, subject to real-world constraints, despite over $100 billion in damages. Nobody had proposed anything better, in terms of money.

However, Tuccori et al. Practice Changes cannot be relied upon across another lawsuit. Gibson et al. is currently under appeal, and the entire Gibson et al. Settlement Agreement could be nullified.

Moreover, Gibson et al. lawsuit produced about $1 billion from $200 billion in damages. Tuccori et al. lawsuit only produced $56 million. An argument can be made that the $56 million can be substantially increased to produce at least some amount closer to the $1 billion obtained in Gibson et al., to the greater benefit of Consumers as a Class.

Otherwise, each harmed Consumer only gets not even a $200 check. Most Consumers will not take the time to fill out the Claim Form to receive a small $20 payment, but some people will fill it out if they also know that there is at least some money to receive (such as a $200 gift card is better than a $20 gift card). There must be at least some amount that the Consumer receives that is meaningful, to simply process their refund.

At the very least, NAR owes Consumers another $1 billion, even if they don't have $200 billion to pay (half of these funds will come directly from co-conspiring 1,500,000 NAR-affiliated MLS Participants brokers-of-record, such as: Anywhere Real Estate Inc., Douglas Elliman, Berkshire Hathaway HomeServices, eXp Realty, Windermere Real Estate, Keller Williams REMAX, Coldwell Banker, NextHome, Inc., HomeSmart, Compass, John L. Scott Real Estate, CENTURY 21, Realty ONE Group, Vylla, ERA Real Estate, Weichert, Realtors,

Better Homes and Gardens Real Estate, Fathom Realty, Intero Real Estate Services, John R. Wood Properties, Worth Clark Realty, Sotheby's International Realty, United Real Estate, Real, Howard Hanna, lpt realty, Jason Mitchell Group, The Corcoran Group, SERHANT., The Agency RE, Realty Executives International, Engel & Völkers, etc.)

Even if this Court decides that $56 million is an adequate Payment against $100 billion in potential damages, the Court can still demand greater and better Practice Changes as part of the Tuccori et al. Class Settlement Agreement. The Court MUST demand better terms, because one cannot cheat a whole lot of people out of $100 billion and expect nothing to happen.

Your Honor, my Proposal here is to merely require a Practice Changes in Tuccori et al. Class Settlement Agreement to clarify *responsibility.* Right now, the NAR's PR reads, "no new practice changes required."

> "The settlement would not require any new practice changes for agents and brokers who are members of NAR, but reaffirms NAR commitment to the previous practice changes." (Source: https://www.nar.realtor/magazine/real-estate-news/nar-reaches-52-25m-settlement-in-tuccori-homebuyer-class-action-lawsuit )

Well, the so-called "commitment to the previous practice changes" is nothing but a massive GSE IPCs mortgage fraud, and these "previous practice changes" are currently under appeal.

NAR has failed to establish responsibility. NAR has failed to establish accountability. Why should anyone trust what they say? This Court has the final say on what Consumers should get. In fact, this Court can easily say, "NAR, under this jurisdiction, you will face another $1.8 billion verdict, multiplied by (50) states = $200 billion." This Court can easily decline to give final approval for a penny-on-a-dollar Settlement Agreement and send this case to the jury.

By modifying the Practice Changes as outlined below, this Court (1) helps Consumers,

GEODOMA'S AMICUS CURIAE BRIEF IN
SUPPORT OF CONSUMERS 17 Case No.: 1:24-cv-00150

(2) stops ongoing unlawful False Claims Act conduct by NAR, and (3) implements real changes in the real estate markets where Consumers do not have to keep suing the NAR, over and over again.

After all, *"[f]or purchasers, if you've committed to a [real estate agent], **then don't try to pull a fast one.** Understand how much work is involved. The brokerage community takes a client on with no guarantee of being paid unless one buys a home. Agents put in a tremendous amount of time and their knowledge and that work is what educates a client and helps to get a deal over the finish line."*

Homebuyers working with NAR-affiliated MLS Participants MUST negotiate their own commissions that they are responsible for paying, until August 17, 2031. Let the homebuyers NOT accidentally end up with a $24,000 bill when hiring an NAR-affiliated MLS Participant. Let the United States government NOT accidentally fund loans with IPCs caps blown. Let the NAR-affiliated MLS Participants NOT accidentally face a $500 billion False Claims Act claim in 2031. Let this lawsuit be the last and final lawsuit posted against the NAR.

## CONCLUSION

First, this Court can verify the GSEs IPCs Guidance and NAR's Settlement FAQs and see that what I am saying here is True. Simply because home sellers advance a concession to homebuyers to help them cover buyer-paid commissions (since August 17, 2024, when working with NAR-affiliated MLS Participants) does not make these costs seller-paid commissions. Only commissions that are the sellers' *responsibility* are seller-paid closing costs. There is a cardinal difference between seller-paid and buyer-paid closing costs. Sharing seller-paid commissions between bona fide real estate brokers under the broker-to-broker RESPA exemption requires full compliance with all laws, at all times, including Section 1 of the Sherman Act, an obligation NAR had failed to uphold.



## Buyer Agent Commissions IPCs Limits Guidelines

### Geodoma Buyer Agent Commissions paid between brokers under RESPA Section 8(c)(3) exemption

| HOME SELLER | LISTING BROKER | BUYER BROKER | HOMEBUYER |

Seller pays FULL commission → Broker-to-broker fee → Buyer rebate in 40 US states

### National Association of REALTORS® (NAR) settlement in the Burnett et al. and Moehrl et al. cases

| HOME SELLER | LISTING BROKER | BUYER BROKER | HOMEBUYER |

Buyer requests a concession from seller, subject to IPCs limits ← Buyer pays own commission

Seller pays own commission → Seller advances a concession to buyer, subject to IPCs limits

*Buyer Agent Commissions amounts offered on Geodoma are customarily paid by the seller and are not required to be counted towards the IPC limits for the transaction as described in Selling Guide B3-4.1-02, Interested Party Contributions (IPCs)*

Second, admittedly, the information I offer comes from a competitor to NAR and NAR-affiliated MLSs (today, Geodoma is a single-person company - an MVP for a product - as opposed to a genuine listings service with fully-developed network effects). However, this does not make my information biased. If anything, I am fully informed.

I also have been (and continue to) warn the industry for years about other cardinal violations of laws, such as RESPA-banned kickbacks being shelled out for referrals into so-called "referral fee networks" (Source: https://www.housingwire.com/articles/opinion-broker-to-broker-referral-exemption-does-not-apply-to-agent-matching-platforms/ and https://www.regulations.gov/document/CFPB-2022-0037-0001 ). Today, Zillow Flex (Source: https://www.hbsslaw.com/cases/zillow-agent-class-action ) Rocket Homes (Source: https://www.hbsslaw.com/cases/rocket-homebuyer-class-action ) and Veteran United Realty (Source: https://www.hbsslaw.com/cases/veterans-united-home-loans-class-action ) are all facing massive RESPA class actions for this exact illegal conduct (in these RESPA lawsuits, all "referral fee networks" self-admit to partaking in kickbacks, where one only has to show that broker-to-broker safe harbor does not apply to the Zillow Flex 40% referral fees. One can, logically, prove that Zillow Flex 40% referral fees violate RESPA's referral fee ban without having to collect a jury as soon as they show that the "referral fee network" serves real estate brokers as customers and a supplier of leads. The broker-to-broker RESPA exemption does not apply to "agent-matching platforms" that serve brokers as customers.)

Third, NAR is consistently involved in massive litigation (such as Top Agent Network, Inc. v. NAR, et al., (N.D. Cal. 2021); The PLS.Com, LLC v. NAR, et al., (C.D. Cal. 2021); etc.) NAR is a cartel that cannot be trusted, and it continues to restrain trade by other means. For instance, according to the Ninth Circuit -

> "[NAR's] Clear Cooperation Policy prevented innovative competitors from entering the market and growing large enough to meaningfully compete with the MLSs, leaving both buyers' agents and sellers' agents with fewer choices, supra-competitive prices, and lower quality products." (Source: https://cdn.ca9.uscourts.gov/datastore/opinions/2022/04/26/21-55164.pdf )

## PROPOSED PRACTICE CHANGES

I, therefore, respectfully ask that this Court consider requiring the following Practice

Changed to be expressly added as part of the FINAL CLASS SETTLEMENT AGREEMENT to

read as following:

### Practice Changes

As soon as practicable, and in no event later than thirty (30) days after the Effective Date, Opt-In Settlor (defined for purposes of this Paragraph to include Opt-In Settlor's present and future, direct and indirect subsidiaries, related entities and affiliates, predecessors, and successors, and franchises) will implement or maintain Practice Changes that are no less restrictive than the following:

i)   advise and periodically remind company-owned brokerages, franchisees (if any), and their agents that there is no company requirement that they must make offers to or must accept offers of compensation from cooperating brokers or that, if made, such offers must be blanket, unconditional, or unilateral;

ii)  require that any company-owned brokerages and their agents (and recommend and encourage that any franchisees and their agents) disclose to prospective home sellers and buyers and state in conspicuous language that broker commissions are not set by law and are fully negotiable (a) in their listing agreement if it is not a government or MLS-specified form, (b) in their buyer representation agreement if there is one and it is not a government or MLS-specified form, and (c) in pre-closing disclosure documents if there are any and they are not government or MLS-specified forms. In the event that the listing agreement, buyer representation agreement, or pre-closing disclosure documents are a government or MLS-specified form, then Settling Defendant will require that any company owned brokerages and their agents (and recommend and encourage that any franchisees and their agents) include a disclosure with conspicuous language expressly stating that broker commissions are not set by law and are fully negotiable;

iii) prohibit all company-owned brokerages and their agents acting as buyer representatives (and recommend and encourage that franchisees and their agents acting as buyer representatives refrain) from advertising or otherwise representing that their services are free;

iv)  require that company-owned brokerages and their agents disclose at the earliest moment possible any offer of compensation made in connection with each home marketed to prospective buyers in any format;

v)   prohibit company-owned brokerages and their agents (and recommend and encourage that any franchisees and their agents refrain) from utilizing any technology or taking manual actions to filter out or restrict MLS listings that are searchable by and displayed to consumers based on the level of compensation offered to any cooperating broker unless directed to do so by the client (and eliminate any internal systems or technological processes that may currently facilitate such practices);

GEODOMA'S AMICUS CURIAE BRIEF IN
SUPPORT OF CONSUMERS                              21                        Case No.: 1:24-cv-00150

vi) advise and periodically remind company-owned brokerages and their agents of their obligation to (and recommend and encourage that any franchisees and their agents) show properties regardless of the existence or amount of cooperative compensation offered provided that each such property meets the buyer's articulated purchasing priorities;

vii) for each of the above points, for company-owned brokerages, franchisees, and their agents, develop training materials consistent with the above relief and eliminate any contrary training materials currently used.

viii) unless inconsistent with state or federal law or regulation before or during the operation of this Class Settlement Agreement, require that all REALTOR® NAR-affiliated MLS Participants working with a buyer enter into a written agreement before the buyer tours any home with the following:

(1) to the extent that such a REALTOR® NAR-affiliated MLS Participant will receive compensation from any source, the agreement must specify and conspicuously disclose the amount or rate of compensation it will receive or how this amount will be determined;

(2) the amount of compensation reflected must be objectively ascertainable and may not be open-ended (e.g., "buyer broker compensation shall be whatever amount the seller is offering to the buyer");

(3) such a REALTOR® NAR-affiliated MLS Participant may not receive compensation for brokerage services from any source that exceeds the amount or rate agreed to in the agreement with the buyer; and

(4) a written agreement must specify and explicitly state that: **"All compensation agreed upon in this Agreement is the buyer's responsibility. THE BUYER AGREES TO PAY ALL COMPENSATION to REALTOR® NAR-affiliated MLS Participant. If a seller's brokerage and/or the property owner is compensating a REALTOR® NAR-affiliated MLS Participant on a property acquired by the buyer, the compensation paid to such REALTOR® NAR-affiliated MLS Participant shall satisfy the buyer's obligation for buyer-paid compensation. In the event that the seller's brokerage and/or the property owner's compensation is less than the buyer-paid amount or rate of compensation owed to REALTOR® NAR-affiliated MLS Participant, the buyer shall pay any remaining difference at closing. All compensation paid by the seller's brokerage and/or the property owner to REALTOR® NAR-affiliated MLS Participant to satisfy the buyer's obligation for buyer-paid compensation are classified as Interested party contributions (IPCs) made by third parties with a vested interest in the transaction as funds directly used to cover costs that are the buyer's responsibility, as described under GSEs Interested Party Contributions (IPCs) Guides (e.g., Fannie Mae Selling Guide B3-4.1-02, Interested Party Contributions (IPCs) Maximum Financing Concessions.)"**

ix) rescind or modify any existing rules that are inconsistent with the practice changes reflected in this Class Settlement Agreement; and

x) the practice changes in this Class Settlement Agreement shall not prevent (a) offers of compensation to buyer brokers or other buyer representatives off of the multiple listing service; or (b) sellers from offering buyer concessions on a REALTOR® NAR-affiliated MLSs (e.g., for buyer closing costs), so long as such concessions are not limited to or conditioned on the retention of or payment to a cooperating broker, buyer broker, or other buyer representative. **All compensation paid to a REALTOR® NAR-affiliated MLS Participants by seller's brokerage and/or the property owner are made to satisfy the buyer's obligation for buyer-paid compensation and must be firmly classified as Interested Party Contributions (IPCs) made by third parties with a vested interest in the transaction as funds directly used to cover costs that are the buyer's responsibility.**

Thank you for your time,

I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 21, 2026

*/s/ Dmitry Shkipin*

Dmitry Shkipin, pro se