**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES TUCCORI, COURTNEY FOREGGER, KEVIN CWYNAR, DAWID ZAWISLAK, MICHAEL D'ACQUISTO, and ALEJANDRO LOPEZ a/k/a ALEANDRO LOPEZ, individually and on behalf of similarly situated individuals, | ) ) ) ) ) ) ) | No. 1:24-cv-00150<br><br>Hon. Lindsay C. Jenkins<br><br>Consolidated with: |
| *Plaintiffs,* | ) ) | No. 24-cv-02399 |
| | ) | No. 24-cv-03160 |
| v. | ) | No. 24-cv-3356 |
| | ) | No. 24-cv-9039 |
| AT WORLD PROPERTIES, LLC, | ) | No. 24-cv-11735 |
| BAIRD & WARNER, INC., REAL | ) | No. 25-cv-04207 |
| ESTATE ONE, INC., SILVERCREEK | ) | |
| REALTY GROUP LLC, EQUITY | ) | |
| REALTORS, L.L.C. d/b/a EQUITY | ) | |
| REAL ESTATE, HOMESMART | ) | |
| INTERNATIONAL, LLC, FATHOM | ) | |
| REALTY, LLC, NEXTHOME, INC., | ) | |
| REALTY EXECUTIVES INTL. SVCS. | ) | |
| LLC, SHOREWEST REALTORS, INC., | ) | |
| ENGEL & VOLKERS GMBH, ENGEL & | ) | |
| VOLKERS AMERICAS, INC., SIDE, | ) | |
| INC., THE KEYES COMPANY, | ) | **JURY TRIAL DEMANDED** |
| ILLUSTRATED PROPERTIES, LLC, | ) | |
| ANYWHERE REAL ESTATE INC., THE | ) | |
| REAL BROKERAGE INC., REAL | ) | |
| BROKER, LLC, and VANGUARD | ) | |
| PROPERTIES, INC., REALTY ONE | ) | |
| GROUP INC., KEMPA AND | ) | |
| ASSOCIATES LLC d/b/a REALTY ONE | ) | |
| GROUP EXCEL, UMRO REALTY | ) | |
| CORP d/b/a THE AGENCY, DOUGLAS | ) | |
| ELLIMAN INC., HANNA HOLDINGS, | ) | |
| INC., HOMESERVICES OF AMERICA, | ) | |
| INC., BHH AFFILIATES, LLC, HSF | ) | |
| AFFILIATES LLC, THE NATIONAL | ) | |
| ASSOCIATION OF REALTORS®, EXP | ) | |
| WORLD HOLDINGS, INC., COMPASS, | ) | |
| INC., and UNITED REAL ESTATE | ) | |
| HOLDINGS, LLC d/b/a UNITED REAL | ) | |

1

ESTATE GROUP, )
 )
 *Defendants.* )
 )

**~~FIRST~~SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

Plaintiffs, James Tuccori, Courtney Foregger, Kevin Cwynar, Dawid Zawislak, Michael D'Acquisto, and Alejandro Lopez a/k/a Aleandro Lopez, individually and on behalf of similarly situated individuals, bring this ~~First~~Second Amended Consolidated Class Action Complaint against Defendants: At World Properties, LLC ("@properties~~"),~~"); Baird & Warner, Inc. ("Baird~~"),~~"); Real Estate One, Inc. ("REO~~"),~~"); Silvercreek Realty Group LLC ("Silvercreek~~"),~~"); Equity Realtors, L.L.C. d/b/a Equity Real Estate ("ERE~~"),~~"); HomeSmart International, LLC ("HomeSmart~~"),~~"); Fathom Realty, LLC ("Fathom~~"),~~"); NextHome, Inc. ("NextHome~~"),~~"); Realty Executives Intl. Svcs. LLC ("REI~~"),~~"); Shorewest Realtors, Inc. ("Shorewest~~"),~~"); Engel & Volkers GmbH and Engel & Volkers Americas, Inc. (together, the "E&V Entities~~"),~~"); Side, Inc. ("Side~~"),~~"); The Keyes Company ("Keyes~~"), and~~"); Illustrated Properties, LLC ("Illustrated~~"),~~"); Anywhere Real Estate Inc. ("Anywhere~~"),~~"); The Real Brokerage Inc. and Real Broker, LLC (together, "Real~~"), and~~"); Vanguard Properties, Inc. ("Vanguard"); Realty ONE Group Inc. and Kempa and Associates LLC d/b/a Realty ONE Group Excel (together, "Realty ONE"); Umro Realty Corp d/b/a The Agency ("The Agency"); Douglas Elliman Inc. ("Douglas Elliman"); Hanna Holdings, Inc. ("Howard Hanna"); HomeServices of America, Inc., BHH Affiliates, LLC, and HSF Affiliates LLC (together, "HomeServices"); eXp World Holdings, Inc. ("eXp"); Compass, Inc. ("Compass"); United Real Estate Holdings, LLC d/b/a United Real Estate Group ("United") (collectively, ~~"~~the "Real Estate Company Defendants~~"), and~~"); and The National Association of REALTORS® ("NAR"). Plaintiffs allege as follows based on personal knowledge as to their own

acts and experiences, and as to all other matters, on information and belief, including an investigation by their attorneys.

## NATURE OF THE ACTION

1. This lawsuit is brought against Defendants – ~~each of~~ which ~~is among~~include some of the largest residential real estate brokerages in the country by sales volume – for engaging in and facilitating a conspiracy that perpetuated anticompetitive measures in the market for real estate broker services within Illinois and nationwide. Defendants and their co-conspirators adopted and implemented anticompetitive practices that harmed consumers and homebuyers by, among other things, artificially increasing and sustaining the commissions paid to real estate brokers as part of residential real estate transactions. Because brokers' commissions are incorporated into the price of a home, Defendants' anticompetitive practices burdened homebuyers nationwide with increased home prices and unnecessarily high costs in residential real estate transactions.

2. The Real Estate Company Defendants, and their co-conspirators, are members of the ~~National Association of Realtors ("NAR"),~~ a national trade association that offers advantages to its members, including access to the primary Multiple Listing Services ("MLSs") with detailed information on properties available for sale. NAR and its members establish and enforces rules, policies, and practices that are adopted and followed by NAR's 1,400+ local associations and their affiliated MLSs ("NAR MLSs"). According to NAR's website, more than 1.5 million real estate professionals across thousands of different brokerages and real estate firms are members of NAR.[1]

3. As part of their membership in NAR, brokerages agree to follow, implement, and enforce NAR's rules, practices, and guidelines for real estate transactions. As explained in greater detail below, these rules have enabled the Real Estate Company Defendants and other NAR

---

[1] https://www.nar.realtor/

members to maintain buyer-agent commissions at supracompetitive levels unrelated to brokers' experience or the services provided, steer homebuyers away from lower commission listings, and drive out competition, among other harms to buyers.

4.      By way of background, the typical residential real estate transaction includes a real estate professional on the buy-side ("buyer-agent") and a sell-side broker ("seller-agent" or "seller-broker") that work for brokerage firms like the Real Estate Company Defendants and are paid commissions based on a percentage of the home's sale price. The seller-broker lists the seller's property on an MLS, while the buyer-agent searches the MLS to find properties to propose to their buyer. The vast majority of residential real estate transactions are facilitated through listings made available on an MLS.

5.      An MLS is essentially a searchable database that serves as a marketplace for properties that are listed for sale. Both the supply side and the demand side of the housing market depend on MLSs. To effectively market and sell a property, a seller-broker has little choice but to list that property on an MLS because that is where buyer-agents search for properties. Similarly, to understand the marketplace and determine which homes are listed for sale, a buyer-agent has little choice but to search an MLS for properties. In this way, MLSs are the digital gateway to homebuying and selling and comparatively few sales occur outside of MLSs. According to the Department of Justice ("DOJ"), MLSs are a joint venture among competing brokers to facilitate the publishing and sharing of information about homes for sale in a geographic area.[2]

---

[2] See DOJ Backgrounder Q&A: National Association of REALTORS®, available at: https://www.justice.gov/opa/press-release/file/1338606/download#:~:text=NAR's%20Commission%2DConcealment%20Rules%20recommend,commission%20offered%20to%20buyer%20brokers.

6. There are numerous NAR MLSs in the United States, and each serves certain geographic areas. According to the DOJ, membership of an MLS is generally comprised of nearly all residential real estate brokers and their affiliated agents in an MLS's service area. In each area an MLS serves, the MLS will include or "list" the vast majority of homes that are for sale through a residential real estate broker in that area. In most areas, the local MLS provides the most up-to-date, accurate, and comprehensive compilation of the area's home listings.

7. For example, Midwest Real Estate Data ("MRED") is an MLS that covers the Chicago Metro Area and is NAR-associated, requiring NAR membership for access.[3] A substantial number of MLSs, including most large regional MLSs, require NAR membership for access to listings. Even many independent MLSs also require brokers to be members of NAR to access their database and enforce NAR rules.

8. To be a member of NAR, real estate ~~brokerage firms such as~~brokerages, including the Real Estate Company Defendants, must adhere to NAR's regulations and guidelines, including those which apply to broker commissions. As explained in greater detail below, the Real Estate Company Defendants knowingly adopted, followed, and enforced the NAR's regulations and guidelines relating to broker commissions, and required their franchisees, affiliates, subsidiaries, and individual agents to do the same. Thus, each of the Real Estate Company Defendants have agreed to participate in, facilitate, and implement the conspiracy by requiring their franchisees, brokers, and individual agents to join in and implement NAR's anticompetitive practices as a

---

[3] Upon information and belief, MRED is owned and operated by NAR brokers and 13 REALTOR® associations, and its parent, Multiple Listing Service of Northern Illinois, is itself composed of multiple REALTOR® associations. MRED is recognized as "the MLS of choice" for Chicagoland and is "[o]ne of the most important member services the Chicago Association of REALTORS® has to offer[.]" https://chicagorealtor.com/realtor-tools/mls/.

condition to receiving the benefits of each Real Estate Company Defendant's brand, brokerage infrastructure, and other support.

9.      The Real Estate Company Defendants are not only among the leading real estate businesses in the United States, they are also heavily intertwined with NAR, which is headquartered in Chicago. The Real Estate Company Defendants require their franchisees, affiliates, subsidiaries, and individual agents to join NAR as well as state and local Realtor associations.

10.      NAR frequently names brokers from large residential real estate brokerages and firms such as the Real Estate Company Defendants to serve in leadership positions concurrently with their position as real estate brokers. These individuals guide the NAR's strategic direction and policymaking in such areas as legislation, professional standards, and business services— influencing the NAR rules that apply to their industry. Real Estate Company Defendants and other NAR members use this power to benefit themselves at the expense of consumers.

11.      The NAR has promulgated anti-competitive regulations related to broker commissions that include mandatory (i.e. non-negotiable) up-front allocation of a specific portion of the home sale price toward buyer-agent commissions (the "Mandatory Commission Rule").[4] As explained in greater detail below, this rule eliminated competition between buyer-agents with respect to their commission rate and the quality of their services. This lack of competition led to homebuyers paying inflated commission rates and receiving lower quality services. In effect, the

---

[4] 2023 Handbook on Multiple Listing Policy, National Association of REALTORS®, at p. 41 MLS Policy Statement 7.31 available at:
https://cdn.nar.realtor/sites/default/files/documents/pdf_mls_handbook-2023-08-11.pdf?_gl=1*6co9sx*_gcl_au*ODk0MjQ3MzYxLjE3MDE2NjYyNjQ.

Mandatory Commission Rule overcompensates buyer-agents at the homebuyers' expense and increases the overall cost of homes purchased by homebuyers.

12. Moreover, during the relevant time period, the NAR and ~~their~~its co-conspirators such as the Real Estate Company Defendants exacerbated the anti-competitive effect of the Mandatory Commission Rule through other rules which prohibited buyer-agents from making purchase offers contingent upon a reduction of the buyer-agent's commission ("Non-Modification Rules")[5] and prohibiting the disclosure to buyers of the commission to be paid to buyer-agents ("Commission Concealment Rule").[6]

13. The result is that the amounts of buyer-agents' commissions became artificially elevated, and this fact was opaque and ill-understood by the homebuyers whose home purchases funded those commissions.

14. These anti-competitive rules have permitted Defendants and their co-conspirators to sustain buyer-agent fees at artificially high levels which would not exist in a competitive marketplace.

15. Defendants and their co-conspirators further protected and promoted their conspiracy by exerting control over and manipulating the MLSs, which act as the gateway to homebuying and selling. As set forth above, NAR offers its members access to NAR MLSs that are widely used to facilitate homebuying and selling.

16. During the time period relevant to this matter, NAR MLSs also permitted buyer-agents to filter searches for properties by commission amount, and NAR ethics rules allowed

---

[5] Code of Ethics and Arbitration Manual 2023, National Association of REALTORS®, at Standard of Practice 16-16 available at: https://cdn.nar.realtor/sites/default/files/documents/2023-coe-standards-of-practice-2022-12-28.pdf (hereinafter "NAR Code of Ethics 2023")

[6] NAR MLS Handbook 2023 at p. 40, Policy Statement 7.23

buyer-agents to show these filtered properties with higher commissions to buyers ("MLS Manipulation Practices").[7] Naturally, this conflict of interest led to buyer-agents promoting properties that would maximize their commission, which lowered demand for properties that offered lower commissions and thus eliminated competition from discount brokers. This harmed homebuyers, who received diminished, biased services from buyer-agents who steered homebuyers toward purchasing homes that offered high commissions.

17.     Defendants and their co-conspirators also protected and promoted their conspiracy by exerting control over and manipulating the homebuying experience. During the relevant time period, the NAR ethics code permitted and encouraged buyer-agents to advertise their services as "free," despite the fact that buyer-agents are in fact paid a commission from the sale price of the home that the buyer pays.[8] Current NAR regulations also limit physical access to houses for sale to only NAR members, further reducing competition from unaffiliated brokers.[9]

18.     This anti-competitive behavior has led to buyers paying higher amounts for misrepresented "free" broker services, overpaying for properties (whose purchase price necessarily includes the inflated commissions that cannot be reduced), and receiving overpriced and biased broker services. This collusion, which extended from the very gateway to homebuying (the MLSs) and throughout the homebuying process, also prevented potential competitors who would compete as to the price of broker services.

---

[7] 2018 Handbook on Multiple Listing Policy, National Association of REALTORS®, at p. 23 Policy Statement 7.58; P. 81 Section 18.2.4 available at:
https://www.nar.realtor/sites/default/files/documents/2018-HMLP-v1.pdf (hereinafter "NAR MLS Handbook 2018")

[8] Code of Ethics and Arbitration Manual 2018, National Association of REALTORS®, at p. 10 Standard of Practice 12-2, available at: https://www.nar.realtor/sites/default/files/documents/2018-CEAM-v1.pdf (hereinafter "NAR Code of Ethics 2018")

[9] NAR MLS Handbook 2023, at p. 41 MLS Policy Statement 7.31.

19. These rules and practices, adopted and enforced by Defendants and their co-conspirators, constitute agreements among real estate brokers who would have otherwise been competing. Defendants' implementation of these agreements is clearly anti-competitive and an unreasonable restraint on trade that benefits only Defendants and their co-conspirators.

20. Since late 2020, when the DOJ sued NAR for antitrust violations, NAR and its members have begun walking back from certain anti-competitive rules discussed herein. However, some anticompetitive practices continue. And the harms caused to American homebuyers for decades have not been remedied, nor have the billions in ill-gotten commissions been disgorged. During the relevant period and prior to the NAR's rules and policies receiving challenges, however, the rules, regulations, and practices that furthered the conspiracy remained materially consistent.

21. The Real Estate Company Defendants wield significant market power, as each is among the largest and most influential real estate brokerages in the United States. The Real Estate Company Defendants' market power and prominent positions in the U.S. real estate broker market mean that their involvement was crucial to the success of the conspiracy with NAR and other brokers. To this end, the Real Estate Company Defendants consented to engage in, facilitate, and execute the conspiracy, playing a significant role within NAR and mandating that their affiliates comply with NAR's anti-competitive rules and policies as a prerequisite for accessing the benefits of the Real Estate Company Defendants' brands and infrastructure, including access to MLSs. Real Estate Company Defendants, together with their co-conspirators, dominate the market for real estate brokerage services.

22. Defendants' and their co-conspirators' advancement of the conspiracy has markedly diminished competitive practices in the buyer-agent service sector, negatively impacting

homebuyers. This conspiracy empowered Defendants and their co-conspirators to elevate and stabilize buyer-agent fees at levels that were unnaturally high compared to those supported by a competitive market, thus harming homebuyers. Among other anti-competitive effects, the conspiracy allowed brokers to favor properties that offered higher commissions by overlooking or concealing lower commission options that might have better suited their buyer clients' requirements.

23.     This conspiracy has led to inflated buyer-agent commissions and higher average cost of homes. Further, homebuyers received lower quality services because buyer-agents were incentivized to avoid lower commission properties and were paid supracompetitive commissions regardless of their experience or the level of services they actually provided.

24.     Plaintiffs and the other Class and Subclass members (as defined below) have suffered significant monetary damages, each incurring hundreds if not thousands of dollars in excess commissions, due to Defendants' participation and involvement in the conspiracy.

25.     Defendants' and their co-conspirators' participation in the conspiracy has unreasonably restrained trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), state antitrust laws including the Illinois Antitrust Act, 740 ILCS 10/1 *et seq.*, state consumer protection laws including the Illinois Consumer Fraud and Deceptive Business Practices Act, and the common law. Accordingly, Plaintiffs, individually and on behalf of the Class and Subclass members, bring this suit against the Defendants and their co-conspirators for these violations, seeking treble damages, injunctive relief, and reasonable attorneys' fees.

**PARTIES**

A.      **Plaintiffs**

26.      Plaintiff James Tuccori is a resident and citizen of Illinois. In 2018, Plaintiff purchased a home in Chicago, Illinois through a transaction involving a buyer-agent and seller-agent who were both NAR Realtors. As part of the transaction, Plaintiff Tuccori paid elevated commissions incorporated into the purchase price of the home. The home Plaintiff Tuccori purchased was listed on a local MLS service that, on information and belief, was run by associations with boards of directors comprised entirely of NAR members who must adhere to NAR's guidelines and policies.

27.      Plaintiff Courtney Foregger is a resident and citizen of Idaho. In or about August 2021, Plaintiff Foregger purchased a home in Boise, Idaho Illinois through a transaction involving a buyer-agent and seller-agent who were both NAR Realtors. The home Plaintiff Foregger purchased was listed on the Intermountain Multiple Listing Service ("IMLS"), which on information and belief requires NAR membership for access and is operated in part by local NAR Associations who must adhere to NAR's guidelines and policies.

28.      Plaintiff Kevin Cwynar is a resident and citizen of Illinois. On or about July 2020, Plaintiff Cwynar purchased a home in Algonquin, Illinois through a transaction involving a buyer-agent and seller-agent who were both NAR Realtors employed by brokerages that are members of NAR. The home Plaintiff Cwynar purchased was listed on the MRED MLS, which on information and belief is run by associations with boards of directors comprised of NAR members who must adhere to NAR's guidelines and policies.

29.      Plaintiff Dawid Zawislak is a resident and citizen of Illinois. In or about September 2021, Plaintiff Zawislak purchased a home in Chicago, Illinois through a transaction involving a

11

buyer-agent and seller-agent who were both NAR Realtors. As part of the transaction, Plaintiff Zawislak paid elevated commissions incorporated into the purchase price of the home. The home Plaintiff Zawislak purchased was listed on the MRED MLS, which on information and belief is run by associations with boards of directors comprised of NAR members who must adhere to NAR's guidelines and policies.

30. Plaintiff Michael D'Acquisto is a resident of Illinois. In or about April 2022, Plaintiff D'Acquisto purchased a home in Bartlett, Illinois through a transaction involving a buyer-agent and seller-agent who were both NAR Realtors. As part of the transaction, Plaintiff D'Acquisto paid elevated commissions incorporated into the purchase price of the home. The home Plaintiff D'Acquisto purchased was listed on the MRED MLS, which on information and belief is run by associations with boards of directors comprised of NAR members who must adhere to NAR's guidelines and policies.

31. Plaintiff Alejandro Lopez a/k/a Aleandro Lopez is a resident and citizen of Illinois. In or about December 2021, Plaintiff Lopez purchased a home in Bolingbrook, Illinois through a transaction involving a buyer-agent and seller-agent who were both NAR Realtors that worked for brokerages that are members of the NAR. As part of the transaction, Plaintiff Lopez paid elevated commissions incorporated into the purchase price of the home. The home Plaintiff Lopez purchased was listed on the MRED MLS, which on information and belief is run by associations with boards of directors comprised of NAR members who must adhere to NAR's guidelines and policies.

**B.      Defendants**

32.      Defendant At World Properties, LLC, is an Illinois limited liability company organized under the laws of Illinois with its principal place of business in Cook County, Illinois. @properties also has several offices in Cook County and transacts business in Cook County.

33.      Defendant, Baird & Warner, Inc., is an Illinois corporation organized under the laws of Illinois, with its principal place of business in Cook County, Illinois. Baird also has several offices in Cook County and transacts business in Cook County as well as throughout the state of Illinois. Baird is one of the largest brokerages in Illinois by sales volume, and its CEO and president, Steve Baird, is considered one of "the most powerful players in the residential real estate industry."[10]

34.      Defendant Real Estate One, Inc. is incorporated in Michigan with its principal place of business in Southfield, Michigan. REO is a member of the NAR and in 2022 it represented sellers or buyers in more than 18,000 transactions totaling at least $6.1 billion in sales volume.

35.      Defendant Silvercreek Realty Group LLC is an Idaho limited liability company organized under the laws of Idaho with its principal place of business in Meridian, Idaho. Silvercreek holds a significant position in the nationwide market for residential real estate broker services, and each year its agents represent parties in thousands of transactions amounting to billions of dollars in transaction volume. Silvercreek has grown to become the largest residential real estate brokerage in Idaho, and has maintained that rank since 2014. Silvercreek has also ascended to the 18th largest independent brokerage in the nation. Silvercreek boasted in 2023 that it accounted for 16% of the total market share in the IMLS, representing more than 2,789

---

[10] *Power players in Chicago real estate named to SP 200*, Chicago Agent Magazine (Jan. 16, 2024), available at https://chicagoagentmagazine.com/2024/01/16/chicago-real-estate-swanepoel-power-200/.

13

transactions and $1.5 billion in total volume within the IMLS. The next closest brokerage in Idaho represented only 1384 transactions and just over $800 million in volume.[11] Additionally, Silvercreek achieved a total sales volume of 3.7 billion from within the state of Idaho alone in 2023, 6.1 billion in 2021, and 4.65 billion in 2020.

36. Defendant Equity Realtors L.L.C. d/b/a Equity Real Estate is a Utah limited liability company headquartered in Sandy, Utah. ERE transacts business in Illinois out of offices located in Illinois, it lists properties for sale in Illinois on its website available to those accessing it in Illinois, and it conducts business in Illinois through its real estate agents and affiliates. ERE has approximately 3,539 active licensed agents across 61 total residential sales offices, and it is the 15th largest independent brokerage and in the top 40 largest brokerages in the country by sales volume, with over $6 billion in sales volume in 2022.

37. Defendant HomeSmart International, LLC is an Arizona limited liability company. On information and belief, its principal place of business is in Scottsdale, Arizona. HomeSmart conducts business in Illinois through numerous HomeSmart-branded offices located in Illinois, by listing properties for sale in Illinois on its website available to those accessing it in Illinois, and through its real estate agents, franchisees, and affiliates located in Illinois. HomeSmart is among the largest brokerages, with over 26,000 agents across 200 offices and 49 states. For years it has been ranked among the top ten brokerages in the nation in terms of both transaction volume and sales volume.[12]

---

[11] https://idahominute.com/blog/2022/01/10/2021-reflection/.

[12] https://homesmart.com/press-room/homesmart-ranks-in-top-10-on-realtrends-500-list-seven-consecutive-years/

38.     Defendant Fathom Realty, LLC is a Texas limited liability company. On information and belief, its principal place of business is in Cary, North Carolina. Fathom conducts business in Illinois out of offices located in Illinois, by listing properties for sale in Illinois on its website available to those accessing it in Illinois, and through its real estate agents and affiliates located in Illinois. Fathom has approximately 11,795 agents across 145 residential sales offices.

39.     Defendant NextHome, Inc. is a national real estate franchise incorporated in Delaware and headquartered in Pleasanton, California. NextHome transacts business in Illinois out of offices located in Illinois, it lists properties for sale in Illinois on its website available to those accessing it in Illinois, and it is doing business in Illinois through its real estate agents and affiliates. NextHome has approximately 6000 active licensed agents across 600 total residential sales offices and was listed by NAR in 2023 as the fastest-growing real estate franchises measured by net office growth. In 2023, NextHome closed over 29,000 transactions worth over $10 billion in volume.

40.     Defendant Realty Executives Intl. Svcs., LLC is an Arizona limited liability company headquartered in Phoenix, Arizona. REI transacts business in Illinois out of offices located in Illinois, it lists properties for sale in Illinois on its website available to those accessing it in Illinois, and it is doing business in Illinois through its real estate agents, franchisees, and affiliates. REI has approximately 8000 active licensed agents across the globe and boasts six affiliate brokerages in the top 500 of real estate brokerages measured by total sides in 2023.

41.     Defendant Shorewest Realtors, Inc. is a Wisconsin corporation headquartered in Brookfield, Wisconsin. Shorewest transacts business in Illinois, it is licensed to sell real estate in Illinois, it lists properties for sale in Illinois on its website available to those accessing it in Illinois, and it is doing business in Illinois through its real estate agents and affiliates. Shorewest is the

largest home seller in Wisconsin and has approximately 800 active licensed agents across 26 offices. Shorewest had over $3.2 billion in sales volume in 2021.

42. Defendant Engel & Volkers GmbH is an international real estate company headquartered in Hamburg, Germany. Its U.S. affiliate, Engel & Volkers Americas, Inc., is a real estate company and real estate brokerage franchisor incorporated in Delaware with its principal place of business in New York. The E&V Entities conduct business in Illinois directly and through franchisees which are licensed to conduct business within Illinois and do so under the E&V Entities' supervision and control.[13]

43. Defendant Side, Inc. is a real estate brokerage platform headquartered in California and incorporated in Delaware. Side partners with agents and brokers to launch and support real estate companies and has helped establish over 500 such brokerages. In 2024, Side reported $28.87 billion in sales volume, ranking as the 9th largest brokerage in the United States. Side is registered to do business in Illinois and maintains a presence in the state, including by attending real estate industry conferences in Chicago and conducting business with Illinois residents.[14]

44. Defendant The Keyes Company is incorporated in Florida and headquartered in Miami, Florida. Keyes is one of the largest independent brokerages with over 3,000 realtors and over 50 offices. Keyes had over $6,800,000,000 in total sales volume in 2024 and was the 26th largest brokerage in terms of sales volume nationally.

---

[13] *Franchise Disclosure Document*, Engel & Völkers Americas, Inc. (2020), at I-11, 11, https://www.franchimp.com/?f=103146_2020.pdf&page=pdf&utm (identifying Jennifer Ames Chicago, Inc., located at 2401 N Clark Street, Chicago, Illinois 60614, as an Illinois-based Engel & Völkers franchisee, and stating that Donald Brown II, Vice President of Engel & Völkers Americas, Inc., resides and works in Bethalto, Illinois).

[14] Side, Events – Chicago, https://web.archive.org/web/20250409033838/https%3A%2F%2Fwww.side.com%2Fevents%3Fs%3Dchi c ago%2B (archived Apr. 9, 2025) (noting Side's attendance at the AREAA National Conference in Chicago on October 12, 2023).

45.    Defendant Illustrated Properties, LLC is incorporated in Florida and headquartered in Miami, Florida. A luxury brand within The Keyes Company, Illustrated Properties is a leader among brokerages in South Florida.[15]

46.    Defendant Anywhere Real Estate Inc. is a Delaware corporation headquartered in Madison, New Jersey. Anywhere owns and franchises many well-known real estate brands including Better Homes and Gardens Real Estate, Century 21 Real Estate, Coldwell Banker, Corcoran Group, ERA Real Estate and Sotheby's International Realty.

47.    Defendant The Real Brokerage Inc. is incorporated in Delaware and headquartered in Miami, Florida and Toronto, Canada. It is among the fastest-growing publicly traded real estate brokerage firms, serves over 48 states and the District of Columbia, and has over 11,000 agents as of February 2023. The Real Brokerage Inc. conducts business in Illinois itself and also through its subsidiaries, such as Real Broker, LLC, which is licensed to conduct business within the state of Illinois and has done business within this District during the relevant time period. Defendant The Real Brokerage Inc. had over $42.44 billion in total sales volume in 2024 and was the 5th largest brokerage in terms of sales volume nationally.

48.    Defendant Real Broker, LLC is Texas limited liability company and a wholly-owned subsidiary of The Real Brokerage Inc.

---

[15] *The Keyes Company and Illustrated Properties Join Forbes Global Properties, Establishing Foothold in Florida's Luxury Markets*, FORBES GLOBAL PROPERTIES (Jan. 9, 2024), https://www.forbesglobalproperties.com/trends/the-keyes-company-and-illustrated-propertiesjoin-forbesglobal-properties-establishing-foothold-in-floridas-luxury-markets.

49. Defendant Vanguard Properties, Inc. is a California corporation headquartered in California. Vanguard had over $2.57 billion in sales volume in 2024 and conducts business in the state of Illinois.[16]

50. Defendant Realty ONE Group Inc. is a real estate brokerage and franchising company incorporated in Nevada and headquartered in California. Defendant Realty ONE Group Inc. is one of the world's largest real estate franchises, serving 49 states, Washington D.C., and sixteen countries and territories with over 19,000 professionals; it was ranked on Entrepreneur's list of companies in 2023 with the fastest-growing franchises; and it had over $8.5 billion in transaction volume in 2024 and was the 20th largest brokerage in terms of volume nationally. Realty ONE Group Inc. transacts business in Illinois, such as through its franchisees like Defendant Kempa and Associates LLC.

51. Defendant Kempa and Associates LLC d/b/a Realty ONE Group Excel is an Illinois limited liability company headquartered in Illinois. It is a franchisee that operates subject to the supervision and control of Defendant Realty ONE Group Inc.

52. Defendant Umro Realty Corp. d/b/a The Agency is a real estate brokerage platform incorporated in California and headquartered in California. It has 2,387 active licensed agents across 84 total residential sales offices and had over $13.94 billion total sales volume in 2024, making it the 13th largest brokerage firm nationwide. The Agency, itself as well as through its subsidiaries, transacts business in Illinois. Additionally, Umro Realty Corp. was registered to do business in Illinois during the relevant time period.

---

[16] https://web.archive.org/web/20250530125626/https://vanguardproperties.com/home-search/listings/5136504617987010063-26822-N-Ada-St Also See https://web.archive.org/web/20250619070919/https://vanguardproperties.com/home-search/listings/5136659640314565906-26805-N-Bernice-St

53. Defendant Douglas Elliman Inc. is incorporated in Delaware and headquartered in Florida. Douglas Elliman provides residential real estate brokerage services through its subsidiaries and affiliates, which have 5,759 active licensed agents across 115 total residential sales offices according to recent data. Douglas Elliman most recently reported closing 21,338 total transaction sides and transaction volume of $39.76 billion.

54. Defendant Hanna Holdings, Inc. is a real estate brokerage company incorporated in Delaware with its principal place of business in Pennsylvania. Hanna Holdings, Inc. is the holding company for the Hanna Family of Companies, which comprise one of the largest privately owned real estate brokerage companies in the United States with 12,093 active licensed agents across 402 total residential sales offices according to recent data. Hanna Holdings most recently reported closing 106,868 total transaction sides and $40.26 billion total sales volume.

55. Defendant HomeServices of America, Inc. ("HomeServices") is a Delaware Corporation with its principal place of business in Minnesota. HomeServices of America, Inc. is one of the largest residential real estate brokerage firms in the United States, with at least 34,934 active licensed agents across 819 total residential sales offices and at least $135.91 billion in total sales volume. HomeServices of America, Inc. is the parent company of Defendants BHH Affiliates, LLC and HSF Affiliates, LLC, which operate real estate brokerage franchise networks.

56. Defendant eXp World Holdings, Inc. is incorporated in Delaware and headquartered in Washington. It conducts residential real estate brokerage services through its subsidiary, eXp Realty, which has 63,410 active licensed agents and $155.56 billion in total sales volume according to recently reported data.

57. Defendant Compass, Inc. is a real estate company incorporated in Delaware and headquartered in New York. Compass is one of the largest independent real estate brokerages in

19

the country, with at least 36,990 active licensed agents and $262.23 billion in total sales volume according to recently reported data.

58.    Defendant United Real Estate Holdings, LLC d/b/a United Real Estate Group is a Delaware limited liability company headquartered in Texas. United operates nationwide through subsidiaries and company-owned and franchised real estate brokerages. United, through its subsidiaries and franchises, has over 16,198 active licensed agents across 170 total residential sales offices and $20.65 billion in total sales volume according to recently reported data.

59.    Defendant The National Association of REALTORS® ("NAR") is a trade association headquartered in Chicago. The NAR serves the interests of real estate brokers and is one of the largest lobbying groups in the country. The NAR has over 1.4 members, which include residential and commercial brokers, salespeople, property managers, appraisers, counselors, and others engaged in the real estate industry. NAR has approximately 1,200 local associations/boards and 54 state and territory associations of REALTORS®.

50.60.  During the time period relevant to this matter, each of the Real Estate Company Defendants implemented and enforced the NAR's anticompetitive rules governing the conduct of brokers engaged in real estate transactions. The Real Estate Company Defendants' conduct described herein has, among other harms, furthered the pervasiveness of anti-competitive NAR rules and practices and inflated broker commissions in the United States and in Illinois in particular. The Real Estate Company Defendants, directly and, where applicable, through their franchisees, brokers, and other co-conspirators, are engaged in interstate commerce and activities affecting interstate commerce.

## C.     Defendants' Co-Conspirators

51.61.  Although not named as party defendants in this action, numerous other entities, such as the NAR, NAR MLSs, and NAR-affiliated brokerages and realtor associations, participated as co-conspirators in the violations alleged herein and performed acts in furtherance thereof.

52.62.  Specifically, each of the local realtor associations that own and operate NAR MLSs agreed to, complied with, and implemented the Mandatory Commission Rule, which requires a seller-broker to specify the blanket, unilateral commission to be paid to the buyer-agent upon sale in terms of a definite dollar amount or percentage of the sale price. NAR MLSs, among others, have participated as co-conspirators in the violations alleged herein and performed acts in furtherance thereof, including by adopting the Mandatory Commission Rule in their individual rules and regulations.

53.63.  Other NAR member residential real estate brokerages also participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. Specifically, each complied with and implemented the Mandatory Commission Rule in the geographic areas where they operate. Franchisees and brokers of the Real Estate Company Defendants also participated as co-conspirators in the same way.

54.64.  Defendants are jointly and severally liable for the acts of their co-conspirators, whether named or not named as party defendants in this action.

### JURISDICTION AND VENUE

55.65.  The Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise in part under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

21

56.66. This Court also has subject matter jurisdiction over this case and the claims at issue pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because this case is a class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; there are greater than 100 putative class members; on information and belief, at least one putative class member is a citizen of a state other than any of Defendants' states of citizenship; and none of the exceptions under subsection 1332(d) apply to this action.

57.67. This Court has personal jurisdiction over the Defendants because each of the Defendants transacts business in this state and this District and receives revenue generated from purchases of homes in this District; each of the Defendants has, through their affiliates, franchisees, officers, agents, and/or employees, transacted with members of the Class and Subclass in this District; and each of the Defendants has, through their affiliates, franchisees, officers, agents, and/or employees, committed substantial acts in furtherance of the unlawful conspiracy among Defendants and their co-conspirators in this District.

58.68. Moreover, the NAR, which is the conduit by which the conspiracy was adopted and enforced, is headquartered in this District.

59.69. Defendants and their co-conspirators participated in, followed, implemented, facilitated, and enforced the conspiracy emanating from this District in at least four ways: (1) the Real Estate Company Defendants' and their co-conspirators' brokers and leadership attend NAR meetings, provide input on NAR's operations, and review, lobby for, and vote on NAR rules; (2) the Real Estate Company Defendants and their co-conspirators assist in NAR's enforcement of the rules; (3) the Real Estate Company Defendants and their co-conspirators required their brokers and agents to comply with NAR rules, including the Mandatory Commission Rule; and (4) the Real Estate Company Defendants and their co-conspirators, through their participation in NAR

22

MLSs and their officers' and employees' membership in NAR, agreed to adhere to anticompetitive restraints, including those reflected in MLS rules and NAR's Code of Ethics. Indeed, the Real Estate Company Defendants and their co-conspirators specifically implemented, complied with, and enforced the Mandatory Commission Rule to maximize the revenues earned by them, their brokerages, and their agents.

60.70.  The Real Estate Company Defendants and their co-conspirators further participated in and aided NAR in promulgating and codifying other anti-competitive practices that governed and applied to real estate transactions in this District. The Real Estate Company Defendants and their co-conspirators did so through their agents, officers, and employees, some of whom hold leadership positions within NAR or NAR-affiliated organizations.

61.71. From within Illinois and this District, NAR leadership drafts, reviews, and publishes regularly updated policies, including its Handbook on Multiple Listing Policy and Code of Ethics. Included in these policies that the Real Estate Company Defendants and their co-conspirators follow is the anticompetitive Mandatory Commission Rule. Upon information and belief, NAR leadership actively monitored and policed the Real Estate Company Defendants and their co-conspirators from this District to ensure full compliance with its rules. Failure to comply with NAR rules can result in loss of membership, expulsion of the entity or individual from MLSs, and other measures.

62.72.  NAR collects substantial revenues and fees from its nationwide membership—including the Real Estate Company Defendants and their co-conspirators—to fund its operations in this District. Public estimates suggest that NAR makes more than $200 million in revenue every year, with most of that coming from member dues, including from members like the Real Estate Company Defendants and their co-conspirators.

63.73.  Venue is proper in this District under 28 U.S.C. §1391 because the Real Estate Company Defendants transact business and receive revenue generated from the purchases of homes in this District; Defendants are found, have agents, and/or reside in this District; a substantial part of the events giving rise to Plaintiffs' and the putative class members' claims occurred in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out both in and from within this District.

**A.      Defendant HomeSmart's Business Activities in and Contacts with Illinois.**

64.74.  Defendant HomeSmart provides residential real estate brokerage services in Illinois both directly and via a number of affiliates and franchisees.

65.75.  Defendant HomeSmart markets its products and real estate broker services directly to Illinois residents and consumers, including through a website that HomeSmart exclusively owns, controls, and operates. For example, HomeSmart places classified directory listings in Illinois and lists Illinois properties that are for sale on its website. Figure 1, below, shows a search for available properties near Chicago, Illinois listed on HomeSmart's website.

24



**Figure 1**

66.76. There are numerous HomeSmart offices and agents that operate within Illinois. Below in Figure 2 is a screenshot from Defendant HomeSmart's website showing how Illinois consumers can use the site to locate and contact nearby HomeSmart offices, including those in this District.



**Figure 2**

67.77. Consumers can also use HomeSmart's website to locate HomeSmart agents, obtain their contact information, or request that an agent contact them. Below in Figure 3 is a screenshot showing a search on Defendant HomeSmart's website for HomeSmart agents near Chicago, Illinois that produced over 1,200 results.

26



**Figure 3**

68.78.  All HomeSmart offices located in Illinois exist only with Defendant HomeSmart's permission and subject to its oversight and control. Defendant HomeSmart controls and ultimately determines whether a HomeSmart office will be opened in Illinois, the geographic location where it can be and will be located, the office's "territory," and the design and appearance of the office.

69.79.  HomeSmart agents in Illinois represent buyers and sellers in a substantial number of residential real estate transactions in Illinois, and Defendant HomeSmart derives significant revenue from these transactions. This revenue includes a portion of the commissions, transaction

27

fees, and other fees (such as referral and finders fees received from brokers or agents in other brokerage companies) paid from each purchase or lease of real estate.

70.80. Defendant HomeSmart advanced the alleged conspiracy by mandating that all Illinois HomeSmart real estate agents join and remain a member of the NAR as well as any local Realtor® associations, boards, or organizations, thereby requiring those agents to adhere to and follow the anticompetitive rules and practices at issue.

71.81. Defendant HomeSmart participates in multiple referral networks by which it provides and facilitates referral services for individuals who either wish to move to Illinois or from Illinois to another state. Defendant HomeSmart also generally requires HomeSmart agents (from other states or from other HomeSmart territories within Illinois) to refer clients to other Illinois HomeSmart agents and vice versa. Through these referrals, HomeSmart collects fees from the sale and purchase of residential real estate in Illinois.

72.82. Defendant HomeSmart transacts business through affiliates and franchisees in Illinois. HomeSmart controls and maintains a direct, hands-on role in the real estate brokerage business activities of its franchisees, including by:

- Controlling the products and services that may be offered and marketed, and requiring franchisees to offer the products and services at the time and in the manner that HomeSmart determines;

- Imposing a number of restrictions on its Illinois franchisees regarding the types of services offered, advertising used, operational techniques, marketing and sales strategies, and related matters;

- Determining each franchisee's territory, the location and number of offices that must be opened in each territory, and the number of agents that must be hired for each territory;

28

- Determining the fees that may be charged by franchisees for their services;

- Requiring that all franchisees enter into written agreements with all agents that include a fee structure allowing the franchisee, and thus HomeSmart, to collect a share of all commissions, transaction fees, and other fees from each real estate transaction, and prohibiting any changes or modifications to the fee structure without HomeSmart's approval;

- Requiring that each franchisee implement and strictly follow HomeSmart's operations manual, which contains mandatory specifications, standards, operating procedures, and rules prescribed by HomeSmart for engaging in the real estate broker business;

- Preparing the marketing materials that franchisees may use and requiring that each franchisee spend money to market within their respective Illinois territories;

- Providing a training program for franchisees' agents that covers the techniques, procedures, methods of operation, advertising, sales techniques, promotional ideas, marketing plans, customer relations, instructions on quality standards, and practical experience for the real estate broker business;

- Purchasing insurance on behalf of franchisees through a carrier of HomeSmart's choice;

- Requiring all franchisees to provide financial statements, reports, performance data, and submit to audits of the franchisees' records and inspections of the franchisees' offices; and

- Utilizing its brand name, recognizability, and goodwill to bolster the real estate business activities of its franchisees and signal to consumers that HomeSmart is the source of the real estate broker services being provided.

73.83. Even where Defendant HomeSmart conducts business through its franchisees, HomeSmart remains the exclusive owner of all of the franchisees' real estate brokerage business

29

records, including all databases; records pertaining to real estate agents and professionals; customer records such as names, addresses, telephone numbers, e-mail addresses, and purchase records; all telephone numbers, fax numbers, and internet addresses used by franchisees; all directory listings; and all other records created and maintained by a franchisee.

74.84.  Defendant HomeSmart receives significant revenue from real estate brokerage business in Illinois in the form of multiple types of fees, such as:

- An initial franchise fee of $20,000 from each HomeSmart franchisee;

- A branch office fee of $10,000 for each branch office opened in a franchisee territory;

- Royalty fees equal to the greater of: 20% of the franchisees' gross revenue, which includes agent commissions, transaction fees, and referral fees from each real estate transaction in Illinois; $5 per franchisee agent per month plus $60 for each transaction, referral, or rental; or $500 per month from each franchisee;

- Annual membership fees paid by franchisees' real estate agents; and

- An additional 5% of franchisees' gross revenue (including agent commissions, transaction fees, and referral fees from each real estate transaction in Illinois) that HomeSmart uses for various purposes, including the costs of HomeSmart's print and online marketing, payment of salaries, and maintenance of HomeSmart's website.

75.85.  Therefore, Defendant HomeSmart not only inhabits, is found, and/or transacts business in Illinois, it also purposefully avails itself of the privilege of doing business in Illinois and receives revenue from residential real estate transactions involving Illinois consumers and through the real estate broker business activities of franchisees and affiliates that HomeSmart controls.

## COMMON FACTUAL ALLEGATIONS

**A.      Broker Compensation in Real Estate Transactions is Opaque for Buyers.**

76.86.  Most people purchase and sell homes only a few times in their lives. Consequently, real estate transactions are difficult to navigate for ordinary consumers, and most homebuyers and sellers depend on brokers to assist them with the process. Indeed, in 2020, NAR reported that nearly 90% of buyers used a broker to buy a home.

77.87.  State laws control who can represent sellers and buyers in real estate transactions. There are two types of licenses: (1) for real estate brokers (or brokerage firms such as the Real Estate Company Defendants), and (2) for individual agents (such as the Real Estate Company Defendants' employees). Only licensed brokers can legally be paid for representing buyers or sellers in real estate deals, according to state law. So, all real estate contracts and payments are made to brokers, not agents. Brokers then pay their agents and are legally responsible for their agents' actions.

78.88.  For the vast majority of residential real estate transactions, brokers and agents on the buy and sell sides are paid based on a percentage of the property's sale price. A typical home sale begins with a homeowner (seller) entering a contract with a seller-broker whereby the seller-broker receives a commission equal to 6% of the property's sale price for facilitating the sale of the home. When the seller-broker lists the house on the MLS, they typically make a unilateral offer of 3% commission to any buyer-agent that can bring a buyer to the table to complete the sale.

79.89.  When the house is purchased, the buyer pays the purchase price into an escrow account where it is then paid to the seller, less the commissions, which are paid to the seller-broker and the buyer-broker.

80.90.  Because the escrow company distributes the commission, buyers often don't realize that they're effectively bearing the cost of commissions. Moreover, during the relevant period, as

31

part of the conspiracy alleged herein, NAR's Code of Ethics encouraged buyer-agents to represent that their services are "free,"[17] which is a fraudulent misrepresentation because buyers pay for these "free" services through higher purchase prices and elevated commission rates.

**B.      Home Buying in America Runs Through The NAR and its Conspirators Like Defendants, Who Dominate the MLSs.**

81.91.  According to its website, NAR is the largest trade group in the U.S.[18] It includes over 1.54 million members in the real estate field including real estate agents, brokers, managers, and appraisers. Being a NAR member carries benefits like insurance, access to property listings on preferred MLSs, training, and more.

82.92.  NAR promulgates and enforces rules and policies that its members implement and follow in real estate transactions. On a yearly basis, NAR issues its Handbook on Multiple Listing Policy which requires, *inter alia*, that member brokerages and MLSs align their policies with those set by NAR's board of directors. The NAR rules are not optional. Brokerages, MLSs, and real estate agents must all follow them.

83.93.  The NAR Board of Directors, and the Multiple Listing Issues and Policies Committee reporting to it, periodically determine whether to modify any policies in the Handbook on Multiple Listing Policy (for example, certain changes to MLS policies were approved by the Board of Directors and made in 2021). The policies that are retained (and any modifications thereto) are set forth in new editions of the Handbook on Multiple Listing Policy that are issued on or about an annual basis. The Board of Directors, and the Handbook on Multiple Listing Policy, have consistently and repeatedly retained the Mandatory Commission Rule.

---

[17] NAR Code of Ethics 2018, at p. 10 Standard of Practice 12-2.

[18] https://www.nar.realtor/

84.94. In setting forth the MLS terms, NAR has successfully invited the Real Estate Company Defendants and their co-conspirators to participate in the following agreement, combination and conspiracy: They can participate in the MLS, and gain the benefits provided by NAR and the MLS, but only if they agree to follow and enforce the anticompetitive restraints set forth in the Handbook on Multiple Listing Policy.

85.95. Both the supply and demand side of the residential real estate market rely on MLSs. Buyer-agents use MLSs to find real estate listing information. And if a seller's broker doesn't list a property on an MLS, many buyer-agents will not show it to their clients. Due to the importance of MLSs, NAR brokers with access to MLSs possess and exercise power in the markets for the provision of real estate brokerage services to home buyers throughout the country.

86.96. Numerous additional entities, including NAR-affiliated MLSs, real estate brokerages, and local realtor associations, although not listed as defendants in this case, have actively engaged with Defendants and the NAR as co-conspirators. In particular, each of the local realtor associations responsible for owning and managing NAR MLSs consented to, adhered to, and executed the "Mandatory Commission Rule." This rule mandated that a seller-broker must define a fixed, unilateral commission for the buyer-broker, which would be disbursed upon the sale of the property, either as a specific dollar value or as a percentage of the sale price.

87.97. The Real Estate Company Defendants each adopted the Mandatory Commission Rule within their respective rules and regulations and specifically implemented, complied with, and enforced the Mandatory Commission Rule for transactions involving their agents in Illinois during the relevant period. In addition, the Real Estate Company Defendants also aided the NAR in promulgating and codifying the other anti-competitive practices discussed herein, including the Mandatory Commission Rule, through the positions their brokers hold within NAR and various

other NAR committees and organizations that operate nationally and from within Illinois.

88.98.  Defendants are thus liable for the acts of their co-conspirators, whether named or not named as defendants in this Complaint.

89.99.  The Real Estate Company Defendants and their co-conspirators have significant market power and are among the largest and most influential real estate brokerages in the United States. For example:

    a. Defendant @properties describes itself as "a driving force in Chicago real estate and beyond" and markets itself as "one of the nation's largest brokerage firms."[19]

    b. Defendant HomeSmart had over $23 billion in sales volume in 2022, and its founder and CEO, Matt Widows, was recently named the 25th most powerful and influential leader in the residential real estate brokerage industry on the Swanepoel Power 200 list.

    c. Defendant Fathom's CEO, Marco Fregenal, was also included on the Swanepoel Power 200 list in addition to being named one of the most influential leaders in the housing economy by HousingWire. Fathom had over $16 billion in sales volume in 2022 and in 2024 became one of the top 10 largest real estate brokerages in terms of closed transaction sides.

    d. Defendant Silvercreek is the largest residential real estate brokerage in Idaho by sales volume and the eighteenth largest independent brokerage in the United States.[20]

---

[19] https://www.atproperties.com/chicagoland/pages/about-us.

[20] https://toolbox.silvercreekrealty.net/welcometosilvercreek/#toggle-id-1

e.   Defendant REO is the largest brokerage in Michigan, selling over $6 billion in real estate in 2024.[21]

f.   Shorewest "is Wisconsin's Largest Home Seller™, a position it has held since 1951"; it "currently controls more than 20% of the metro-Milwaukee real estate market"; and it "outperforms [its] competition in homes sold, market share and resources."[22]

g.   NextHome was listed by NAR in 2023 as the fastest-growing real estate franchises measured by net office growth, and its co-founder and CEO, James Dwiggins, is on the Swanepoel Power 200 list of the "most powerful and influential executives in the residential real estate brokerage industry."

h.   Side's Co-Founders, Guy Gal and Hilary Saunders, are NAR members and are ranked 29th overall on the Swanepoel Power 200 list.

i.   Engel & Volkers's Paul Benson & Anthony Hitt have also appeared on the Swanepoel Power 200 list, and Engel & Volkers Americas Inc.'s current CEO Stuart Siegel was included on the Swanepoel Power 200 Watchlist.

90.100.      Defendants collectively control the primary MLSs and have a major share of many local and national markets. Along with their affiliates and co-conspirators, the Real Estate Company Defendants provide a significant portion of the residential real estate broker services in Illinois and nationally. And the Real Estate Company Defendants are each among the largest

---

[21] https://www.realestateone.com/history-of-real-estate-one.

[22] https://andy.shorewest.com/blog/shorewest-realtors-agents-named-in-2023-realtrends-the-thousand-ranking/.

brokerages in terms of sales volume. As such, the Real Estate Company Defendants and their co-conspirators dominate the buyer-agent services market.

91.101.    The relevant geographic market is the set of regions in which MLSs in which Defendants participate are active. This market includes the market for services provided to homebuyers by residential real estate brokers with access to MLSs like MRED. This market spans regions across the nation because Defendants' conspiracy is nationwide in scope. Indeed, the vast majority of MLSs nationwide are formally controlled by NAR associations that are required to implement the challenged rules. Only a small number of MLSs are not exclusively owned or operated by NAR associations, and even those MLSs are not fully independent from NAR. For example, most of those MLSs have adopted rules identical or similar to the NAR rule mandating blanket unilateral offers of compensation, and NAR's Code of Ethics applies to Realtors participating even in non-NAR MLSs.[23]

92.102.    Through NAR and its associated organizations, and control over NAR MLSs, the Real Estate Company Defendants worked in concert with their co-conspirators—such as other brokerages and MLSs like MRED—to implement and enforce the anticompetitive rules and policies that kept agent commissions and home prices artificially elevated. Defendants and their co-conspirators, by controlling the MLSs and the rules governing commissions, enforced the Mandatory Commission Rule and other anti-competitive NAR rules for transactions with Class members, Subclass members, and other market participants.

93.103.    For example, HomeSmart brokers Mike Jeppson, Wendy Lapham, and Sandi Mosley, have each served on the Multiple Listing Service Committee of the California

---

[23] Such non-NAR MLSs include the Real Estate Board of New York, the REBNY Residential Listing Service, the Northwest Multiple Listing Service ("NWMLS"), West-Penn Multi-List, Inc., and MLS Property Information Network.

Desert Association of REALTORS® which "[o]versees operation of the MLS and its technological aspects and recommends enhancements, policies and procedures[.]"[24]

94.104.       Similarly, Silvercreek is highly involved in IMLS, the largest MLS in Idaho, which has multiple committees involved in the control and operation of IMLS, including the "New Technology Committee" and the "Rules and Policies Committee." In 2016, the chairs of the New Technology Committee and the Rules and Policies Committee were both brokers employed by Silvercreek.[25] IMLS's Rules and Policies Committee's responsibilities consist of "Review[ing] IMLS Rules and Policies[, r]ecommending changes, additions, or deletions based on feedback from the membership and changes in the industry[, and r]eviewing and implement[ing] new rules and policies handed down from the National Association of REALTORS."[26]

95.105.       Access to MLSs is vital for brokers to compete and work with homebuyers in those areas. Buyer-brokers operating in regions covered by the primary MLSs would face overwhelming obstacles if they tried to compete outside of the MLSs. Due to Defendants' and their co-conspirators' dominance over the MLSs, brokers not involved in the conspiracy would have to create a new listing service to rival the conspirators or try to compete without one. Seller-brokers not using an MLS would miss out on most potential buyers, while buyer-agents not using an MLS would miss out on most sellers. Essentially, without access to a listing service, brokers cannot compete effectively.

---

[24] *Committees – MLS/Multiple Listing Service*, CAL. DESERT ASS'N OF REALTORS, https://cdaronline.org/member-resources/committees/

[25] https://web.archive.org/web/20160731023639/https://www.imlsmembers.com/Directories/Committees.aspx.

[26] *Id.*

96.106. To effectively rival a NAR MLS, any new listing service must offer as extensive a range of listings. Brokers and their agents, who benefit from high buyer-agent commissions, have little reason to join a new service that could lead to increased competition and reduced commissions. Moreover, many buyers would hesitate to hire agents from such a service, especially because buyer agents on NAR MLSs fraudulently misrepresented that their services were free to buyers during most of the relevant period. Consequently, seller-brokers on alternative services would find it hard to attract agents and their clients. Also, buyer-agents would be wary of using a service with fewer property options. Hence, a listing service trying to compete with a NAR MLS would likely struggle to gather enough listings to be profitable and challenge the established MLSs. The dearth of competitive listing services demonstrates that there are significant entry barriers.

97.107. To further limit competitive pricing pressure, NAR recommends that MLSs include non-compete clauses as a vital part of their agreements with third-party listing websites like Zillow seeking MLS data access. According to NAR's list of "critical components," such non-compete agreements should ensure that the third-party website agrees not to compete against brokerage firms like Defendants or MLSs by either turning into a licensed brokerage or offering cooperation and compensation deals. NAR also recommends that these agreements should prevent the third-party website from using the data in ways that mirror the functions of an MLS. Therefore, as part of the conspiracy, NAR advises MLSs to actively work to stop third-party websites from emerging as competitors.

## C. Defendants and Their Co-Conspirators Have Adhered to NAR's Anti-competitive Rules, Regulations, and Standards of Practice.

98.108. NAR and Defendants suppressed competition in a number of ways, primarily through requiring buyer-agents and seller-brokers to become members of NAR and

conform to NAR's regulations as a condition of membership. NAR's Handbook, Code of Ethics, and Standards of Practice enforce various rules, policies, and practices on all co-conspirators, including NAR MLSs and Defendants.

99.109.      Compliance with NAR's rules is mandatory for NAR membership. As NAR's Code of Ethics specified during the relevant time period: "[a]ny Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association."[27]

100.110.      Moreover, the NAR's Handbook on Multiple Listing Policy stipulates that association and association-owned MLSs must conform their governing documents to the mandatory MLS policies established by the National Association's Board of Directors to ensure continued status as member boards and to ensure coverage under the master professional liability insurance program.[28]

101.111.      NAR empowers its MLSs to fine, suspend, and revoke the membership of MLS users that do not comply with NAR regulations. Given the commercial necessity of access to the NAR MLSs, brokers and agents are compelled to adhere to these mandatory provisions. Without access to local MLSs, a broker or agent would be incapable of listing or viewing properties for sale in the centralized database.

102.112.      To ensure that its rules are being followed, NAR also conducts examinations of the governing documents of its local realtor associations to verify their adherence

---

[27] NAR Code of Ethics 2018, at p. 241 Section 2.

[28] NAR MLS Handbook 2018 at p. 161; NAR MLS Handbook 2023, at p. 169.

to its rules. Further, NAR obligates its local realtor associations to prove their compliance with these rules by periodically submitting their governing documents to NAR for evaluation.

103.113.   In addition to providing commercially necessary access to MLSs, NAR offers many benefits to its realtor associations and the MLSs they own, including professional liability insurance. To qualify for this insurance, however, realtor associations and their MLSs must adhere to the mandatory provisions in the Handbook on Multiple Listing Policy. NAR withholds these insurance benefits from realtor associations and MLSs that fail to comply with its mandatory provisions. Indeed, NAR's Handbook currently reads: "[t]hose associations or multiple listing services found by the National Association to be operating under bylaws or rules and regulations not approved by the National Association are not entitled to errors and omissions insurance coverage and their charters are subject to review and revocation."[29]

104.114.   During the relevant time period, NAR's rules and policies have included numerous collusive and anti-competitive requirements: (i) the Mandatory Commission Rule; (ii) rules preventing the disclosure to buyers of the total broker commissions in a home sale ("Commission Concealment Rules"); (iii) policies limiting the ability of sellers and seller-brokers to change the commissions offered to buyer-agents after a purchase offer is made ("Non-Modification Rules"); (iv) policies that allow and encourage buyer-agents to inform homebuyers that their services come at no cost ("Free-Service Rule"); (v) guidelines enabling buyer-agents to filter MLS listings based on commission levels ("MLS Manipulation Practices"); and (vi) a policy restricting access to key-holding lockboxes to NAR members only ("Lockbox Policy").[30]

---

[29] NAR MLS Handbook 2023, at p. 8 Policy Statement 7.17

[30] Numerous of these anti-competitive rules were implicated in the DOJ's investigation of NAR. https://www.justice.gov/opa/press-release/file/1338606/download#:~:text=NAR's%20Commission%2DConcealment%20Rules%20recommend,commission%20offered%20to%20buyer%20brokers.

105.115.    NAR and its affiliates maintain a defined arrangement: Members can join the MLS and receive benefits from NAR and NAR MLSs, but only if they commit to follow and implement the anti-competitive restraints outlined in NAR's rules, practices, and policies. As a result, the implementation and enforcement of these guidelines by NAR and NAR MLSs constitute coordinated actions among parallel competitors, forming agreements among (should-be) rival real estate brokers. These agreements diminish price competition among brokers, resulting in increased costs and lesser service quality for American homebuyers.

106.116.    The Real Estate Company Defendants have played a pivotal role in the conspiracy described above by, among other things: joining NAR and agreeing to adopt and follow NAR's anti-competitive rules and regulations; placing their brokers in leadership positions within NAR and local NAR associations; mandating that their employees, franchisees, affiliates, and the agents working under them adopt and follow NAR rules and regulations, including the anti-competitive rules listed above; and exerting influence over local realtor associations by, for instance, requiring adoption of NAR's rules, such as the Mandatory Commission Rule.

107.117.    The Real Estate Company Defendants are heavily intertwined in NAR leadership at the local and national levels:

    a.  ERE broker Kenny Parcell previously served as president of the NAR. Mr. Parcell also served as NAR's Vice President of Government Affairs in 2018.

    b.  HomeSmart's founder and CEO, Matt Widows, has been a member of the NAR's Real Estate Services ("RES") Advisory Group. Members of the RES Advisory

41

Group have seats on the NAR's Executive Committee and on its Board of Directors, through which they are "given an avenue to provide meaningful input to NAR[.]"[31]

c.  HomeSmart broker Miguel Fernandez was elected to the 2023 Board of Directors of the Illinois Association of Realtors. Mr. Fernandez was also president of the 2022 Realtor® Association of the Fox Valley, a member of the Illinois Realtors® 2020 Leadership Development Class, and the 2021 Chair of the Illinois REALTORS® Local Government Independent Expenditures Committee. Further, HomeSmart managing broker Harriet Kubicz is an instructor for the NAR-associated MRED MLS.

d.  Fathom's Tom Campbell has served as a vice president and then president of the Virginia REALTORS®; president within the Greater Piedmont REALTORS®; a two-time appointee to the NAR's Public Policy Coordinating Committee; a member of the NAR Professional Standards and Arbitration Committee; and a NAR REALTOR® Code of Ethics instructor.

e.  Fathom broker Kim Sitton was elected as the National Treasurer of the Women's Council of REALTORS® for 2025.

f.  In 2020, Mabel Guzman, then a broker with @properties, was named a member of NAR's Leadership Team.[32]

---

[31] NAT'L ASSN. OF REALTORS, REAL ESTATE SERVICES (2019), *available at* https://narfocus.com/billdatabase/clientfiles/172/8/3431.pdf.

[32] Former CAR President Named 2020 NAR Vice President of Association Affairs, available at: https://chicagorealtor.com/former-c-a-r-president-named-2020-nar-vice-president-of-association-affairs/

g. In 2017, Krista Deacon, a leading broker with Silvercreek, was a Director for NAR.[33] Silvercreek and its agents also frequently make contributions to the NAR Political Action Committee—located in Chicago, Illinois—which furthers the interests of NAR, Silvercreek, and its co-conspirators.[34]

h. Susan Weaver, a broker with Silvercreek, is also the State Director and a member of the board of the NAR-associated Boise Regional REALTORS ("BRR").[35] In these roles, she is "very involved in the local, state and national Realtor organizations," and has served "on the Public Policy Committee for [the BRR]" as well as "the National and State Committees for Professional Standards."[36]

i. REO's co-president, Stuart Elsea, was a Board Member for the NAR's Michigan chapter Michigan Realtors®.[37]

j. Side executive Casey McLoed served as the 2023 REALTOR® Party of California Chair for C.A.R., held positions on NAR's Legislative and Federal Committees, and is both a REALTORS Political Action Committee (RPAC) Fundraising Trustee and Hall of Fame member.[38]

---

[33] *See* 2017 NAR Form 990 at 8, available at
https://projects.propublica.org/nonprofits/organizations/361520690/201833189349312968/full; *see also* RE-21 Deep Dive | Krista Deacon, available at https://toolbox.silvercreekrealty.net/calendar/event/re-21-deep-dive-krista-deacon-meridian-classroom-live-stream-2/.

[34] *See, e.g.*, Schedule A to FEC Form 3X Report of Receipts and Disbursements of National Association of Realtors Political Action Committee, available at
https://docquery.fec.gov/pdf/848/201701319042138848/201701319042138848.pdf (Last Accessed April 19, 2024).

[35] https://www.realtor.com/realestateagents/586ec598d93e6f0011526a45

[36] *Id*.

[37] https://www.mirealtors.com/Portals/0/Documents/NARDirectors18.pdf

[38] Side, *Casey McLoed*, https://www.side.com/team/casey-mcloed/).

k.  Erik Sain, District Sales Manager for The Keyes Company, served as the NAR's VP of Association Affairs.

l.  Christina and Michael Pappas of Defendants Keyes and Illustrated have both served as NAR Directors and are consistently ranked on the Swanepoel Power 200 list of the most powerful figures in residential real estate.[39] Michael Papps has also been a member of NAR's RES program, and Christina Pappas has served as NAR's 2024 First Vice President and chaired its 75-member Culture Transformation Commission, which meets in Chicago to recommend internal reforms.

m.  REI broker D. Patrick Lewis is currently the Regional Vice President for NAR's Region 11 and has served in a variety of leadership roles at the local, state, and national levels including President of the Scottsdale Area Association of REALTORS® and the 2019 President of Arizona REALTORS®.

n.  Baird's senior vice president of strategic innovation, Dean Rouso, is a member of NAR who has "served on the board of directors of the National Association of REALTORS® and in the Illinois Association of REALTORS® License Law Working Group, which crafted much of the Illinois Broker License Laws that exist today."[40] Mr. Rouso has also served as President of the MRED's board of directors and board president of Mainstreet Organization of REALTORS®.[41]

---

[39] Real Estate Almanac, *Mike Pappas & Christina Pappas*, https://web.archive.org/web/20250409075940/https://www.realestatealmanac.com/executives/mike pappas-christina-pappas/ (listing Mike Pappas and Christina Pappas, CEO and President of The Keyes Company & Illustrated Properties, respectively, as jointly ranked 80th on the 2025 Swanepoel Power 200 list of the most powerful executives in real estate).

[40] https://www.bairdwarner.com/our_management_team/dean-rouso/

[41] *Id.*

44

o.  Baird's senior vice president of residential sales, John Matthews, has served on MRED's board of directors since 2012, and he currently sits on the National Association of REALTORS'® Top 75 Large Firms Directors Forum.[42]

108.118.    The Real Estate Company Defendants require their brokers, affiliates, franchisees, and agents to: (1) adhere to NAR's Code of Ethics; (2) become members of NAR and follow realtor association rules; and (3) participate in and comply with the rules of local MLSs, which include the mandatory provisions of NAR's Handbook on Multiple Listing Policy.

109.119.    For example, Defendant HomeSmart requires that each real estate agent join and remain a member in good standing of the NAR and any local association or board of realtors in their respective territory. In addition, HomeSmart acknowledges that it is "subject to rules, policies, data licenses, and terms of service established by over 90 MLSs of which we are a participant."[43] HomeSmart also complies with the NAR's as well as state and local associations of Realtors' "codes of ethics and rules as a result of our membership in these organizations."[44]

110.120.    Similarly, Defendant NextHome requires that its franchisees "comply with the National Association of REALTORS® Code of Ethics."[45] NextHome also requires that its franchisees subscribe to their local MLS and provide a listings data feed if permitted by "the rules of the Multiple Listing Service (MLS) in which you are a member."[46] NextHome further requires

---

[42] https://www.bairdwarner.com/our_management_team/john-matthews/

[43] HomeSmart Holdings, Inc. Form S-1 Registration Statement at 115 (filed Sept. 3, 2021), *available at* https://www.sec.gov/Archives/edgar/data/1867684/000095012321012147/filename1.htm.

[44] *Id.*

[45] NextHome Franchise Disclosure Document at 9, 160, available at https://www.franchimp.com/?page=pdf&f=103234_2022.pdf.

[46] *Id.* at 160.

45

franchisees to provide it "MLS records showing all listings and sales activity of the Office" upon request and an "MLS Production Report" upon termination of the franchise agreement—necessitating MLS membership.[47]

111. The E&V Entities likewise require that Engel & Volkers franchisees adhere to the Code of Ethics and Standards of Practice of the NAR. Specifically, Engel & Volkers franchisees and their agents must "conform to any Code of Ethics or similar standard of conduct promulgated by any REALTOR® association to which Licensee or its employees or Sales Advisors belong, such as the Code of Ethics and Standards of Practice of the National Association of REALTORS®." Engel & Volkers franchisee compliance is also conditioned on MLS membership,

121. and thus NAR membership, because the failure to "obtain or maintain membership in the Multiple Listing Service if such is available in your Protected Area" is grounds for termination of the franchise agreement.

**D.     The Mandatory Commission Rule, Commission Concealment Rule, and Anti-Modification Rule are Unreasonable Restraints on Trade.**

112.122. During the relevant period, the Mandatory Commission Rule read: "In filing a property with the multiple listing service of an association of REALTORS®, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants."[48]

113.123. The Mandatory Commission Rule has further stated throughout the relevant time period that: "multiple listing services shall not publish listings that do not include an offer of

---

[47] *Id.* at 165, 174.

[48] NAR MLS Handbook 2018, at p. 65 Section 5; NAR MLS Handbook 2023, at p. 69 Section 5.

compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships."[49]

114.124.    This practice has been widely, if not universally, adopted. Indeed, nearly every MLS in the U.S. required listing brokers to extend a blanket offer of compensation to buyer-agents during the relevant period.

115.125.    The Mandatory Commission Rule prevented buyer-agents from competing on terms such as price and service quality. Therefore, the Mandatory Commission Rule curtailed competition in the market for buyer-agent services, adversely affecting homebuyers in various ways.

116.126.    Moreover, because the Mandatory Commission Rule required brokers to provide blanket, unilateral, unconditional offers of commissions, brokers had little incentive to compete in terms of service quality to earn higher commissions. For instance, new brokers who had only recently obtained their licenses were compensated at the same level as seasoned, highly skilled brokers. Similarly, when broker commissions are based on a percentage of the gross selling price, a buyer-agent assisting in an $800,000 home purchase could earn potentially double compared to one assisting in a $400,000 home purchase, irrespective of whether the higher compensation matches the level and nature of services rendered.

117.127.    This practice has drawn the ire of consumer watchdog organizations. Indeed, the Consumer Federation of America referred to real estate brokers as "a price-setting cartel." As the Federation explained, "[i]n a rational pricing system, home sellers and buyers would

---

[49] NAR MLS Handbook 2018, at p. 35 Section 5; NAR MLS Handbook 2023, at p. 40 Section 5.

each pay for real estate brokerage services they receive."[50] But, "[i]f sellers and buyers each separately negotiated compensation with their brokers, uniform [] commissions would quickly disappear."[51]

118.128.     The Mandatory Commission Rule lacks any pro-competitive rationale. Before the early 1990s, all brokers either represented sellers or were subagents of those representing sellers. Under this almost universal sub agency system brokers, even those working solely with buyers were legally obligated to represent the interests of sellers. Because nearly all brokers involved in transactions represented the seller either as the seller's agent or as the subagent of the listing (i.e., seller's) broker, the seller's broker, who received payment from the seller, would then remunerate the subagent assisting the buyer.

119.129.     But with the advent of brokers representing buyers directly, payment of buyer-agents' commissions from a fixed total commission split between brokers is no longer justified. Real estate industry insiders have conceded that the practice of seller-brokers dictating the fees that buyer-agents charge to their own clients should be recognized as potentially fixing market prices. There is no pro-competitive justification for allowing seller-brokers to determine the default commissions charged by competing buyer-agents to their clients. Rather, removing inter-broker compensation would reduce brokers' ability to impede price competition, likely resulting in a significant decrease in broker commissions.

---

[50] Testimony of Stephen Brobeck, *Residential Real Estate Brokerage Services: a Cockamamie System that Restricts Competition and Consumer Choice*, CONSUMER FED'N OF AM., at 3-4 (July 25, 2006), available at https://consumerfed.org/wp-content/uploads/2006/07/7-25-06-Residential-Real-Estate-Brokerage_Testimony.pdf.

[51] Stephen Brobeck and Patrick Woodall, *How the Real Estate Cartel Harms Consumers and How Consumers Can Protect Themselves*, CONSUMER FED'N OF AM., at 4 (June 2006), available at https://consumerfed.org/pdfs/Real_Estate_Cartel_Study061906.pdf.

120.130.	The reason for the Mandatory Commission Rule is clear: to maintain artificially high broker commissions for Defendants, other NAR members, and their co-conspirators at the expense of homebuyers. In the absence of the Rule, buyers rather than sellers would negotiate buyer-agent commissions, and brokers would compete with one another by offering lower commission rates and/or higher quality services.

121.131.	The Commission Concealment Rules protected the Mandatory Commission Rule and exacerbated its anti-competitive effects. These rules barred disclosure of the offered buyer-agent commission to potential buyers.

122.132.	The Commission Concealment Rules were laid out in several places in NAR's Handbook during the relevant period, including Policy Statement 7.23, which stated: "the multiple listing service shall not publish the total negotiated commission on a listing which has been submitted to the MLS by a participant. The multiple listing service shall not disclose in any way the total commission negotiated between the seller and the listing broker."[52]

123.133.	Hence, while buyer-agents were aware of the commission they'd receive if their client bought a property, NAR MLSs concealed this fee from homebuyers who ultimately paid the commission through the property's purchase price.

124.134.	At the same time, NAR rules required brokers to share pricing information among themselves. This kind of unilateral information sharing agreement is collusive and further diminished the incentive for buyer-agents to compete on pricing, whether by offering rebates or accepting reduced commissions. It also promoted and facilitated the setting of consistently high commission rates by brokers, leading to increased costs for buyer-agent services. Moreover,

---

[52] NAR MLS Handbook 2018, at p. 34 Section 1 Policy Statement 7.23; NAR MLS Handbook 2023, at p. 40 Section 1 Policy Statement 7.23

because buyers were unable to view commission offers, they were unable to identify when they were being steered towards a property with a high commission. As explained below, this type of steering leads to higher prices and diminishes the quality of services provided by buyer-agents to homebuyers.

125.135.     During the relevant period, NAR's ethical rules explicitly forbade buyer-agents from attempting to decrease the buyer-agent commissions listed on MLSs when submitting purchase offers ("Non-Modification Rules"). Therefore, even if a homebuyer had been able to access sufficient information to negotiate a reduced buyer-agent commission, NAR's rules prohibited such negotiations. Although NAR frequently asserted in litigation that brokers could purportedly negotiate their fees at any point in the transaction, such claims are belied by NAR's Standard of Practice 16-16, which stated as follows during the relevant period:

> REALTORS®, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation.[53]

126.136.     Indeed, a buyer-agent could not even present an offer to a seller that was conditional on the seller reducing the buyer-agent commission without violating the NAR's ethics rules. This did nothing but unreasonably restrain homebuyers' negotiations to the benefit of NAR members such as Defendants.

127.137.     If buyer-agents did try to alter buyer-agent commissions, NAR advised them to initiate these modifications before they even showed the property to prospective buyers. By obliging buyer-agents who were open to reducing their commissions to seek these reductions

---

[53] NAR Code of Ethics 2018, at Standard of Practice 16-16; NAR Code of Ethics 2023, at Standard of Practice 16-16.

before showing the property to a potential buyer, NAR rules effectively shut down most negotiation over the buyer-agent commission. To adhere to this, a buyer-agent would have had to independently approach a seller-broker to negotiate a cut in their own commission, even before their client had viewed the potential home. In practice, this was unlikely to occur because it would require buyer-agents to proactively approach seller-brokers and negotiate commissions where no buyer had yet been identified. As NAR knew, this would be seen by most individuals as a speculative waste of time.

128.138.     NAR's rules also limited the negotiation of the buyer-agent commission by stipulating that once a seller had received purchase offers, the seller-broker was not allowed to unilaterally alter the buyer-agent commission originally offered on the MLS. This was outlined in NAR Standard of Practice 3-2, which stated during the relevant period that:

> Any change in compensation offered for cooperative services must be communicated to the other REALTOR® prior to the time that REALTOR® submits an offer to purchase/lease the property. After a REALTOR® has submitted an offer to purchase or lease property, the listing broker may not attempt to unilaterally modify the offered compensation with respect to that cooperative transaction.[54]

129.139.     Consistent with NAR's rule, the MRED Rules and Regulations, for example, stated that a listing broker could only offer a buyer-agent compensation that differed from the compensation indicated on the listing if the seller-broker "informs the other broker in writing or in accordance through the Service in advance of his producing an offer to purchase . . . ."[55]

---

[54] NAR Code of Ethics 2018, at Standard of Practice 3-2; NAR Code of Ethics 2023, at Standard of Practice 3-2.

[55] Section 5: Division of Commissions, Rules and Regulations, Midwest Real Estate Data, MRED Quick Reference Guide. (Revised Feb. 2019), https://ww2.mredllc.com/wp-content/uploads/2018/07/MRED-Rules-and-Regulations.pdf.

130.140.    NAR further restricted negotiation by deeming it unethical for a buyer-agent to suggest that the buyer directly negotiate with the seller to lower commissions. Given that most homebuyers have little to no understanding of this market and are under the impression that the buyer-agent's services are "free," this limitation additionally curbed negotiations concerning buyer-agent commissions.

**E.    The Free-Service Rule and MLS Manipulation Practices Allow Defendants and their Co-Conspirators to Dominate the Homebuying Process and Improperly Steer Homebuyers to Higher-Commission Properties.**

131.141.    During the relevant period, the Real Estate Company Defendants and their brokers also adopted NAR's Free-Service Rule, which encouraged buyer-agents to mislead buyers into thinking that the buyer-agent's services were free when they were not.

132.142.    During the relevant period, NAR Ethics Standard 12-2 stated "REALTORS® may represent their services as 'free' or without cost even if they expect to receive compensation from a source other than their client provided that the potential for the REALTOR to obtain a benefit from a third party is clearly disclosed at the same time." Because buyer-agents are technically paid out of the home's purchase price, those buyer-agents could misleadingly tell their buyer clients that their services were "free." As a result, homebuyers were led to think they were paying nothing for buyer-agent services, when in reality the buyer-agent's commissions were incorporated into the purchase price of the home.

133.143.    For instance, HomeSmart brokers and agents routinely and falsely promote their services as free to buyers: "If you are only purchasing, you get all the benefits of an experienced Realtor *at no cost to you*."[56]

---

[56] https://homesmart.com/real-estate-agent/hsca002/homer-farsad/3dcaaeb5-ec3d-536b-9e15-0b72c6424c3a (emphasis added) (last accessed Oct. 29, 2025).

134.144. Fathom brokers similarly misrepresent that "the seller pays the commission for both the buyer's and seller's agents."[57] Indeed, in a list of "[b]enefits of [u]sing a [b]uyer's [a]gent" published on a Fathom broker's website, Fathom incorrectly states that buyer-agents come at "[n]o [d]irect [c]ost to the [b]uyer."[58] In actuality, homebuyers do pay buyer-agent commissions, which are incorporated into the home purchase price.

135.145. Because buyers were deceptively misled to believe that they were not paying for brokerage services, they were not given a meaningful opportunity to negotiate for a lower buyer-agent commission or seek out or discover appealing rebate offers or other discounts from buyer-agents. As such, NAR's Free-Service Rule contributed to elevated costs for services rendered by buyer-agents.

136.146. During the relevant period, NAR's MLS Manipulation Practices were yet another set of rules that hindered competition and contributed to elevated commissions.

137.147. During the relevant period, NAR's MLS Manipulation Practices enabled buyer-agents to curate MLS listings according to the amount of buyer-agent commissions being offered. Additionally, some MLSs even allowed buyer-agents to exclude homes from potential homebuyers when the listings offered lower commissions, despite the homes meeting the buyer's search requirements.

138.148. For instance, during the relevant period, Policy Statement 7.58 in NAR's Handbook read: "Participants may select the IDX listings they choose to display based only on objective criteria including . . . cooperative compensation offered by listing brokers."[59]

---

[57] https://www.jimmywilliamsrealtor.com/the-benefits-of-using-a-buyers-agent-in-real-estate (last accessed Oct. 29, 2025).

[58] *Id.*

[59] NAR MLS Handbook 2018, at p. 23 Policy Statement 7.58; P. 81 Section 18.2.4.

139.149.	The MLS Manipulation Practices, adopted by the Real Estate Company Defendants and NAR MLSs during the relevant period, aided in steering by enabling buyer-agents to selectively hide from potential homebuyers those property listings that provided for lower buyer-agent commissions. This practice, which has since been repealed,[60] diminished the quality of services provided by buyer-agents and increased the cost of these services for homebuyers.

**F.	The Lockbox Policy Shut Out Competitors.**

140.150.	Further reducing competition for buyer-agent services, NAR and its member brokers also restricted physical access to listed properties through the use of lockboxes that were available only to real estate brokers who were part of a NAR MLS. These brokers, with the consent of the sellers, stored keys to the homes listed for sale in lockboxes, enabling them to grant potential buyers limited access to the properties. Access to these lockboxes was controlled by real estate brokers using either a numerical code or a digital Bluetooth 'key' which was not provided to non-members of NAR.

141.151.	During the relevant time period, NAR and NAR MLSs implemented a set of rules (outlined in the NAR Handbook, Policy Statement 7.31) that limited lockbox access solely to real estate brokers who were NAR members that subscribed to the NAR MLS.[61] Brokers not affiliated with NAR were denied access to these lockboxes, preventing them from showing their clients homes listed for sale, which in turn diminished competition in the realm of buyer-broker services.

---

[60] NAR MLS Handbook 2023, at p. 23 Policy Statement 7.58; P. 87 Section 18.2.4.

[61] NAR MLS Handbook 2018, at p. 36 Policy Statement 7.31; NAR MLS Handbook 2023, at p. 41 Policy Statement 7.31.

**G.     The Conspiracy Harmed Homebuyers.**

~~142.~~152.     The rules and practices discussed above have collectively functioned to sustain elevated commission rates and deteriorate the quality of services that homebuyers received from buyer-brokers during the relevant period. These regulations led to increased buyer-broker commissions despite technological advancements and other changes that should have noticeably decreased commissions. Additionally, they hindered the capacity of more cost-effective alternatives to foster a more competitive market.

~~143.~~153.     There is no pro-competitive benefit to the conspiracy. Defendants and their co-conspirators artificially raised and maintained the financial costs of buyer-broker commissions, despite the diminishing role of buyer-brokers due to the emergence of third-party listing websites. NAR data indicates that many homebuyers now prefer to search for prospective homes independently through online services, rather than with a broker's help, and buyer-brokers are increasingly engaged only after their client has identified the desired home. Yet, despite the reduced involvement of buyer-brokers, buyer-agents still often received the same artificially high commission due to the conspiracy among Defendants and other brokers.

~~144.~~154.     The conspiracy between Defendants and other brokers has had many anti-competitive effects, including:

      a.  Homebuyers have incurred elevated buyer-broker commissions and total commissions, which were integrated into the purchase price of their homes;

      b.  Seller-brokers were disinclined to offer commissions below market rate for fear that the seller's house would not be shown;

      c.  The engagement of a buyer-broker became disconnected from the determination of the broker's commission;

      d.  There has been a suppression of price competition among brokers for retention by homebuyers;

55

e. Homebuyers' competitive ability has been hindered due to their inability to compete for home purchases by reducing the buyer-broker commission;

f. The quality of services provided by buyer-brokers has declined, as they are motivated to direct their clients towards homes with higher commissions;

g. The quality of buyer-broker services has further deteriorated due to obstacles that impeded buyer-brokers from presenting and receiving purchase offers that would lower the buyer-broker commission, thereby making these offers more appealing and acceptable to sellers; and

h. Brokers have significantly increased their profits by obtaining inflated buyer-broker commissions and total commissions.

145.155.    Defendants and their co-conspirators have not only maintained but, in terms of inflation-adjusted dollars, significantly increased the fees charged by buyer-brokers, a situation that markedly contrasts with trends in other industries. In almost every consumer sector — including bookselling, retail, home appliances, insurance, banking, and stock brokering — the emergence of technology and the proliferation of internet and discount sellers has tremendously benefited customers financially. Economists refer to this reduction of transaction costs as "disintermediation." The real estate brokerage market, worth approximately $70 billion annually, is particularly suited for such a transformation. Yet, despite the technological advancements that have diminished the role of brokers and the considerable fluctuations in housing market prices, brokerage fees have not adapted to these changes. This resilience, or "stickiness" in commissions is attributable to the collusive conspiracy alleged herein.

146.156.    There is also a notable discrepancy between buyer-broker costs and the commissions they earn. In a competitive market, pressure from and among competitors forces prices toward the marginal cost of goods (or services) sold. However, this pattern is not evident in real estate brokerage fees. For instance, the costs incurred by buyer-brokers are generally consistent, and have trended downward with technology, irrespective of the home's price. As noted

56

by the Wall Street Journal, "many, if not most, of the services that Realtors provide don't vary with the sales price, so the percentage fee should fall as home price rises." Contrary to this expectation, broker commissions remain disconnected from the amount, quality, and value of the services provided.

147.157.    Even if there were any plausible pro-competitive effects of Defendants' and their co-conspirators' conspiracy, those effects would be substantially outweighed by the conspiracy's anti-competitive effects.

148.158.    There is considerable economic evidence that Defendants' and their co-conspirators' conspiracy has inflated buyer-broker commissions and total commissions to well above a competitive level nationwide.

149.159.    The conspiracy among Defendants and their co-conspirators consistently kept broker commission rates at exceptionally stable and elevated levels over the past two decades. This trend persisted despite the emergence of the internet and the reduced role of buyer-brokers. From 2000 to 2017, the average national commission rate remained consistently high, between 5% and 5.4%, irrespective of varying market conditions.

150.160.    Housing prices in many areas have risen significantly recently, surpassing the rate of inflation. Given that commissions are calculated as a percentage of a home's sale price, the real dollar value of commissions has substantially increased alongside the price of homes. "For example, between 2001 and 2017, the average price of new homes in current dollars sold rose from $213,200 to $384,900, according to U.S. Census Bureau Statistics." [62]

---

[62] *Comments of Stephen Brobeck, Executive Director Consumer Federation of America Before the Department of Justice-Federal Trade Commission Public Workshop on Competition Issues*, CFA, 2 n.4 (June 5, 2018), https://consumerfed.org/wp-content/uploads/2018/06/CFA-comments-DOJ-FTC-publicworkshop-on-competition-issues.pdf.

151.161.     As the Consumer Federation of America points out: "[b]ecause the industry functions as a cartel, it can overcharge consumers tens of billions of dollars a year. . . . Consumers are increasingly wondering why they are often charged more to sell a home than to purchase a new car."[63]

152.162.     During the relevant period, the typical total broker commissions (i.e., the combined commission for the seller-broker and buyer-broker) in regions with NAR MLSs range from 5% to 6%, markedly higher than in countries with competitive residential real estate brokerage markets. In their 2002 study "International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry," economists Natalya Delcoure and Norm Miller observed: "Globally, we see much lower residential commission rates in most of the other highly industrialized nations, including the United Kingdom (UK), Hong Kong, Ireland, Singapore, Australia, and New Zealand. . . . In the UK, the [total] commission rates average less than 2%. . . . In New Zealand and South Africa, [total] commission rates average 3.14%. In Singapore, the [total] commission rates also tend to run around 3%."[64]

153.163.     Delcoure and Miller also noted variations within countries. For instance, in the United Kingdom, Delcoure and Miller found that "1%-2% is typical; in very competitive areas 0.5- 0.75%; in low priced areas [for homes] as high as 3.5%."[65] Ultimately, they concluded that, "[b]ased on global data . . . [total] US residential brokerage fees should equal something closer to

---

[63] Glen Justice, *Lobbying to Sell Your House*, N.Y. TIMES (Jan. 12, 2006), https://www.nytimes.com/2006/01/12/business/lobbying-to-sell-your-house.html.

[64] Natalya Delcoure & Norm G. Miller, *International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry*, 5 INTL. REAL ESTATE REV. 12, 14 (2002).

[65] *Id.* at 17.

3.0%."[66] That is approximately <u>half</u> of what such fees are now.

~~154.~~164.　　　Indeed, economists Chang-Tai Hsieh and Enrico Moretti have proposed that competition could potentially eliminate over half of the current commission rates. [67]

~~155.~~165.　　　The conspiracy to restrict price competition for commissions has had a significant negative economic impact. The Consumer Federation of America noted, "[i]f sellers and buyers each separately negotiated compensation with their brokers, uniform 5-6% commissions would quickly disappear."[68] This suggests that the current uniform commission rates born from NAR rules were maintained by the lack of individual negotiation and competition.

~~156.~~166.　　　The extent and significance of the overcharges at issue in this case have resulted in a tremendous economic burden for the putative class members and other consumers. Experts estimate that consumers could save approximately $30 billion or more each year if brokers competed on price.[69]

**H.　　Due to Defendants' Concealment of the Conspiracy and Plaintiffs' Reasonable Lack of Knowledge Thereof, the Statutes of Limitations have Been Tolled.**

~~157.~~167.　　　In the years leading up to the filing of this action, Defendants and their co-conspirators repeatedly and continuously engaged in anti-competitive behavior. This includes the implementation and enforcement of the Mandatory Commission Rule and other anti-competitive NAR rules.

~~158.~~168.　　　As a result of their conspiracy with the NAR and other brokerages, the Real

---

[66] *Id.* at 29.

[67] *See* Chang-Tai Hsieh & Enrico Moretti, *Can Free Entry be Inefficient? Fixed Commissions and Social Waste in the Real Estate Industry*, 111 J. POL. ECON. 1076, 1116 (2003).

[68] Brobeck & Woodall, *Supra* n.6.

[69] Mark S. Nadel, *A Critical Assessment of the Traditional Residential Real Estate Broker Commission Rate Structure (Abridged)*, 5 CORNELL REAL ESTATE REV. 26, 26 n.1 (2007).

Estate Company Defendants have consistently charged and collected, and continue to charge and collect, excessive buyer-broker commissions and total commissions. Plaintiffs and the other Class and Subclass members paid excessive and inflated commissions in connection with their purchase of residential real estate. Every instance of paying these inflated commissions by the Plaintiffs and the Class and Subclass members during the class period resulted in harm to them and created a new cause of action.

159.169.    Prior to the filing of this action, Plaintiffs and the other Class and Subclass members had no knowledge of Defendants' unlawful conspiracy with NAR and their other co-conspirators, nor a full understanding of Defendants' roles in that conspiracy, and could not have discovered it by the exercise of due diligence prior to the filing of this action.

160.170.    It was reasonable for Plaintiffs and the Class and Subclass Members not to suspect Defendants of engaging in illegal anti-competitive conduct. Plaintiffs and the members of the Class and Subclass, as typical homebuyers, lack extensive knowledge or insights about the real estate industry and are not familiar with NAR's rules and operations. Further, as explained above, NAR's policies, rules, and practices explicitly forbade revealing the total broker commissions to homebuyers and encouraged buyer-brokers to convey to their clients that they are receiving the brokers' services at no cost. Consequently, the average homebuyer was not made aware that they were incurring costs for buyer-broker services, much less that Defendants are conspiring to uphold excessively high broker commissions.

161.171.    For these reasons, the statutes of limitation applicable to Plaintiffs' and the other Class and Subclass members' claims have been tolled with respect to the claims asserted herein.

162.172.    Additionally, or alternatively, application of the doctrine of fraudulent

concealment tolled the statutes of limitations applicable to Plaintiffs' and the Class and Subclass members' claims.

163.173.     Defendants actively concealed the conspiracy by, for example, prohibiting the disclosure of total commissions to homebuyers and encouraging brokers to misrepresent to homebuyers that their services were free of charge.

164.174.     Moreover, Defendants' anti-competitive behavior was intrinsically self-concealing given NAR's strict control over its regulated MLSs, agents, and brokers. A reasonable buyer, under the circumstances, would not have had grounds to suspect exposure to anti-competitive actions. The policy that prevented NAR MLSs from disclosing to prospective buyers the commission a buyer-broker would receive for a home purchase on the MLS naturally hid the conspiracy's existence. Similarly, practices that allowed buyer-agents to falsely claim their services were complimentary to buyers, and actions by the Real Estate Company Defendants' agents to filter MLS listings based on buyer-broker commission levels and exclude homes offering lower commissions, were also inherently self-concealing.

I.     **The Home Seller Settlements Do Not Preclude Plaintiffs From Seeking Relief Here.**

165.175.     Recently, the NAR and a number of its members and co-conspirators—including Defendants HomeSmart and Fathom—have entered into class settlements to resolve claims brought by home sellers. *See, e.g.*, Order, *Burnett v. The Nat'l Assoc. of REALTORS®*, No. 4:19-cv-00332-SRB (W.D. Mo. Nov. 27, 2024), ECF No. 1622 (granting final approval to the NAR's seller-side class settlement). Under these settlements, the NAR and the other settling parties have agreed to pay compensation to home sellers and implement certain practice changes.

166.176.     The home seller settlements neither bar nor impede Plaintiffs' claims here in any way. As an initial matter, Plaintiffs are not class members in the NAR's settlement in

*Burnett* nor any of the other related home seller settlements, because Plaintiffs have never sold a home. As the *Burnett* court explained, "[t]he only people included in the settlements – and thus the only people giving any release – are people who *sold* homes during the class period." *Id.* at 62 (emphasis added). Conversely, "[p]eople who only *bought* homes during the class period" – like Plaintiffs here – "are not Settlement Class members. They have released nothing and can continue to litigate indirect purchaser claims should they so desire." *Id.* at 62 n.16 (emphasis added); *id.* at 66 ("People who only bought homes are not Class members. Such 'buyer only' individuals have released nothing and can litigate indirect purchaser buyer claims any way they desire, whether individually or in [other] cases. *Those cases will continue to be litigated*." (emphasis added)).

167.177.    Thus, Plaintiffs have neither released any claims related to their home purchases nor given up the right to pursue prospective relief. Because the seller-side settlements and the orders approving those settlements specifically carve out individuals with buyer-only claims from the settlement class, they are free to pursue their claims and the best possible relief tailored to their specific claims, just as Plaintiffs are doing here. *Id.*

168.178.    While the seller-side settlements do include practice changes that will apply to many estate transactions going forward, the changes do not eliminate all of the buyer-specific concerns raised in this matter, and there is real doubt as to whether the changes extend to buyers, especially those who, like Plaintiffs, are not class members.

169.179.    Indeed, in a Statement of Interest of the United States filed by the DOJ in the *Burnett* matter, the DOJ asserted that the seller-side settlements allow certain anticompetitive practices to continue, while simultaneously introducing new problems that pose risks specifically to homebuyers. Statement of Interest at 1-2, *Burnett*, No. 4:19-cv-00332-SRB (W.D. Mo. Nov. 24, 2024), ECF No. 1603.

170.180.     Specifically, the DOJ noted that the seller settlements "allow[ ] offers of compensation [from sellers] to continue," and also require "buyers and brokers" to enter into written agreements containing concerning provisions that "bear[ ] a close resemblance to prior restrictions among competitors that courts have found to violate the antitrust laws in other proceedings and could limit — rather than enhance — competition for buyers among buyer brokers." *Id.* at 2, 4.

171.181.     Accordingly, the DOJ concluded that even if the NAR settlement "achieves important concessions in the interests of the *private* actors in [the seller-side] litigation and satisfies Rule 23(e), such determination does not mean that the proposed settlement effectively prevents or restrains ongoing antitrust violations or remedies past violations, or itself contemplates practices that fully comply with the antitrust laws." *Id.* at 3-4 (emphasis in original).

**J.      Defendants' Ongoing Conduct Poses a Real and Immediate Threat of Future Harm.**

172.182.     Plaintiffs would like to be able to engage a real estate agent to assist them with the sale of their homes and any future home purchases. However, Plaintiffs cannot engage a realtor without subjecting themselves to the ongoing anticompetitive practices alleged herein that have caused and continue to cause broker commissions to remain elevated at supracompetitive levels.

173.183.     As explained above, if Plaintiffs sought to engage a brokerage or realtor who is a member of the NAR—and nearly all major brokers are—to assist with a transaction, Plaintiffs' brokerage and the individual agent would be *required* to follow NAR rules, guidelines, and practices like those challenged herein. Similarly, if Plaintiffs' selling agents were to list their homes on an MLS that is NAR-affiliated—and all major MLSs are—Plaintiffs could be subject to MLS Manipulation Practices like those at issue.

174.184.    To completely avoid subjecting themselves to the NAR's and its co-conspirators' practices, Plaintiffs' only option would be to list their homes for sale off of any MLS and without the assistance of a realtor, which would put them at a significant disadvantage compared to other home sellers. Likewise, in searching to purchase a new home, Plaintiffs could not engage a brokerage that is a NAR member. Neither of these options is a realistic alternative. As explained above, MLSs are essential to homebuying and selling, because they are the primary source of information for properties for sale. MLSs are where seller-agents make listings visible to buyer-agents, and similarly, where buyer-agents look to understand the marketplace and determine which homes are available purchase. Further, NAR member brokerages command significant shares of the market for real estate broker services, leaving homebuyers with limited options when seeking out buyer-agents who are not NAR members.

175.185.    Thus, Defendants' ongoing, anticompetitive practices pose a real and immediate threat of impending harm, including: putting Plaintiffs at a disadvantage relative to other homebuyers and sellers; making it more difficult and time consuming for Plaintiffs to market and sell their homes; impeding Plaintiffs' ability to purchase any desired properties; and preventing them from engaging an agent to help them navigate real estate transactions, which are complex and opaque to most ordinary consumers, thereby depriving them of access to MLSs as well as the guidance, market knowledge, negotiation skills, and time-saving assistance of an agent. Indeed, NAR statistics show that homes listed for sale by their owner, without the assistance of an agent, typically take longer to sell and "sell for less than the selling price of other homes."[70]

---

[70] https://www.nar.realtor/research-and-statistics/research-reports/highlights-from-the-profile-of-home-buyers-and-sellers#fsbo

## CLASS ALLEGATIONS

176.186.      Pursuant to Fed. R. Civ. P. 23, Plaintiffs bring this action both individually and on behalf of a class (the "Class") with one subclass (the "Subclass") of similarly situated individuals defined as follows:

> **Class:** All persons who, during the applicable limitations period, purchased residential real estate listed on an MLS in the United States where a commission was paid to any brokerage in connection with the transaction.

> **Subclass:** All persons who, during the applicable limitations period, purchased residential real estate listed on an MLS in the state of Illinois where a commission was paid to any brokerage in connection with the transaction.

177.187.      Expressly excluded from the Class and Subclass are any members of the judiciary assigned to preside over this matter and their staff; Plaintiffs' counsel and Defendants' counsel; any officer, director, or employee of Defendants and their affiliates as well as any immediate family members of such officers, directors, or employees; any individuals who have entered into a binding and enforceable arbitration agreement with Defendants that is in effect and covers the claims at issue in this matter; and any individuals who have already released or are otherwise barred from pursuing their claims against a Defendant, but only as to that Defendant.

178.188.      On information and belief, there are at least tens of thousands, if not hundreds of thousands, of members of the Class and Subclass, making the members of the Class and Subclass so numerous that joinder of all members is impracticable. Although the exact number of Class and Subclass members is unknown to Plaintiffs, the members can easily be ascertained through Defendants' records.

179.189.      Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Class and Subclass. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are

65

committed to vigorously prosecuting this action on behalf of the other members of the Class and Subclass and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Class and Subclass.

180.190.     Plaintiffs' claims are typical of the claims of the other members of the Class and Subclass, in that the factual and legal bases of Defendants' liability to Plaintiffs and to the other members of the Class and Subclass are the same. Plaintiffs and the other members of the Class and Subclass have all suffered similar harms and damages as a result of Defendants' anticompetitive practices and collection of unlawfully excessive commissions.

181.191.     There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Class and Subclass, and those questions predominate over any questions that may affect individual members of the Class and Subclass. Common questions for the Class and Subclass include, but are not limited to:

a.  Whether Defendants conspired with their co-conspirators as alleged herein;

b.  Whether the conspiracy harmed competition as alleged herein;

c.  Whether homebuyers were harmed because of Defendants' anti-competitive conduct as alleged herein;

d.  Whether buyer-agent commissions were elevated because of the conspiracy;

e.  Whether the quality of buyer-agent services was diminished because of the conspiracy;

f.  Whether the competitive harm from the conspiracy substantially outweighs any competitive benefits;

g.  Whether Defendants committed deceptive acts under the ICFA and materially similar consumer protection laws in other states by representing to the members of the Subclass that buyer-agent fees were free, paid by the seller, or otherwise not ultimately paid by the buyer;

h.  Whether Defendants should be enjoined from engaging in such conduct in the future;

66

   i. The appropriate class-wide measures of damages; and

   j. Whether Defendants should be ordered to disgorge all unlawful fees collected by them or on their behalf during the applicable limitations period.

182.192.  This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class and Subclass is impracticable. This proposed class action presents fewer management difficulties than individual litigation and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision making.

183.193.  Absent a class action, most members of the Class and Subclass would find the cost of litigating their claims to be prohibitive and would have no effective remedy. Unless the Class and Subclass are certified, Defendants will retain the monies they received from the members of the Class and Subclass as a result of their unfair and deceptive conduct.

**COUNT I**
**Violations of Section 1 of the Sherman Act, 15 U.S.C § 1**
**(On behalf of the Plaintiffs and the members of the Class and Subclass)**

184.194.  Plaintiffs reallege and incorporate by reference each of the foregoing allegations as though stated herein.

185.195.  During the applicable limitations period, Defendants and/or their co-conspirators engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

186.196.  The misrepresentations as to the payment of brokerage commissions and the increased prices of houses sold due to elevated broker commissions are actual and proximate

causes of harm to homebuyers. The contract, combination, or conspiracy alleged herein has consisted of continuing agreements among Defendants and their co-conspirators to set, raise, and maintain the level of broker commissions.

187.197. In furtherance of the contract, combination, or conspiracy, Defendants and their co-conspirators have committed one or more of the following overt acts:

    a. participated in the establishment, maintenance, and implementation of the Mandatory Commission Rule and other anti-competitive NAR rules;

    b. participated in the establishment, maintenance, and implementation of rules by NAR associations and MLSs that adopted the Mandatory Commission Rule and other anti-competitive NAR rules; and

    c. used their control over the NAR MLSs to force affiliated brokers, members, and franchisees to implement and adhere to the Mandatory Commission Rule and other anti-competitive NAR rules in the areas in which the NAR MLSs operate.

188.198. Defendants' and their co-conspirators' conspiracy has caused buyer-agents to conceal total commissions, to misrepresent to buyers that buyer-agents' services are free, to steer homebuyers towards high commission listings, and to diminish the value of buyer-agent services by restraining competition on buyer-agent commission fees in the home buying process. The conspiracy has also had the effect of excluding non-NAR-affiliated brokers from competing in the market for buyer-agent services by restricting access to lockboxes, which is required in order for buyer-agents to show houses for sale to their clients.

189.199. Defendants' and their co-conspirators' conspiracy also reduced competition among buyer-agents, thereby requiring buyers to pay inflated prices for their homes and inflated buyer-agent commissions. Reduced price competition among buyer-agents has also reduced the quality of broker services provided to homebuyers. This harm to competition substantially outweighs any competitive benefits arising from the conspiracy.

190.200.   Plaintiffs and the other members of the Class and Subclass paid inflated home purchase prices and broker commissions throughout the class period in connection with the purchase of residential real estate listed on the NAR MLSs. Absent Defendants' and their co-conspirators' conspiracy, Plaintiffs and the other members of the Class and Subclass would have paid lower prices for their homes and lower commissions.

191.201.   Plaintiffs and other members of the Class and Subclass also received diminished services from buyer-agents as a result of the conspiracy. Absent this conspiracy, Plaintiffs would have received improved services and had the ability to freely negotiate and reduce the purchase prices of their homes.

192.202.   As a direct and proximate result of Defendants' and their co-conspirators' past and continuing violations, Plaintiffs and the other Class and Subclass members have been injured in their business and property.

193.203.   Plaintiffs and the members of the Class and Subclass are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein, and to damages as permitted by law for the injuries they suffered because of Defendants' and their co-conspirators' anti-competitive conduct.

194.204.   Accordingly, with respect to Count I, Plaintiffs, individually and on behalf of the proposed Class and Subclass, pray for the relief set forth below.

## COUNT II
**Commission-Fixing Conspiracy in Violation of State Antitrust Laws**
**(On Behalf of Plaintiffs and the members of the Class and Subclass)**

195.205.   Plaintiffs reallege and incorporate by reference each of the foregoing allegations as though stated herein.

196.206.   Under the Illinois Antitrust Act ("IAA"), as well as other materially similar

69

antitrust statutes enacted by states throughout the country, it is unlawful to enter into a "contract, combination, or conspiracy with one or more other persons" to "unreasonably restrain trade or commerce[.]" 740 ILCS 10/3(2); *see also id.* § 3(1)(a) ("Every person shall be deemed to have committed a violation of this Act who shall . . . for the purpose or with the effect of fixing, controlling, or maintaining . . . the fee charged or paid for any service performed or received by the parties thereto").

207.     During the applicable limitations period, Defendants and/or their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in Illinois as well as other states for the purpose and with the effect of fixing, controlling, or maintaining the commissions paid to the Real Estate Company Defendants' brokers and agents. Defendants' and the co-conspirators' conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in Illinois and other states.

208.     Defendants' and their co-conspirators' agreement to uphold NAR rules, policies, and procedures related to buyer-agent compensation is *per se* unlawful under 740 ILCS 10/3(1) and materially similar provisions in other states' antitrust statutes because Defendants and their co-conspirators agreed to fix the commissions to be paid to buyer-agents. Defendants' commission-fixing conspiracy was not reasonably necessary to any separate, legitimate business purpose, transaction, or collaboration.

209.     Defendants' and their co-conspirators' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services within Illinois and other states with materially similar laws.

210.     As a result of Defendants' and their co-conspirators' unlawful conduct, Plaintiffs and other members of the Class and Subclass have been harmed by paying inflated prices

70

for their homes and elevated buyer-agent commissions and by receiving lower quality or fewer services.

201.211.      By engaging in the aforementioned conduct, Defendants and their co-conspirators intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of the IAA and other materially similar state antitrust laws.

202.212.      To the extent that Plaintiffs and the other Class and Subclass members are indirect, rather than direct, purchasers, they are permitted to bring claims for damages under the IAA and materially similar antitrust laws of other states that permit such indirect purchaser claims. 740 ILCS 10/7(2) ("No provision of this Act shall deny any person who is an indirect purchaser the right to sue for damages."). Although the IAA bars indirect purchasers from pursuing IAA claims on a class basis in state court, that limitation is procedural in nature and is not a substantive restriction that applies in federal court. *See* 740 ILCS 10/7(2) ("no person shall be authorized to maintain a class action in any court *of this State* for indirect purchasers asserting claims under this Act . . . .") (emphasis added). Accordingly, federal courts in this District *do* allow indirect purchasers to proceed with IAA claims as part of a class action under Federal Rule 23. *See, e.g., In re Dealer Mgmt. Sys. Antitrust Litig.*, 680 F. Supp. 3d 919, 988-89 (N.D. Ill. 2023); *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 763-65 (N.D. Ill. 2019); *Hatchett v. Henry Schein, Inc.*, No. 3:19-CV-83-NJR, 2020 WL 733834, at **2-4 (N.D. Ill. Feb. 13, 2020); *In re Broiler Chicken Antitrust Litig*, 290 F. Supp. 3d 772, 817-18 (N.D. Ill. 2017). *see also In re Aggrenox Antitrust Litig.*, No. 3:14-md-2516, 2016 WL 4204478, at **5-6 (D. Conn. Aug. 9,

71

2016).[71]

203.213.　　　Plaintiffs and the other members of the Class and Subclass seek damages as permitted by law in their respective states for the injuries they suffered as a result of Defendants' and the co-conspirators' anti-competitive conduct.

204.214.　　　Accordingly, with respect to Count II, Plaintiffs, individually and on behalf of the proposed Class and Subclass, pray for the relief set forth below.

**COUNT III**
**Violations of State Consumer Protection Laws**
**(On Behalf of Plaintiffs and the members of the Class and Subclass)**

205.215.　　　Plaintiffs reallege and incorporate by reference each of the foregoing allegations as if fully set forth herein.

206.216.　　　The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 502/1 *et seq.*, as well as other materially similar consumer protection statutes enacted by states throughout the country, prohibit deceptive acts and practices in trade and commerce. *See, e.g.*, Michigan Consumer Protection Act, Mich. Comp. Laws § 445.901 *et seq.* and Idaho Consumer Protection Act (ICPA), Idaho Code Ann. § 48-601 *et seq.*

207.217.　　　For example, Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act provides in relevant part that:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

---

[71] Because Plaintiffs' IAA claims may proceed on a class basis, the Court may assert subject matter jurisdiction over those claims under CAFA. *See supra* ¶ 52. Additionally, the Court may assert supplemental jurisdiction over the IAA claims because it has federal question subject matter jurisdiction over Plaintiffs' federal Sherman Act claims. *See supra* ¶ 51.

72

815 ILCS 505/2.

208.218.  Plaintiffs and the other members of the Class and Subclass are "consumers" protected under their respective states' consumer protection laws. Defendants' and their co-conspirators' business activities are subject to consumer protection laws because they involve trade or commerce, are addressed to the market generally, and implicate consumer protection concerns.

209.219.  During the relevant period, the NAR's rules and policies included numerous collusive and anti-competitive requirements, including the Mandatory Commission Rule, Commission Concealment Rules, and Free-Service Rule. The Real Estate Company Defendants and their co-conspirators required their real estate agents to join and remain a member in good standing of NAR and any local association or board of realtors in their respective territory. To satisfy this requirement, the Real Estate Company Defendants' and their co-conspirators' agents adopted and adhered to the Mandatory Commission Rule, the Commission Concealment Rules, and the Free Service Rule.

210.220.  While these NAR rules and policies were collusive and anti-competitive, they also enabled Defendants and their co-conspirators to intentionally misrepresent that buyer-agents' services were free of charge or otherwise paid by the seller, when in fact the buyer-agents' commissions were ultimately paid by the buyers.

211.221.  Misrepresenting their agents' services as free to buyers is a deceptive practice in violation of Section 2 of the ICFA and other states' consumer protection laws.

212.222.  Defendants and their co-conspirators concealed from Plaintiffs and the other Class and Subclass members that the cost of purchasing a house was artificially increased by the inclusion of agent commissions into the purchase price. This act of concealment or omission is a deceptive practice in violation of Section 2 of the ICFA and other states' consumer protection

73

laws.

213.223.    Defendants and their co-conspirators concealed from Plaintiffs and the other Class and Subclass members that the buyer-agents' commissions were paid uniformly regardless of the buyer-agents' experience, skill, or contribution to the homebuying process. This act of concealment or omission is a deceptive practice in violation of Section 2 of the ICFA and other states' consumer protection laws.

214.224.    Additionally, Defendants and their co-conspirators deceptively omitted and concealed the amounts of buyer-agent commissions offered to potential buyer-agents on MLSs and concealed that listing software enabled agents to steer buyers toward properties with higher buyer-agent commissions. This act of concealment or omission is a deceptive practice in violation of Section 2 of the ICFA and other states' consumer protection laws.

215.225.    Defendants and their co-conspirators intended that Plaintiffs and the other Class and Subclass members rely on these misrepresentations and omissions. Indeed, Defendants and their co-conspirators knowingly and intentionally misrepresented the true nature of buyer-agent commissions to maintain commissions at an artificially elevated rate.

216.226.    Plaintiffs and the other Class and Subclass members did actually rely upon and were actually deceived by Defendants' and their co-conspirators' misrepresentations and omissions. Plaintiffs and the other members of the Class and Subclass would have acted differently had they known that Defendants' and their co-conspirators' buyer-agent commissions were inflated, such as by, among other things, seeking out buyer-agents with discounted commissions or attempting to negotiate lower commission rates.

217.227.    As a direct and proximate result of Defendants' and their co-conspirators' anti-competitive, deceptive, unfair, unconscionable, and fraudulent conduct, Plaintiffs and the

74

other Class and Subclass members have been harmed and suffered actual damages through payment of higher prices for their homes and inflated buyer-agent commissions in exchange for lower quality of services.

218.228.    Further, Defendants' and their co-conspirators' violations of the Sherman Act, 15 U.S.C § 1, and state antitrust statutes like the Illinois Antitrust Act, 740 ILCS 10/1 *et seq.*, constitute unfair business practices under the ICFA and other states' consumer protection laws. Defendants' and their co-conspirators' actions unfairly imposed additional, unlawful costs on Plaintiffs and the other Class and Subclass members in the form of elevated home prices and excessive buyer-agent commissions. Defendants and their co-conspirators' actions are thus oppressive, unethical, and unscrupulous, and have caused substantial injury to consumers.

219.229.    Pursuant to Section 10a of the ICFA and materially similar provisions in other states' consumer protection laws, Plaintiffs and the other Class and Subclass members are entitled to bring a private cause of action under their respective states' consumer protection laws for the above violations and to actual damages in an amount to be proven at trial, injunctive relief, as well as costs and reasonable attorney's fees.

220.230.    Accordingly, with respect to Count III, Plaintiffs, individually and on behalf of the proposed Class and Subclass, pray for the relief set forth below.

### COUNT IV
### Unjust Enrichment
### (On behalf of Plaintiffs and the members of the Class and Subclass)

221.231.    Plaintiffs reallege and incorporate by reference each of the foregoing allegations as if fully set forth herein.

222.232.    Defendants and their co-conspirators received benefits from Plaintiffs and the Class and Subclass members and unjustly retained those benefits at their expense. For example,

75

Plaintiffs and the Class and Subclass members paid supracompetitive commissions to agents employed by the Real Estate Company Defendants or their co-conspirators. Defendants' and their co-conspirators' financial benefits resulting from their unlawful and inequitable conduct are economically traceable to overpayments for buyer-agent commissions by Plaintiffs and the other Class and Subclass members.

233. Additionally, Defendants and the co-conspirators promulgated and enforced anti-competitive rules, including the Mandatory Commission Rule, Commission Concealment Rules, Free-Service Rule, Non-Modification Rules, MLS Manipulation Practice and Lockbox Policy in order to raise, set, and maintain high commission rates and otherwise reduce competition in the market for buyer-agent services for its own gain, providing Defendants and their co-conspirators with economic, intangible, and other benefits.

234. Defendants and their co-conspirators unjustly retained those benefits at the expense of Plaintiffs and the other Class and Subclass members because Defendants' and their co-conspirators' conduct harmed Plaintiffs and Class and Subclass members, all without providing any commensurate compensation to Plaintiffs and the Class and Subclass members.

235. The benefits that Defendants and their co-conspirators derived from Plaintiffs and the other Class and Subclass members rightly belong to Plaintiffs and the other Class and Subclass members. It would be inequitable under principles of equity and unjust enrichment for Defendants and their co-conspirators to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

236. Defendants and their co-conspirators should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the other Class and Subclass members all unlawful

76

or inequitable proceeds they received, and such other relief as the Court may deem just and proper.

~~227.~~237.      Accordingly, with respect to Count IV, Plaintiffs, individually and on behalf

of the proposed Class and Subclass, pray for the relief set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other Class and Subclass

members, pray that the Court enter an order:

A.      Certifying the Class and Subclass proposed above, appointing Plaintiffs as class representatives of the Class and Subclass, and appointing the undersigned counsel as class counsel;

B.      Declaring that Defendants' actions, as set forth in this Complaint, violate Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.      Declaring that Defendants' actions, as set forth in this Complaint, violate the Illinois Antitrust Act and the Illinois Consumer Fraud and Deceptive Business Practices Act and materially similar antitrust and consumer protection statutes in other states;

D.      Awarding Plaintiffs and the other members of the Class and Subclass all available damages and/or restitution in an amount to be determined at trial;

E.      Awarding Plaintiffs pre- and post-judgment interest;

F.      Awarding Plaintiffs their costs of suit, including reasonable attorney's fees and expenses;

G.      Awarding Plaintiffs and the Class and Subclass members an injunction to permanently enjoin and restrain the Defendants from maintaining or re-establishing the same or similar anti-competitive rules, policies, or practices as those challenged in this action in the future; and

H.      Awarding such further and additional relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs request a trial by jury of all claims that can be so tried.

Dated: ~~March 6~~May 18, 2026                              Respectfully submitted,

JAMES TUCCORI, COURTNEY FOREGGER, KEVIN CWYNAR, DAWID ZAWISLAK, MICHAEL D'ACQUISTO, and ALEJANDRO LOPEZ a/k/a ALEANDRO LOPEZ, individually and on behalf of similarly situated individuals

By: */s/ Paul T. Geske*
One of Plaintiffs' attorneys

Myles McGuire
Evan Meyers
Paul T. Geske
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002
Fax: (312) 275-7895
mmcguire@mcgpc.com
emeyers@mcgpc.com
pgeske@mcgpc.com

Jonathan M. Jagher
~~FREED KANNER LONDON & MILLEN LLC~~
~~923 Fayette Street~~
~~Conshohocken, PA 19428~~
~~Tel: (610) 234-6487~~
~~jjagher@fklmlaw.com~~

Matthew W. Ruan
~~FREED KANNER~~JUSTICE JAGHER LONDON
& MILLEN LLC
100 Tri-State International, Ste. 128
Lincolnshire, IL 60069
Tel: (224) 632-4500
mruan@~~fk~~jjlmlaw.com
jjagher@jjlmlaw.com

*Counsel for Plaintiffs and the putative Class and Subclass members*

78