**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES TUCCORI *et al.*, individually and on behalf of similarly situated individuals, | ) ) ) ) | No. 1:24-cv-00150 |
| *Plaintiffs,* | ) ) | Hon. Lindsay C. Jenkins |
| v. | ) ) | Consolidated with: |
| AT WORLD PROPERTIES, LLC *et al.*, | ) ) | No. 24-cv-02399 No. 24-cv-03160 |
| *Defendants.* | ) ) ) | No. 24-cv-3356 No. 24-cv-9039 No. 24-cv-11735 No. 25-cv-04207 |
| | ) | |

**PLAINTIFFS' SECOND *UNOPPOSED* MOTION AND MEMORANDUM IN SUPPORT
OF PRELIMINARY APPROVAL OF SETTLEMENTS WITH PARTIES OPTING
<u>INTO THE COURT APPROVED CLASS SETTLEMENT AGREEMENT</u>**

**TABLE OF CONTENTS**

Table of Authorities ................................................................................................. iv

I.  INTRODUCTION ...........................................................................................1

II.  BACKGROUND ............................................................................................3

     A.  Prior Litigation Brought By Home Sellers Led To Settlements That Also Released Most Homebuyer Claims. ............................................................................4

     B.  The *Tuccori* Litigation Seeks Relief For The Remaining Unreleased Homebuyer Claims. ....................................................................................................6

     C.  Negotiations With Prospective Opt-In Settlors..........................................................7

III.  SUMMARY OF SETTLEMENT TERMS SPECIFIC TO OPT-IN SETTLORS ............10

     A.  The Settlement Class...............................................................................10

     B.  Relief To The Settlement Class Members. ...........................................................10

     C.  The Settlement's Opt-In Procedure. .................................................................12

     D.  Appointment Of The Special Master. ................................................................13

     E.  Releases...............................................................................................14

IV.  DISCUSSION .............................................................................................15

     A.  Legal Standard At The Preliminary Approval Stage. ...........................................15

     B.  The Settlement Provides Excellent Relief To The Settlement Class Members.....17

          i.  The benefits of settlement outweigh the cost, risk, and delay of further litigation. ..................................................................................20

          ii.  The proposed method of distributing relief to the Settlement Class is effective.................................................................................23

          iii.  The Opt-In Agreements do not introduce any concerns regarding Class Counsel's fee award...............................................................23

          iv.  There are no side agreements to be identified. .........................................24

C. Plaintiffs And Class Counsel Have Capably Represented The Settlement Class Members. ..................................................................................................24

D. The Opt-In Agreements Are The Product Of Arm's-Length Negotiations. ..........26

E. The Settlement Treats All Settlement Class Members Equitably......................... 27

F. The Limited Opposition To The Opt-In Settlements From *Batton* Counsel Is Unfounded...........................................................................................................28

V. CONCLUSION...............................................................................................................32

Certificate of Service ..............................................................................................................34

iii

## TABLE OF AUTHORITIES

**Supreme Court Cases**                                                                                **Page(s)**

*Ill. Brick Co. v. Ill.*,
   431 U.S. 720 (1977)...................................................................................................... 20

*Kansas v. UtiliCorp United, Inc.*,
   497 U.S. 199 (1990)...................................................................................................... 20

**Cases**

*Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*,
   No. 07 C 2898, 2011 WL 3290302 (N.D. Ill. July 26, 2011) ............................................ 25, 30

*Armstrong v. Bd. of Sch. Dirs. of Milwaukee*,
   616 F.2d 305 (7th Cir. 1980) ........................................................................................ 16

*Burnett v. Nat'l Ass'n of Realtors*,
   No. 4:19-CV-00332-SRB, 2024 WL 2842222 (W.D. Mo. May 9, 2024) ................................... 2

*Charvat v. Valente*,
   12-CV-05746, 2019 WL 5576932 (N.D. Ill. Oct. 28, 2019) ................................................... 22

*Crawford v. Equifax Payment Servs., Inc.*,
   201 F.3d 877 (7th Cir. 2000) ........................................................................................ 31

*Gautreaux v. Pierce*,
   690 F.2d 616 (7th Cir. 1982) ........................................................................................ 16

*Goldsmith v. Tech. Sols. Co.*,
   No. 92 C 4374, 1995 WL 17009594 (N.D. Ill. Oct. 10, 1995) ............................................. 20

*Henson v. East Lincoln Township*,
   108 F.R.D. 107 (C.D. Ill. 1985) ..................................................................................... 12

*Hudson v. Libre Tech., Inc.*,
   No. 3:18-cv-1371-GPC-KSC, 2020 WL 2467060 (S.D. Cal. May 13, 2020) ......................... 22

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*,
   270 F.R.D. 330 (N.D. Ill. 2010)..................................................................................... 17

*In re Cardizem CD Antitrust Litig.*,
   218 F.R.D. 508 (E.D. Mich. 2003) ................................................................................. 20

*In re Fico Antitrust Litig. Related Cases*,
No. 1:20-CV-02114, 2023 WL 6388247 (N.D. Ill. Sept. 28, 2023) ........................................ 21

*In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*,
MDL No. 2492, 2016 WL 3854603 (N.D. Ill. July 15, 2016) .................................................. 16

*Isby v. Bayh*,
75 F.3d 1191 (7th Cir. 1996) ........................................................................................ 17, 19

*Kaufman v. Am. Express Travel Related Servs. Co., Inc.*,
264 F.R.D. 438 (N.D. Ill. 2009) ................................................................................................ 16

*Leeder v. Nat'l Ass'n of Realtors*,
601 F. Supp. 3d 301 (N.D. Ill. 2022) .......................................................................................... 4

*Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*,
29 F.4th 337 (7th Cir. 2022) ..................................................................................................... 13

*Negrete v. Allianz Life Ins. Co. of N. Am.*,
523 F.3d 1091 (9th Cir. 2008) .................................................................................................. 29

*Nistra v. Reliance Trust Co.*,
No. 1:16-cv-04773, 2020 WL 13645290 (N.D. Ill. Mar. 12, 2020) ........................................ 16

*Paper Sys. Inc. v. Nippon Paper Indus. Co., Ltd.*,
281 F.3d 629 (7th Cir. 2002) .................................................................................................... 13

*Pickett v. Simos Insourcing Solutions, Corp.*,
249 F. Supp. 3d 897 (N.D. Ill. 2017) ........................................................................................ 15

*Ponzio v. Pinion*,
87 F.4th 487 (11th Cir. 2023) ............................................................................................. 26, 27

*Retired Chi. Police Ass'n v. City of Chi.*,
7 F.3d 584 (7th Cir. 1993) ........................................................................................................ 24

*Rutter & Wilbanks Corp. v. Shell Oil Co.*,
314 F.3d 1180 (10th Cir. 2002) .......................................................................................... 29, 30

*Snyder v. Ocwen Loan Servicing, LLC*,
No. 14 C 8461, 2019 WL 2103379 (N.D. Ill. May 14, 2019) ...................................... 24, 25, 27

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
463 F.3d 646 (7th Cir. 2006) .................................................................................................... 17

*T.K. ex rel. Leshore v. Bytedance Tech. Co., Ltd.*,
   No. 19-cv-7915, 2022 WL 888943 (N.D. Ill. Mar. 25, 2022) ...........................................*passim*

*Tech. Training Assocs., Inc. v. Buccaneers Ltd. P'ship*,
   874 F.3d 692 (11th Cir. 2017) ........................................................................................ 31

*Wong v. Accretive Health, Inc.*,
   773 F.3d 859 (7th Cir. 2014) .......................................................................................... 28

*Young v. Rolling in the Dough, Inc.*,
   No. 17-cv- 07825, 2020 WL 969616 (N.D. Ill. Feb. 27, 2020) ................................................ 22

## Other Authorities

*Manual for Complex Litigation (Fourth)* § 21.631 ....................................................... 17

*Manual for Complex Litigation (Fourth)* § 21.632 ................................................. 14, 16

## Rules

Fed. R. Civ. P. 23(e) ..........................................................................................*passim*

Plaintiffs, James Tuccori, Courtney Foregger, Kevin Cwynar, Dawid Zawislak, Michael D'Acquisto, and Alejandro Lopez a/k/a Aleandro Lopez, by and through their undersigned counsel, and pursuant to Section G of the Court-approved Class Settlement Agreement in this matter, respectfully move for preliminary approval of the Opt-In Agreements being filed herewith. In support of this Motion, Plaintiffs state as follows:

## I.  INTRODUCTION

The Court-approved Settlement[1] in this matter has succeeded in providing outstanding compensation for the Settlement Class Members. On October 16, 2025, the Court entered its Preliminary Approval Order (Dkt. 65), granting preliminary approval to the Class Settlement and establishing an opt-in mechanism by which "[t]he National Association of REALTORS®, and any real estate brokerage, franchisor, or real estate company that is not a Party to th[e] Settlement Agreement" could elect to opt into the Settlement in exchange for fulfilling certain conditions and making a monetary contribution to the Settlement's Global Settlement Fund, among other things. (Dkt. 58-1 ¶ 36).

The Settlement's Opt-In Period closed on April 13, 2026, and Plaintiffs are pleased to report that they have reached settlements with eleven more Opt-In Settlors,[2] adding to the prior

---

[1] Unless stated otherwise, capitalized terms used in this Motion are intended to be interpreted in accordance with the definitions in the Court-approved Class Settlement Agreement. (Dkt. 58-1).

[2] The eleven Opt-In Settlors whose settlements are presented in this Motion are Defendant HomeSmart International, LLC; Defendant Fathom Realty, LLC; Realty ONE Group Inc., Kempa and Associates LLC d/b/a Realty ONE Group Excel, and Umro Realty Corp d/b/a The Agency, which are defendants in an action filed by Plaintiffs' counsel captioned *Cwynar v. The Real Brokerage, Inc. et al.*, 25-cv-07289 (N.D. Ill.) (Alexakis, J.); Hanna Holdings, Inc. which is a defendant in *Davis v. Hanna Holdings, Inc.*, 24-cv-02374 (E.D. Pa.) (Beetlestone, J.); Douglas Elliman Inc., HomeServices of America, Inc., BHH Affiliates, LLC, and HSF Affiliates LLC which are defendants in *Lutz et al. v. HomeServices of America, Inc. et al.*, 24-cv-10040 (S.D. Fl.) (Moore, J.); eXp World Holdings, Inc., Compass, Inc., and United Real Estate Holdings, LLC d/b/a United Real Estate Group which are defendants in *Batton et al. v. Compass, Inc. et al.*, No. 1:23-cv-15618 (N.D. Ill.) (Hunt, J.); and The National Association of REALTORS® which is a defendant in *Batton v. The Nat'l Ass'n of Realtors*, No. 21-cv-00430 (N.D. Ill.) (Hunt, J.).

1

Court-approved settlements with the ten initial Settling Defendants and the five prior Opt-In Settlors. (Dkt. Nos. 58, 98). These 26 Settling Parties have collectively agreed to contribute a total of $120,334,500 to the Global Settlement Fund. By any measure, this is an exceptional result for the Settlement Class.

As the Court is aware, this homebuyer antitrust Litigation was preceded by other class actions brought on behalf of people who sold homes. (Dkt. 162 at 1). That litigation led to settlements that released all home seller claims and most homebuyer claims, leaving only a small sliver of "buyer-only" claims remaining. This Settlement favorably resolves those remaining claims for amounts that are entirely consistent with the existing settlements. As explained below, the settlements here capture just as much per claim as the home seller plaintiffs negotiated after they prevailed at trial. This result is especially noteworthy since the homebuyer claims here are "indirect purchaser" claims involving merits challenges and problems of proof that the direct purchasers (home sellers) did not have to contend with.

The opt-in procedures established here were modeled off a similar opt-in mechanism employed in the *Burnett* home seller settlement. *See Burnett v. Nat'l Ass'n of Realtors*, No. 4:19-CV-00332-SRB, 2024 WL 2842222, at *5 (W.D. Mo. May 9, 2024) ("The NAR settlement also provides opportunities for various multiple listing services and brokerages to opt-in to the settlement, which may provide still further financial compensation to the Settlement Class."). The opt-in process succeeded there and has proven successful here as well. Indeed, the opt-in settlements in the aggregate are even stronger than those the Court approved previously—both in terms of the total dollar amount and as a percentage of the corresponding home seller settlements—demonstrating that the Settlement's opt-in process helped encourage further settlements that, if approved, will grow the Global Settlement Fund for the benefit of the Settlement Class. *Id.*

(collecting cases and explaining that an early settlement can deliver significant value by "serving as an 'ice-breaker' settlement to potentially facilitate future settlements").

The Opt-In Agreements presented with this Motion are the product of months of investigation, confirmatory discovery, and extensive arm's length negotiations including seven separate mediations overseen by the Court-appointed Special Master for Mediation, former Northern District of Illinois Chief Judge James F. Holderman (Ret.). Plaintiffs' efforts have yielded a set of settlements that, if approved, promise to provide certainty, closure, and tremendous compensation to the Settlement Class. Accordingly, Plaintiffs respectfully request that the Court grant preliminary approval to the Opt-In Agreements submitted with this Motion to allow the Settling Parties to provide notice of the Settlement to the Settlement Class.[3]

## II.    **BACKGROUND**

The claims in this Litigation arise out of an alleged antitrust conspiracy among the National Association of REALTORS® ("NAR") and residential real estate brokers across the country. (First Amended Consolidated Complaint ¶¶ 1-25, Dkt. 123). Plaintiffs allege that the NAR and its members promulgated anticompetitive rules designed to keep brokers' commissions artificially elevated, and that the Defendants and their co-conspirators adopted, implemented, and enforced those rules in residential real estate transactions. (*Id.*). This conspiracy allegedly impaired competition in the market for residential real estate broker services nationwide to the detriment of consumers, who unwittingly paid inflated commissions as part of their respective home transactions. (*Id.*).

---

[3] To avoid repetition, Plaintiffs incorporate by reference their initial Preliminary Approval Motion (Dkt. 58), the Parties' Class Settlement Agreement (Dkt. 58-1), and the Court's October 16, 2025 Preliminary Approval Order (Dkt. 65), which fully describe the Settlement's terms and support the fairness and adequacy of the Settlement and Opt-In Agreements.

Plaintiffs plead claims for (I) violations of the Sherman Antitrust Act, 15 U.S.C. § 1; (II) violations of the Illinois Antitrust Act ("IAA"), 740 ILCS 10/1 *et seq.* and substantially similar antitrust statutes in other states; (III) violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq*. and substantially similar consumer fraud statutes in other states; and (IV) unjust enrichment. (*See generally id.* ¶¶ 184-227).

**A.      Prior Litigation Brought By Home Sellers Led To Settlements That Also Released Most Homebuyer Claims.**

While the *Tuccori* action seeks relief on behalf of home*buyers*, it follows on the heels of prior antitrust cases brought by home *sellers*. Homebuyers and sellers are on two sides of the same transaction, and both incur costs from elevated broker commissions albeit in different ways. (*See id.* ¶¶ 1, 79-80, 132). Brokers' commissions are deducted from the home seller's proceeds pursuant to a listing agreement, but a portion of those costs are also passed through to homebuyers because they are incorporated into the purchase price of the home. *Leeder v. Nat'l Ass'n of Realtors*, 601 F. Supp. 3d 301, 308-11 (N.D. Ill. 2022) (Wood, J.). In antitrust parlance, this makes home sellers the "direct purchasers" of broker services (because they contract directly with the seller-broker and are the "party *paying* the commission"), whereas homebuyers are deemed "indirect purchasers" (since the commissions are "'baked into' the purchase price" of the home and "'passed through' to the buyer"). *Id.* at 309-10.

The first home seller cases were filed in 2019 following an investigation by the U.S. Department of Justice into the NAR's practices. Home seller plaintiffs brought Sherman Act claims against the NAR and multiple brokerages in two cases, one in the U.S. District Court for the Western District of Missouri and the other in the Northern District of Illinois. *Burnett v. The Nat'l Ass'n of Realtors*, No. 19-cv-00332 (W.D. Mo.); *Moehrl v. The Nat'l Ass'n. of Realtors*, No. 19-cv-01610 (N.D. Ill.). The *Burnett* and *Moehrl* cases were vigorously litigated, and in 2023 the

4

claims in *Burnett* were tried on a class basis before a jury, resulting in a verdict in favor of the plaintiff class of nearly $1.8 billion prior to trebling.[4]

The Missouri litigation led to settlements with numerous brokerages and real estate companies beginning in 2023. The trial verdict increased the number and pace of the settlements. Nearly all of the Settling Defendants and Opt-In Settlors in this matter reached settlements either in *Burnett* or one of the other home seller cases.[5] The settlements culminated in a global settlement with the NAR, which included an opt-in procedure like the one the Court approved here. The opt-in mechanism in the NAR's settlement led to additional settlements with more than two dozen non-party opt-in settlors in *Burnett*.[6]

Importantly, the releases in the home seller settlements cover *all* of the home seller class members' claims arising out of the alleged conspiracy among real estate brokerages, including claims related to home sales *and* any home purchases those individuals made during the same period. (*See, e.g.*, Order at 59, *Burnett*, 4:19-cv-00332 (W.D. Mo. Nov. 27, 2024), ECF 1622, hereinafter the "*Burnett* Final Approval Order"); (Order Granting Final Approval at 49-50, *Hooper*, 1:23-cv-05392 (N.D. Ga. Mar. 31, 2026), ECF 245, hereinafter the "*Hooper* Final Approval Order"). Because most individuals who sell a home also simultaneously buy a new one to relocate to, the vast majority of homebuyers are also sellers. (*Id.*) Indeed, as explained in prior

---

[4] Verdict Form at 2, *Burnett*, 4:19-cv-00332-SRB (W.D. Mo. Oct. 31, 2023), ECF No. 1294. *Moehrl* was also procedurally advanced, with summary judgment and *Daubert* motions pending and a trial anticipated to begin in January 2025 if not for settlements.

[5] *See, e.g., Gibson et al. v. The Nat'l Ass'n of Realtors® et al.*, No. 4:23-cv-00788-SRB (W.D. Mo.); *Keel et al. v. House of Seven Gables Real Estate, Inc. et al.*, No. 4:25-00055 (W.D. Mo.); *1925 Hooper LLC et al. v. The Nat'l Ass'n of Realtors et al.*, No. 1:23-cv-5392-MHC (N.D. Ga.).

[6] *See* Mot. for Preliminary Approval of Settlements with Brokerages and Non-Realtor Multiple Listing Services Opting Into the NAR Settlement, *Burnett*, No. 4:19-CV-00332-SRB (W.D. Mo. Sept. 30, 2024), ECF No. 1538.

filings, as many as 79-76% of all homebuyers have also sold a home and thus fall within the home seller settlement classes; only approximately 21-24% of homebuyers have "buyer-only" claims unreleased by the home seller settlements.[7]

> **B.** **The *Tuccori* Litigation Seeks Relief For The Remaining Unreleased Homebuyer Claims.**

*Tuccori* was initiated in December 2023, and the *Tuccori* Plaintiffs seek relief for the "buyer-only" claims carved out of the home seller settlements. From the outset of the Litigation, Class Counsel invested significant time and effort into advancing the Plaintiffs' and Class Members' claims, including conducting a robust pre-filing investigation; preparation and filing of pleadings and amended pleadings in the seven cases consolidated before this Court as well as *Cwynar v. The Real Brokerage, Inc. et al.*, 25-cv-07289 (N.D. Ill.) (Alexakis, J.); briefing four lengthy motions to dismiss in addition to motions to strike class allegations across the *Tuccori*, *Zawislak*, and *Cwynar* cases; organizing and coordinating the proceedings in multiple cases against numerous defendants; engaging in extensive, lengthy settlement negotiations with the Settling Defendants and Opt-In Settlors, which included undertaking thorough and detailed research into brokerages' relevant financial information, reviewing publicly available transaction data for each brokerage, studying each brokerage's home seller settlement, and comparing each brokerage with similarly situated brokerages to assess settlement values, confirmatory discovery, preparation of mediation submissions, and numerous separate mediation sessions. (Dkt. 58-5 ¶¶ 13-22).

Class Counsel's hard work succeeded in advancing the buyer-side litigation and securing strong settlements for the Settlement Class Members. The *Tuccori* Plaintiffs were the first

---

[7] Based on expert testimony and available data, roughly 79-76% of homebuyers have sold a home, meaning that they are included in the home seller settlements and have released their claims. This leaves only 21-24% of homebuyers with unreleased "buyer-only" claims. (Dkt. 110 at 6); (Dkt. 116-1 at 15).

nationwide to achieve a homebuyer (indirect purchaser) class settlement, and the *Tuccori* Plaintiffs' counsel were the first to be appointed class counsel for a homebuyer class. In 2024, the *Tuccori* Plaintiffs' counsel reached the first-ever homebuyer antitrust settlement with Defendant At World Properties, LLC ("@properties") following a mediation conducted by Judge Holderman. (Dkt. 58 at 5). *Tuccori* Class Counsel subsequently reached additional settlements with nine other real estate brokerage company defendants who agreed to join with @properties in a global settlement presented for approval in October 2025. (*Id.* at 5-6). The negotiations that preceded these ten settlements spanned many months and numerous, separate mediation sessions. (*Id.* at 5-6, 20-21). The Court granted preliminary approval on October 16, 2025, finding the Settlement fair, reasonable, adequate, and negotiated at arms' length by experienced counsel. (Dkt. 65 ¶ 3).

      **C.**      **Negotiations With Prospective Opt-In Settlors.**

As noted above, the *Tuccori* Settlement includes an opt-in mechanism—modeled off the NAR's settlement approved in *Burnett*—that allowed unnamed real estate brokerages and alleged co-conspirators to opt into the Settlement by agreeing to implement or maintain certain practice changes and contributing a payment to the Settlement's Global Settlement Fund, which grows the monetary relief available for distribution to the Settlement Class. (Dkt. 58-1 ¶¶ 35-36); (Dkt. 58 at 8) (summarizing the Settlement's opt-in procedure). Because alleged co-conspirators are allegedly jointly and severally liable for the same claims the *Tuccori* Plaintiffs asserted against the original Defendants, the Court-approved Settlement directed Class Counsel to "use their best efforts to resolve Released Claims with the National Association of REALTORS®, and any real estate brokerage, franchisor, or real estate company that is not a Party to this Settlement Agreement during the Opt-In Period." (Dkt. 58-1 ¶ 36).

As part of the Court-approved opt-in procedures, the Court appointed Judge Holderman to

serve as the Special Master for Mediation to conduct, supervise, and oversee mediations with non-parties who elected to attend a mediation in an effort to become an Opt-In Settlor. (Dkt. 58-1 ¶¶ 32-34); (Dkt. 65 ¶ 15). Pursuant to the Court-approved opt-in procedures, Class Counsel previously sought approval of opt-in settlements with five brokerages following mediations with Judge Holderman in his role as Special Master. (Dkt. 98). The Court preliminarily approved those settlements on March 4, 2026. (Dkt. Nos. 117-119).

The Opt-In Agreements presented with this Motion were reached through the same Court-approved opt-in process, including multiple mediation sessions with Judge Holderman. (Second Supplemental Declaration of Special Master for Mediation Judge James F. Holderman (Ret.) ¶ 4, attached hereto as Exhibit A and hereinafter the "Holderman Decl.") In addition to the numerous mediation sessions Class Counsel had with the original Settling Defendants and the other Opt-In Settlors, the negotiations with the prospective Opt-In Settlors identified in this Motion included seven separate mediation sessions:

- With Hanna Holdings, Inc. conducted by Judge Holderman on March 13, 2026;

- With Douglas Elliman Inc. conducted by Judge Holderman on March 23, 2026;

- With HomeSmart International, LLC conducted by Judge Holderman on March 24, 2026;

- With The National Association of Realtors® conducted by Judge Holderman on March 27, 2026;

- With HomeServices of America, Inc., BHH Affiliates, LLC, and HSF Affiliates LLC conducted by Judge Holderman on March 30, 2026;

- With Compass, Inc. before former Magistrate Judge Michael T. Mason (Ret.), conducted under Judge Holderman's supervision, on April 9, 2026; and

8

- With eXp World Holdings, Inc. conducted by Judge Holderman on April 10, 2026.

(Holderman Decl. ¶ 4); (Declaration of Paul T. Geske ¶ 9, attached hereto as Exhibit B and hereinafter the "Geske Decl.").[8] These sessions were conducted at arm's-length according to Judge Holderman's mediation procedures and the terms of the Court-approved Class Settlement Agreement. (Geske Decl. ¶ 10); (Holderman Decl. ¶¶ 9-10). The negotiations were often contentious, albeit always civil, and in many instances the negotiating parties did not reach a settlement at the mediation itself, leading to extended negotiations over the days and weeks that followed. (Geske Decl. ¶ 10); (Holderman Decl. ¶ 11). Even where the negotiating parties did reach an agreement in principle at the mediation itself, negotiations continued concerning the specific terms and contours of each opt-in agreement. (Geske Decl. ¶ 10). The settlements with the other Opt-In Settlors were reached through arm's-length direct negotiations with counsel for each Opt-In Settlor. (*Id.* ¶¶ 11-12).

Prior to reaching an agreement with each Opt-In Settlor, Class Counsel undertook research into each Opt-In Settlor's involvement in the alleged conspiracy to raise, fix, maintain, or stabilize real estate broker commissions in violation of Section 1 of the Sherman Act, state antitrust laws, and state consumer protection laws, including their participation in the NAR, their role and relative size in the real estate broker services market, and their adoption, implementation, and enforcement of the challenged NAR rules at issue. As part of the negotiations, Class Counsel considered extensive information relevant to the strength of the Plaintiffs' and the Class Members' claims against each prospective Opt-In Settlor. For example, Class Counsel reviewed numerous mediation

---

[8] Importantly, Judge Holderman was aware, prior to each of these mediations, of the existence of concurrent homebuyer litigation against some of the prospective Opt-In Settlors. But at no time during any of the negotiations did the Parties discuss or disclose settlement negotiations (if any) that may have occurred in connection with the parallel litigation. (Holderman Decl. ¶¶ 5-6, 9).

briefs, robust confirmatory discovery, and financial information bearing on ability-to-pay issues where applicable. Class Counsel also evaluated each potential settlement against relevant benchmarks, such as each Opt-In Settlor's respective home seller settlement.

## III.   SUMMARY OF SETTLEMENT TERMS SPECIFIC TO OPT-IN SETTLORS

The terms of the Class Settlement Agreement have already been presented and discussed at length in prior filings. (*See generally* Dkt. Nos. 58, 58-1). To avoid repetition, this Motion focuses solely on settlement terms bearing on the settlements with the prospective Opt-In Settlors.

### A.   The Settlement Class.

In its Preliminary Approval Order, the Court preliminarily certified the Settlement Class defined as follows:

> All persons who purchased a home that was listed on an MLS anywhere in the United States where a commission was paid to any brokerage in connection with the transaction during the Class Period.

(Dkt. 65 ¶¶ 5-6); (*see also id.* ¶ 7) (listing certain exclusions). None of the Opt-In Agreements alter the Class Definition itself, but they do extend the Class Period to be consistent with the Class Period in the Court-approved Opt-In Agreement with Anywhere Real Estate Inc. ("Anywhere") (Dkt. 98 at 6). This is to account for the various limitations periods applicable to the Class Members' claims and to encompass all time periods at issue in this case and other homebuyer antitrust litigation.

### B.   Relief To The Settlement Class Members.

The Settlement established a Global Settlement Fund to pool all payments from the Settling Defendants and Opt-In Settlors. (Dkt. 58-1 ¶¶ 6, 42, 69-73). The prospective Opt-In Settlors have agreed to the following payments subject to Court approval:

10

| Prospective Opt-In Settlor(s) | Total Contribution to Settlement Fund |
|---|---|
| HomeSmart International, LLC | $600,000 |
| Fathom Realty, LLC | $250,000 |
| Realty ONE Group Inc. and Kempa and Associates LLC d/b/a Realty ONE Group Excel | $500,000 |
| Umro Realty Corp d/b/a The Agency | $300,000 |
| Douglas Elliman Inc. | $2,041,250 |
| Hanna Holdings, Inc. | $8,250,000 |
| HomeServices of America, Inc., BHH Affiliates, LLC, and HSF Affiliates LLC | $30,000,000 |
| The National Association of REALTORS® | $52,250,000 |
| eXp World Holdings, Inc. | $4,335,000 |
| Compass, Inc. | $7,331,250 |
| United Real Estate Holdings, LLC d/b/a United Real Estate Group | $487,500 |
| **Total** | **$106,345,000** |

These contributions, coupled with the $13,989,500 in payments from Court-approved settlements with the initial Settling Defendants and the other Opt-In Settlors (Dkt. 98 at 4), bring the Settlement's total monetary relief to $120,334,500. (Geske Decl. ¶ 25). Each Opt-In Settlor's payment is non-reversionary; that is, no amount will revert if the Settlement is approved. Following final approval, the Global Settlement Fund—including all contributions from both the initial Settling Defendants and all Opt-In Settlors—will be fully distributed pursuant to the Court-approved plan of allocation after deductions for Court-approved administrative costs, litigation expenses, and attorney fees in accordance with the Settlement Agreement. (Dkt. 58-1 ¶¶ 69-71). When Plaintiffs submit their plan of allocation, they will propose a formula under which each individual payment will be determined equitably according to a pro rata formula that takes into account the commissions each claimant paid as part of their home purchase.

In addition to monetary relief, the Opt-In Agreements also provide non-monetary,

11

prospective relief to the Settlement Class Members by requiring that the Opt-In Settlors agree to maintain or extend certain practice changes like those set forth in the Settlement Agreement. (*See generally* Exs. 1-11 to Geske Decl.). These practice changes are aimed at addressing the conduct that led to the Litigation. (Dkt. 58-1 ¶ 78); (Dkt. 58 at 8, 24).

### C. The Settlement's Opt-In Procedure.

Under the Court-approved opt-in procedure, non-parties that allegedly participated in the antitrust conspiracy could opt into the Settlement in exchange for agreeing to the terms of an opt-in agreement that obligates them to 1) maintain and extend certain practice changes and 2) contribute a payment to the Global Settlement Fund, thereby increasing the total monetary relief available for distribution to the Settlement Class. As noted above, this opt-in mechanism was based on a similar opt-in mechanism approved as part of the NAR's settlement in *Burnett*.[9]

This opt-in procedure is particularly well-suited to the real estate broker antitrust litigation for three primary reasons. ***First***, the alleged conspiracy at issue permeated virtually the entire real estate broker industry and included numerous participants. (*Burnett* Final Approval Order at 81) ("the litigation challenged practices that were central to the real estate brokerage industry."). The opt-in procedure provided an effective means of joining many of the most prominent alleged co-conspirators for purposes of holding these entities accountable and effectuating a global settlement.[10] ***Second***, under well-established antitrust law, each alleged co-conspirator can be held

---

[9] As in this case, the opt-in procedure in *Burnett* was available to not just to existing parties, but also non-parties, including those that had been named in other, concurrent litigation. (*See, e.g., Hooper* Final Approval Order at 6) (noting that "[t]he parties sought a stay for sixty days so that the defendants who were not automatically released under the NAR settlement could determine whether to opt in.").

[10] The opt-in procedure is analogous to a defendant class action, which allows a plaintiff to join numerous defendants in order to obtain an effective remedy. *Henson v. East Lincoln Township*, 108 F.R.D. 107, 111 (C.D. Ill. 1985) (collecting cases demonstrating the "long history" of defendant class actions, and noting that "[c]ertification of defendant classes has also been allowed . . . in anti-trust actions involving common issues").

jointly and severally liable for all damages flowing from the conspiracy, so aggregating funds from multiple alleged conspirators ensures that the class receives sufficient compensation without bankrupting any individual entity. *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 347 (7th Cir. 2022) ("antitrust conspiracy liability is joint and several."); *Paper Sys. Inc. v. Nippon Paper Indus. Co., Ltd.*, 281 F.3d 629, 633 (7th Cir. 2002) ("If [the plaintiffs] can prove that there was indeed a conspiracy, they may collect damages not just firm-by-firm according to the quantity each sold, but from all conspirators for all sales."). And ***third***, because all alleged co-conspirators are potentially liable to the *Tuccori* Plaintiffs and the Settlement Class members for the same claims and the same damages, joining the co-conspirators in a single action promotes efficiency and consistency for the benefit of the Settlement Class.

The opt-in procedure was successfully employed in *Burnett*, where it led to additional settlements with more than two dozen opt-in settlors. The Court-approved opt-in mechanism in this case has proven successful here as well, leading to settlements with 16 other alleged co-conspirators and substantial additional compensation for the Settlement Class.

### D. Appointment Of The Special Master.

In its Preliminary Approval Order, the Court appointed Judge Holderman as the Special Master for Mediation. (Dkt. 65 ¶ 15). Judge Holderman's responsibilities included conducting, supervising, and overseeing mediations with non-parties who elected to attend a mediation with the Special Master in an effort to become an Opt-In Settlor, either personally or through others working under his supervision. (*Id.*). Judge Holderman followed the Court's Order in effectuating the opt-in process, including mediating settlements with Opt-In Settlors that have committed to make substantial contributions to the Global Settlement Fund for the benefit of the Settlement Class. (Holderman Decl. ¶¶ 4, 9). While this work is now complete, Judge Holderman has offered

to remain available to the Parties and the Court should they require his assistance. (*Id.* ¶ 13); *Manual for Complex Litigation (Fourth)* § 21.632 ("the judge can have a court-appointed expert or special master review the proposed settlement terms, gather information necessary to understand how those terms affect the absent class members, and assist the judge in determining whether the fairness, reasonableness, and adequacy requirements for approval are met.").

### E.  Releases.

The release terms in the Opt-In Agreements presented for approval mirror those that the Court has already preliminarily approved. (*Compare* Dkt. 58-1 ¶¶ 29-31 *with* Ex. 1 to Geske Decl. ¶¶ 24-26). The release provision in NAR's Opt-In Agreement, however, is modified to reflect its status as a trade association comprised of individual members, brokers, local associations, and REALTOR® boards.[11] Consistent with the NAR's settlement agreement in *Burnett*, and as more fully set forth in NAR's Opt-In Agreement, the NAR's release provision encompasses the NAR and its affiliates as well as the following entities provided they meet certain conditions, including that they agree to abide by the practice changes set forth in the NAR's Opt-In Agreement: (i) NAR Members, Associate Members, and Member Boards that do not operate an unincorporated Multiple Listing Service ("MLS"); (ii) Realtor MLSs and non-Realtor MLSs, as described in the Opt-In Agreement; and (iii) real estate brokerages that have a REALTOR® as a Principal with membership in the NAR on the date of Class Notice and a Principal who was a Participant in any MLS during the Class Period. (Ex. 4 to Geske Decl. ¶ 8).

---

[11] "NAR is a membership organization whose membership dues are paying for the Settlement, at least in part. The record supports that NAR would not have settled if the release did not include, at a minimum, its small agent and broker members—and certainly would not have settled for the amount it did[.]" (*Burnett* Final Approval Order at 45).

14

The NAR's *Burnett* settlement expressly excluded any real estate brokerages that had more than $2 billion in annual transaction volume. (*See Burnett* Final Approval Order at 45). This "cut-off" reflected the parties' estimate of the minimum size a brokerage would likely need to be in order to have sufficient resources to contribute toward a settlement or litigated judgment. (*Id.*) ("this Court doubts whether it would be feasible or cost effective for the Class to bring expensive antitrust litigation to recover funds from thousands of small brokerages that could not afford to pay significant amounts.").

Plaintiffs' Opt-In Agreement with the NAR contains a similar exclusion that carves out any "entities that have settled or been named as a defendant in any lawsuit or action alleging claims that share the same factual predicate as those asserted in the Litigation as of" the date the NAR publicly announced its settlement, including "the defendants that are or were named in the Litigation, Burnett, Gibson, Keel, Keel II, Hooper, or Lutz." (Ex. 4 to Geske Decl. ¶ 8.vi.). This language is simply a different means of accomplishing the same goal as the exclusion in the NAR's *Burnett* settlement: preserving potential claims against brokerages that are large enough to contribute to a settlement or otherwise be named in litigation in order to leave open the possibility of additional recoveries for the Class. Indeed, because nearly all of the pursuable brokerages have already reached settlements or been named as defendants in one of the home seller cases, the exclusion in the NAR's Opt-In Agreement has the same practical effect as its exclusion in its *Burnett* settlement.

## IV.     **DISCUSSION**

### A.     **Legal Standard At The Preliminary Approval Stage.**

"At the preliminary approval stage, the Court's task is to 'determine whether the proposed settlement is within the range of possible approval.'" *Pickett v. Simos Insourcing Solutions, Corp.*,

249 F. Supp. 3d 897, 898 (N.D. Ill. 2017) (quoting *Armstrong v. Bd. of Sch. Dirs. of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980)); *see generally Manual for Complex Litigation (Fourth)* § 21.632. The purpose of the preliminary approval inquiry is "to ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing." *Gautreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982); *see also Kaufman v. Am. Express Travel Related Servs. Co., Inc.*, 264 F.R.D. 438, 447 (N.D. Ill. 2009).

To show that preliminary approval is justified, the parties must establish that "the court will likely be able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal" at the time of final approval. Fed. R. Civ. P. 23(e)(1)(B); *Nistra v. Reliance Trust Co.*, No. 1:16-cv-04773, 2020 WL 13645290, at *1 (N.D. Ill. Mar. 12, 2020) (discussing the 2018 amendments to Federal Rule 23). Here, the Court has already preliminarily certified the Settlement Class for settlement purposes and found that it satisfies all prerequisites to certification listed in Federal Rules 23(a) and (b)(3). (Dkt. 65 ¶¶ 3-9); *In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, MDL No. 2492, 2016 WL 3854603, at *3 (N.D. Ill. July 15, 2016) ("Because the Court has already conducted an analysis with regard to certification of the settlement class . . . it will not repeat that here.").

Accordingly, this Motion focuses on the requirements of Rule 23(e)(2), which directs courts to determine whether a settlement is "fair, reasonable, and adequate" based on consideration of whether: (A) the class representative and class counsel have adequately represented the class; (B) the settlement was negotiated at arm's length; (C) the relief provided to the settlement class is adequate; and (D) the settlement treats settlement class members equitably relative to each other. Fed. R. Civ. P. 23(e)(2); *Nistra*, 2020 WL 13645290, at *1 ("although the factors cited in Rule 23(e)(2) 'apply to final approval, the Court looks to them [at the time of preliminary approval] to

16

determine whether it will likely grant final approval based on the information currently before the Court'"). The proposed Opt-In Settlements readily satisfy these requirements.

**B.      The Settlement Provides Excellent Relief To The Settlement Class Members.**

Consideration of Rule 23(e)(2)(C)—the adequacy of the relief provided to the class—is the "most important factor relevant to the fairness of a class action settlement." *T.K. ex rel. Leshore v. Bytedance Tech. Co., Ltd.*, No. 19-cv-7915, 2022 WL 888943, at \*12 (N.D. Ill. Mar. 25, 2022) (quoting *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006)). Courts should attempt to assess the "net expected value of continued litigation to the class" by "estimat[ing] the range of possible outcomes and ascrib[ing] a probability to each point on the range." *Id.* (citations omitted). This analysis is "not an exact science," however, and "[c]ourts are expected only to estimate and come to a 'ballpark valuation' of continued litigation." *Id.* (citations omitted). Importantly, "because '[t]he essence of settlement is compromise,' courts should not reject a settlement 'solely because it does not provide a complete victory to the plaintiffs.'" *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 347 (N.D. Ill. 2010) (quoting *Isby v. Bayh*, 75 F.3d 1191, 1200 (7th Cir. 1996)).

Here, the most helpful and appropriate starting point in determining the "net expected value of continued litigation" is the outcome of the home seller litigation. *Manual for Complex Litigation (Fourth)* § 21.631 ("The outcomes of parallel litigation may also inform the court . . . about the fairness, reasonableness, and adequacy of the proposed settlement."). This is so for three reasons:

***First***, the *Burnett* and *Gibson* home seller cases involved the same antitrust conspiracy, the same defendants, and the same underlying factual allegations as this Litigation. (*Burnett* Final Approval Order at 69) ("the buyer claims arise from the same factual predicate as the seller claims. . . . All such claims arise from the same common nucleus of operative fact"). Although the home

17

seller litigation asserted claims on behalf of direct purchasers (home sellers), while this Litigation asserts claims by indirect purchasers (homebuyers), the home seller settlements also encompassed and resolved most homebuyer claims since the vast majority of those claims (nearly 80%) belong to people who sold homes. (*See id.* at 59-70); *see supra* n.7.

**Second**, most of the home seller settlements were reached only after a trial and a verdict in favor of the plaintiffs. As such, the portion of those settlements attributable to homebuyer claims reflects the *most* that Plaintiffs and the Settlement Class Members could realistically hope to receive if this Litigation continued and they prevailed at trial. The direct purchaser settlements therefore aid the Court and the Parties in approximating the *maximum* potential value of Plaintiffs and Settlement Class Members' claims here.

**Third**, the *Burnett* and *Gibson* home seller settlements have already been approved as fair, reasonable, and adequate by a court that is extremely familiar with the underlying facts and claims, having presided over the trial in *Burnett*. In approving the settlements, the *Burnett* court expressly considered whether the settlements provided adequate relief for the homebuyer claims included in those settlements and found that they did. (*Burnett* Final Approval Order at 59-70). Accordingly, the *Burnett* court's findings serve as highly persuasive authority.

Against this backdrop, it is important to bear in mind that the direct purchaser settlements included, and thus released, 100% of home seller claims and nearly 80% of all homebuyer claims against the settling defendants. *See supra* n.7. As such, those settlements encompass between 7/8 (87.5%) and 9/10 (90%) of the total universe of potential claims against those defendants arising out of their participation in the antitrust conspiracy at issue. Put differently, the direct purchaser settlements included between eight and ten times the number of claims asserted in this Litigation on a per transaction basis. One would therefore expect the settlements in this case to be—at *most*—

between 1/10 (10%) and 1/8 (12.5%) of the direct purchaser settlements before accounting for any other factors.

The settlements here exceed these guideposts, demonstrating that they are an excellent outcome for the Settlement Class. As stated above, the total monetary contributions from the Settling Defendants and Opt-In Settlors is $120,334,500. The total amount these entities committed to pay in their direct purchaser settlements (where applicable) is $957,023,154.[12] The settlements here are thus equal to 12.57% (120,334,500/957,023,154) of the direct purchaser settlements. Accordingly, the Settlement delivers immediate monetary relief commensurate with what the Settlement Class Members could realistically hope to achieve after a complete victory at trial with basically no discounts for the merits of their indirect purchaser claims, litigation risks, and the early procedural posture of the Litigation. *Isby*, 75 F.3d at 1199 (affirming approval of class settlement that "represented an outcome at least comparable, if not far superior, to that which plaintiffs might achieve by proceeding to trial."). The Settlement's relief is therefore highly reasonable and more than adequate.

Beyond the adequacy of the relief itself, Rule 23(e)(2)(C) also includes four express considerations to take into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of

---

[12] *See generally Burnett*, ECF No. 1192 ($83.5m settlement with Anywhere); *Burnett*, ECF No. 1458 ($418m settlement with the NAR); *Burnett*, ECF No. 1518 ($250m settlement with HomeServices entities); *Burnett*, ECF No. 1538 ($2.95m settlement with Fathom Realty, $6.923m settlement with Shorewest Realtors, $350,000 settlement with Silvercreek Realty, $2m settlement with Vanguard, and $3.75m settlement with The Agency); *Gibson*, ECF No. 161 ($57.5m settlement with Compass, $9.25m settlement with Real Brokerage, $5m settlement with Realty ONE, $6.5m settlement with @properties, and up to $17.75m from Douglas Elliman); *Gibson*, ECF No. 294 ($6.9m settlement with Engel & Volkers); *Gibson*, ECF No. 303 ($3.75m settlement with United Real Estate and $4.7m settlement with HomeSmart); *Gibson*, ECF No. 531 ($600,000 settlement NextHome and $2.4m with Keyes Company and Illustrated Properties); *Gibson*, ECF No. 655 ($1.5m settlement with Real Estate One and $2.2m settlement with Baird & Warner); *Gibson*, ECF No. 808 ($32m settlement with Hanna Holdings); *Keel*, ECF No. 2 ($5.5m settlement with Side); *Hooper* Final Approval Order at 10 ($34m settlement with eXp Realty).

processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3). Fed. R. Civ. P. 23(e)(2)(C). As explained below, each of these considerations supports a finding that the relief provided here is more than adequate.

> **i.    The benefits of settlement outweigh the cost, risk, and delay of further litigation.**

The Settlement's monetary relief is especially noteworthy when balanced against the risks of continued litigation. The Settlement Class faced significant obstacles above and beyond the risks inherent in any trial or appeal, and this Settlement secures immediate relief rather than forcing the Settlement Class to endure years of costly and uncertain litigation. *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 523 (E.D. Mich. 2003) ("experience proves that, no matter how confident trial counsel may be, they cannot predict with 100% accuracy a jury's favorable verdict, particularly in complex antitrust litigation."); *Goldsmith v. Tech. Sols. Co.*, No. 92 C 4374, 1995 WL 17009594, at *4 (N.D. Ill. Oct. 10, 1995) ("As courts recognize, a dollar obtained in settlement today is worth more than a dollar obtained after a trial and appeals years later.").

For instance, homebuyers face risks unique to their status as indirect purchasers that the home sellers did not have to contend with. Specifically, indirect purchasers cannot seek damages under the Sherman Act, so they generally may only seek damages for antitrust violations under state laws. *See generally Ill. Brick Co. v. Ill.*, 431 U.S. 720, 729 (1977). Variations in state laws could pose a serious impediment to certification of a nationwide class. Further, proving up the Settlement Class Members' damages would pose challenges because homebuyers must show that the allegedly elevated buyer-broker commissions were passed on to them through the increased prices of the homes they bought. *See Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 206-07 (1990) (because "a wide range of considerations may influence a company's pricing decisions, . . .

establishing the amount of an overcharge shifted to indirect purchasers 'would normally prove insurmountable.'"); *In re Fico Antitrust Litig. Related Cases*, No. 1:20-CV-02114, 2023 WL 6388247, at *9 (N.D. Ill. Sept. 28, 2023) ("Allowing indirect purchasers to claim antitrust damages . . . would threaten to mire antitrust litigation in nigh-impossible valuations of the damages allegedly suffered by each indirect purchaser."). Establishing a passthrough theory would require significant expert discovery and lengthy *Daubert* motion practice, driving up both the costs and risk to the Settlement Class.

Making matters even more challenging, adverse conditions in the real estate industry— coupled with the significant payments already committed to the direct purchaser settlements— have put a strain on virtually all real estate brokerages, introducing significant ability-to-pay issues that limited the resources available to fund a settlement like the one here. The entire real estate industry has faced significant headwinds over the last several years due to challenging financial conditions and prolonged high interest rates. According to data from the NAR, home sales reached a nearly 30-year low in 2023, representing an 18.7% decline from 2022 after sales of homes declined by 18% in 2022.[13] Many real estate brokerage companies suffered large financial losses during this period that have drained their cash balances and net assets and limited their ability to generate profits into the future. Continued litigation would only exacerbate these concerns. The expense and burden of protracted litigation would consume finite resources that can instead be made available to the Class Members now through this Settlement. The Settlement captures these available assets while still allowing the Settling Defendants and Opt-In Settlors to continue operations.

---

[13] *Home sales slowed to a crawl in 2023. Here's why.*, CBS News, https://www.cbsnews.com/news/nar-existing-home-sales-price-2023/ (citing publicly reported home sale statistics from the NAR).

Moreover, it is far from certain that Plaintiffs would prevail on the merits of their claims. Plaintiffs acknowledge that the Defendants have firmly denied that they participated in an anticompetitive conspiracy and presented other challenges to Plaintiffs in proceeding with their claims. Further, in resolving motions to dismiss in the *Zawislak* action, this Court dismissed the Plaintiffs' claims without prejudice and with leave to replead. While Plaintiffs believe that this dismissal was the result of curable pleading errors, they acknowledge that the Defendants intended to raise other defenses if this Litigation were to proceed further. These defenses, if successful, could result in Plaintiffs and the proposed Class Members receiving materially less in compensation, or potentially no recovery whatsoever.

Even if Plaintiffs were to prevail on the merits, they would also need to succeed in obtaining class certification, which would be highly contested. The prospect of adversarial class certification presents serious risks on its own. *See* Fed. R. Civ. P. 23(e)(2), 2018 Committee Notes (instructing courts to consider the likelihood of certifying the class for litigation in evaluating this sub-factor); *see also Hudson v. Libre Tech., Inc.*, No. 3:18-cv-1371-GPC-KSC, 2020 WL 2467060, at *6 (S.D. Cal. May 13, 2020) ("Proceeding in this litigation in the absence of settlement poses various risks such as failing to certify a class.").

In sum, "any relief to class members would still be far down the road and may ultimately be entirely denied." *Charvat v. Valente*, 12-CV-05746, 2019 WL 5576932, at *7 (N.D. Ill. Oct. 28, 2019). In contrast, "[a]pproving the proposed settlement agreement will end the case and cause benefits to flow in short order." *Id.*; *see also Young v. Rolling in the Dough, Inc.*, No. 17-cv- 07825, 2020 WL 969616, at *5 (N.D. Ill. Feb. 27, 2020) ("If this case had been litigated to conclusion, all that is certain is that plaintiffs would have spent a large amount of money, time, and effort."). The Settlement provides meaningful relief to the Settlement Class, avoiding potentially years of

complex litigation and appeals with a risk of no recovery whatsoever.

### ii. The proposed method of distributing relief to the Settlement Class is effective.

The Opt-In Agreements do not modify the claims process nor the means of distributing relief to the Settlement Class Members. (*See also* Supplemental Declaration of Cameron R. Azari, Esq. Regarding Notice Plan, attached hereto as Exhibit C) (discussing the addition of the Opt-In Settlors to the proposed notice plan). Accordingly, the Opt-In Agreements do not create any concerns as to the method of notifying the Settlement Class or distributing relief.

### iii. The Opt-In Agreements do not introduce any concerns regarding Class Counsel's fee award.

Although a court's evaluation of the adequacy of relief under Rule 23(e)(2)(C) is separate from its determination as to attorneys' fees, courts still check for issues concerning "the terms of any proposed award of attorney's fees, including timing of payment" in deciding whether to grant approval. Fed. R. Civ. P. 23(e)(2)(C)(iii). *T.K.*, 2022 WL 888943, at *15 ("Most importantly, with respect to the Court's consideration of the Settlement's fairness, the approval of attorneys' fees remains entirely separate from approval of the Settlement.").

In Plaintiffs' original preliminary approval motion, they explained that the Settlement Agreement does not raise any red flags as to Class Counsel's fee award. The Settlement does not purport to guarantee any specific amount or percentage of the Global Settlement Fund as attorneys' fees for Class Counsel, and there is no clear-sailing agreement, so the Settling Parties and the Class Members are free to contest the amount of any fees requested. The Opt-In Agreements do not change this.

Under the terms of the Court's original Preliminary Approval Order, Plaintiffs are directed to file any "motion seeking an award of attorneys' fees plus reimbursable costs and litigations

23

expenses, as well as service awards for the Class Representatives, within 30 days after the commencement of notice and shall post such motion on the Settlement Website." (Dkt. 65 ¶ 21). Accordingly, if the Settlement proceeds to final approval, the Settlement Class Members will have an opportunity to review and object to Class Counsel's requested fee award well in advance of final approval and be heard as to the requested awards. There are thus no red flags about an award of attorneys' fees for Class Counsel here.

### iv. There are no side agreements to be identified.

Federal Rule 23(e)(2)(C)(iv) directs courts to take into account "any agreement made in connection with the [proposed settlement]." *See also* Fed. R. Civ. P. 23(e)(3). As before, there are no Agreements to be identified; all terms and agreements affecting Settlement Class Members are contained within the Settlement Agreement and the Opt-In Agreements.

### C. Plaintiffs And Class Counsel Have Capably Represented The Settlement Class Members.

Rule 23(e)(2)(A) directs courts to consider "whether the class representative and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). "[A]dequacy of representation is composed of two parts: 'the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest' of the class members." *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 598 (7th Cir. 1993). This factor is satisfied where the named plaintiff "participated in the case diligently . . . [a]nd class counsel fought hard throughout the litigation," *Snyder v. Ocwen Loan Servicing, LLC*, No. 14 C 8461, 2019 WL 2103379, at *4 (N.D. Ill. May 14, 2019), and where "Class Counsel had 'an adequate information base' while negotiating for the settlement," *T.K.*, 2022 WL 888943, at *11 (quoting 2018 Committee Notes).

Here, the excellent settlements and Class Counsel's capable prosecution of the Litigation

demonstrate that this factor is satisfied. Class Counsel investigated Plaintiffs' and the Class Members' claims, pursued multiple separate cases simultaneously against well-defended companies, opposed attempts to dismiss the Litigation in the *Zawislak*, *Tuccori*, and *Cwynar* actions, "and pursued mediation when it appeared to be an advisable and feasible alternative." *Snyder*, 2019 WL 2103379, at \*4. Class Counsel also engaged in months of complex negotiations and conducted more than 20 separate mediation sessions. As part of this process, Class Counsel prepared and reviewed numerous mediation statements, issued subpoenas and obtained confirmatory discovery, and researched each brokerage's transaction volume and relative position in the industry, gaining "an adequate information base" on which to negotiate. *T.K.*, 2022 WL 888943, at \*11; *see also Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, No. 07 C 2898, 2011 WL 3290302, at \*8 (N.D. Ill. July 26, 2011) (noting that the standard "is not whether it is conceivable that more discovery could possibly be conducted" but whether the parties have enough information "to evaluate the merits of this case").[14]

The results achieved follow from this diligence and preparation, demonstrating that the proposed Settlement Class was adequately represented. As explained above, the settlements that Class Counsel have achieved are an excellent result and recover basically the full value of what the Class Members could have hoped to achieve after further litigation. *See supra* § IV.B. Indeed, Class Counsel obtained outstanding settlements here when counsel in other concurrent homebuyer cases could not.

Plaintiffs also participated in this Litigation, including by helping with the investigation of

---

[14] Although formal discovery was stayed in *Tuccori*, that does not preclude a finding of adequacy due to the significant informal and third-party discovery that occurred. (*See Hooper* Final Approval Order at 48) ("even though this case was stayed for the majority of its existence (thus preventing formal discovery), the Court expressly authorized and contemplated that the Parties would engage in settlement negotiations, mediations, and informal discovery to facilitate and consummate settlements while the case was stayed.").

their claims, providing records about their respective home transactions, assisting in the preparation of the initial complaints before filing, becoming familiar with the Litigation generally, and reviewing and approving the Settlement Agreement before signing it. Plaintiffs also stood ready to participate in discovery had this Litigation not settled. In other words, Plaintiffs have and will continue to adequately represent the Settlement Class they seek to represent.

### D. The Opt-In Agreements Are The Product Of Arm's-Length Negotiations.

The second Rule 23(e)(2) factor—whether the settlement was negotiated at arm's length—addresses a "procedural" concern. Fed. R. Civ. P. 23(e)(2)(B); 2018 Committee Notes to Paragraphs (e)(2)(B) and (A). This factor focuses on "[t]he conduct of the negotiations" to ensure they "were conducted in a manner that would protect and further the class interests." 2018 Committee Notes to Paragraphs (e)(2)(B) and (A). In this context, "[t]he best evidence of a truly adversarial bargaining process is the presence of a neutral third-party mediator." *T.K.*, 2022 WL 888943, at *11 (internal quotations omitted); 2018 Committee Notes to Paragraphs (e)(2)(B) and (A) ("the involvement of a neutral or court-affiliated mediator or facilitator in th[e] negotiations may bear on whether they were conducted in a manner that would protect and further the class interests.").

Here, each proposed Opt-In Agreement is the product of arm's-length negotiations, including seven separate mediations overseen by Judge Holderman. *See supra* § IV.B.; (Holderman Decl. ¶¶ 4, 9-12). Courts across the country have lauded Judge Holderman for his skill and experience as a mediator. *Ponzio v. Pinion*, 87 F.4th 487, 508 (11th Cir. 2023) (affirming approval of class settlement over objections where the settlement was "negotiated at an arm's-length formal mediation conducted by a neutral, highly respected mediator, former United States District Judge James F. Holderman." (cleaned up)). Each mediation was carried out pursuant to

26

Judge Holderman's procedures and the terms of the Court's Preliminary Approval Order. (Holderman Decl. ¶ 9). And during every mediation session, "each side and their [c]ounsel conducted their mediated settlement negotiations in an adversarial, arm's length, and non-collusive manner[.]" *Ponzio*, 87 F.4th at 508 ("finding that "[t]he close participation of . . . Judge Holderman in multiple mediation sessions support[ed] the procedural fairness of the [s]ettlement [a]greement." (alterations in original)); (Holderman Decl. ¶ 10). There is no evidence whatsoever of collusion. (*See Hooper* Final Approval Order at 26-27) ("The fact that the entire mediation was conducted under the auspices of . . . a highly experienced mediator, lends further support to the absence of collusion.").

The terms of the Opt-In Agreements further underscore the arm's-length nature of the negotiations. The Opt-In Agreements, like the Settlement Agreement, do not contain any provisions that might suggest collusion. There are no terms that guarantee an amount of fees to Class Counsel, return unclaimed finds to the Opt-In Settlors, or any other provisions that would benefit Class Counsel at the Class Members' expense. *See Snyder*, 2019 WL 2103379, at *4 (finding that a settlement was negotiated at arm's length where "there is no provision for reversion of unclaimed amounts, no clear sailing clause regarding attorneys' fees, and none of the other types of settlement terms that sometimes suggest something other than an arm's length negotiation"). In a similar vein, the Opt-In Agreements' releases are not overbroad. They are similar, if not identical, to the release language in the original Settlement Agreement and the home seller settlements, and are tethered to the factual underpinnings of the Litigation. In other words, none of the Opt-In Settlors are getting more than what they're paying for. Thus, each Opt-In Agreement is the product of arm's-length negotiations.

**E.**      **The Settlement Treats All Settlement Class Members Equitably.**

The final Rule 23(e)(2) factor asks whether the settlement "treats class members equitably relative to each other." The Settlement Agreement plainly does, as do the various Opt-In Agreements. This Settlement involves only one Settlement Class, and the terms of the Settlement apply uniformly across the Settlement Class Members. Every Settlement Class Member will be eligible for monetary relief and entitled to submit a claim to receive a payment. The amount of each payment will be determined equitably and according to a formula for allocation developed with the assistance of a damages expert. The plan of allocation will ensure an equitable, *pro rata* distribution of funds amongst the Settlement Class based on the amount of commissions paid by each member of the Settlement Class. (Dkt. 98 at 4). And a neutral third-party, the Settlement Administrator, will be processing payments. No group or individual will be unfairly advantaged or disadvantaged. Accordingly, this factor also weighs in favor of granting preliminary approval.

**F.**      **The Limited Opposition To The Opt-In Settlements From *Batton* Counsel Is Unfounded.**

Although not listed in Rule 23(e)(2), courts in the Seventh Circuit also consider "the amount of opposition to the settlement," typically at the time of final approval. *T.K.*, 2022 WL 888943, at *16 (quoting *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 863 (7th Cir. 2014)) (granting final approval over objections). Plaintiffs briefly address this factor now due to the repeated efforts by counsel in *Batton v. The Nat'l Ass'n of Realtors*, 21-cv-430 (N.D. Ill.) ("*Batton*") to disrupt the Settlement.

The *Batton* Plaintiffs' counsel have attempted to impede the settlements with certain Opt-In Settlors through a series of meritless and unnecessary motions, including a motion to intervene, a motion to reassign this case to another court, motions to enjoin some Opt-In Settlors from completing the Court-approved opt-in process, and a motion to stay the Settlement. Every single

28

one of these motions was denied. (*See, e.g.*, Dkt. Nos. 118, 162). The *Batton* Plaintiffs' motions primarily contend that the payments from certain Opt-In Settlors are too low. But as explained above and in prior filings, the *Tuccori* Plaintiffs' settlements with each Opt-In Settlor are exceptional. (Dkt. 150 at 6).

Moreover, in many instances the Opt-In Settlors' payments are *higher* as a percentage of their respective home seller settlements than the settlements with the initial Settling Defendants. The *Batton* Plaintiffs notably haven't challenged any of the settlements with the initial Settling Defendants nor argued that their payments are inadequate. This demonstrates that the *Batton* Plaintiffs' opposition to the Settlement isn't founded on any actual problems with the Settlement itself, but instead is motivated by the *Batton* Plaintiffs' counsel's own interest in attempting to seek attorneys' fees.[15]

Despite the strong relief provided by the *Tuccori* Plaintiffs' settlements, the *Batton* Plaintiffs baselessly assert that the settlements with Anywhere and certain other Opt-In Settlors were the product of a "reverse auction." They were not. The *Batton* Plaintiffs have not adduced any evidence whatsoever of collusion, and instead premise their reverse auction accusation on the fact that they sued some of the Opt-In Settlors in concurrent litigation. However, it is well-settled that the mere existence of parallel or competing litigation does not give rise to reverse auction concerns. *Rutter & Wilbanks Corp. v. Shell Oil Co*., 314 F.3d 1180, 1189 (10th Cir. 2002) ("Absent some more concrete evidence of collusion than Objector's conclusory allegations and inferences, we decline to disturb the district court's conclusion that the settlement was not a collusive reverse auction."); *Negrete v. Allianz Life Ins. Co. of N. Am.*, 523 F.3d 1091, 1099-1100 (9th Cir. 2008)

---

[15] Dkt 136 at 3 ("if it so happens that the settlement is preliminary approved, we would intend to make an application for fees and expenses . . . . that was part of our basis for intervention, and it's still something we intend to present at the appropriate time.") (quoting Tr. of Mar. 4, 2026 H'ng at 28:15-23).

(reversing entry of injunction against settlement negotiations in other litigation where there was "no evidence of underhanded activity"). If that were true, it "would lead to the conclusion that no settlement could ever occur in the circumstances of parallel or multiple class actions—none of the competing cases could settle without being accused by another of participating in a 'collusive reverse auction.'" *Rutter*, 314 F.3d at 1189.

As explained above, the *Tuccori* Plaintiffs reached the settlements with the Opt-In Settlors through the Court-approved opt-in procedures, and each settlement was the product of arm's-lengths negotiations. *See Am. Int'l Grp.*, 2011 WL 3290302, at *3-4 (granting preliminary approval over opposition from objectors, finding that "the complex negotiations leading up to the proposed settlement agreement do not demonstrate collusion, a reverse auction, self-dealing, or any of the other faults that the Objectors assign to them").

As this Court noted in denying the *Batton* Plaintiffs' motion to stay the Settlement, the Northern District of Georgia recently rejected similar reverse auction accusations in another real estate broker antitrust settlement where the *Batton* Plaintiffs' counsel "represented a nonparty objector." (Dkt. 162 at 4 n.3) (citing *Hooper* Final Approval Order). There, the *Hooper* plaintiffs sought approval of settlements with several entities that were also named in the *Gibson* home seller action pending in the Western District of Missouri. (*Id.* at 3). Relevant here, the *Gibson* Plaintiffs objected to the *Hooper* Plaintiffs' settlements and made reverse auction accusations similar to those that the *Batton* Plaintiffs have raised here.

At final approval, the *Hooper* court overruled the *Gibson* Plaintiffs' reverse auction objection and found that, as here, "no evidence has been offered to show that [the settling defendants] ever revealed to Class Counsel the substance of its settlement discussions with the *Gibson* Plaintiffs." (*Hooper* Final Approval Order at 44). The court further found that the *Hooper*

30

Plaintiffs' settlements were the result of arm's-length negotiations, including confirmatory discovery, and were mediated with highly reputable mediators. (*Id*. at 45). The same is true here. None of the Opt-In Settlors disclosed any information about prior settlement discussions with the *Batton* Plaintiffs (if they even took place at all). Moreover, all mediations with Opt-In Settlors were overseen by the Court-appointed Special Master for Mediation, Judge Holderman, who would not have allowed such discussions to occur.

The *Hooper* court further found that the monetary relief afforded by the settlements was fair, reasonable, and adequate, because it was on par with comparable settlements approved in the *Gibson* home seller action and "within the range of reasonableness and provide a significant financial recovery to the Settlement Class in light of the strengths and weaknesses of the case and the risks and costs of continued litigation," *Id*. at 28-29. Likewise, here, the *Tuccori* Plaintiffs' settlements with Opt-In Settlors are excellent in light of the home seller settlements.

In their filings, the *Batton* Plaintiffs cited a small handful of examples of cases where courts declined to approve a settlement due to a reverse auction. But those cases involve extreme facts that are nothing like the negotiations that occurred here. For instance, in *Tech. Training Assocs., Inc. v. Buccaneers Ltd. P'ship*, 874 F.3d 692 (11th Cir. 2017), the lead attorney for the settlement class left his law firm and went to work for a new firm where he "engaged in a 'Machiavellian' plan to undercut" his prior firm and their clients through a low settlement. *Id.* at 697. Nothing even close to that happened in this case. *Crawford v. Equifax Payment Servs., Inc.*, 201 F.3d 877, 880 (7th Cir. 2000), is also far afield. There, the parties reached a settlement under which the class received no money while the attorneys were still awarded fees. *Id*. at 880, 882. More egregiously, the class members did not receive personal notice nor were they allowed to opt out. Again, the settlement in *Crawford* bears no resemblance to the Settlement here.

31

Although the *Batton* Plaintiffs have not yet formally raised an objection under Rule 23(e), there is no merit whatsoever to their challenges to the Settlement. As explained above, the *Tuccori* Plaintiffs reached settlements with Opt-In Settlors through the Court-approved opt-in process, modeled off a similar procedure employed in *Burnett*. All negotiations were conducted at arm's length, and all mediations were overseen by highly experienced mediators, including the Court-appointed Special Master, Judge Holderman. The *Tuccori* Plaintiffs had ample information going into each negotiation, including the benefit of robust confirmatory discovery, and the result is a set of very strong settlements that are an excellent result for the class members when compared to other court-approved settlements in the real estate broker antitrust litigation. Accordingly, the settlements with the Opt-In Settlors should be preliminarily approved so that the Parties can proceed with effectuating notice of the favorable settlements to the Settlement Class.

## V.      **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court enter an order: 1) granting this Motion; 2) granting preliminary approval to the Opt-In Agreements with each Opt-In Settlor; 3) entering the proposed preliminary approval order being submitted herewith; and 4) granting such further and additional relief as the Court deems reasonable and just.

Dated: May 18, 2026                              Respectfully Submitted,

JAMES TUCCORI, COURTNEY
FOREGGER, KEVIN CWYNAR, DAWID
ZAWISLAK, MICHAEL D'ACQUISTO,
and ALEJANDRO LOPEZ A/K/A
ALEANDRO LOPEZ, individually and on
behalf of similarly situated individuals

By: */s/ Paul T. Geske*
One of Plaintiffs' attorneys

Myles McGuire
Evan M. Meyers

Paul T. Geske
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002
Fax: (312) 275-7895
mmcguire@mcgpc.com
emeyers@mcgpc.com
pgeske@mcgpc.com

Jonathan M. Jagher
Matthew W. Ruan
JUSTICE JAGHER LONDON
& MILLEN LLC
100 Tri-State International, Ste. 128
Lincolnshire, IL 60069
Tel: (224) 632-4500
jjagher@jjlmlaw.com
mruan@jjlmlaw.com

*Counsel for Plaintiffs and the Settlement Class*

33

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that on May 18, 2026 I caused the foregoing *Plaintiffs'*
*Second* Unopposed *Motion and Memorandum in Support of Preliminary Approval of Settlements*
*With Brokerages Opting Into the Court Approved Class Settlement Agreement* to be electronically
filed with the Clerk of the Court using the CM/ECF system, which will cause a copy of said
document to be electronically transmitted to all counsel of record.


/s/ *Paul T. Geske*

34