**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JAMES TUCCORI, *et al.*, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AT WORLD PROPERTIES, LLC, *et al.*,<br><br>Defendants. | Case No. 1:24-cv-00150<br><br>Judge Lindsay C. Jenkins |

**MOTION BY *BATTON* COUNSEL AND PLAINTIFFS FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND SERVICE AWARDS**

## INTRODUCTION

Binding precedent, Federal Rule of Civil Procedure 23(h), and principles of fairness and restitution require attorneys whose efforts contribute to creating a common fund to be compensated for their time and expenses, regardless of whether they have been named as class counsel. *Sutton v. Bernard*, 504 F.3d 688, 691–92 (7th Cir. 2007) (the common fund doctrine "is based on the equitable notion that those who have benefited from litigation should share in its costs"); Fed. Jud. Ctr., *Awarding Attorneys' Fees and Managing Fee Litigation* at 62–64 (2015).[1] To determine a reasonable fee, courts in this Circuit must do their "best to award counsel the market price for legal services" had the fees been set at the outset of the litigation. *In re Synthroid Marketing Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("*Synthroid I*"). The most important factors are "the risk of nonpayment a firm agrees to bear" and "the amount of work necessary to resolve the litigation." *Id*. at 721.

Plaintiffs seek approval of $120,334,500 in settlements. $114,297,500 of these settlements were with entities against whom Plaintiffs never litigated. Those entities were, however, named and actively prosecuted by the undersigned counsel and the named plaintiffs in four other cases across three districts.[2] As to the *Batton* Defendants, *Batton* Counsel provided over five years of zealous litigation services bearing substantial risk of nonpayment for millions

---

[1] *Batton* Counsel conferred with *Tuccori* Counsel, who did not consent to this motion.

[2] "*Batton* Counsel" refers to Korein Tillery, LLC and Lowey Dannenberg, P.C., counsel of record in *Batton v. National Association of Realtors*, No. 21-cv-00430 (N.D. Ill.) ("*Batton I*"); *Batton v. Compass, Inc.*, No. 23-cv-15618 (N.D. Ill.) ("*Batton II*"); *Lutz v. HomeServices*, No. 4:24-cv-10040 (S.D. Fla.) ("*Lutz*"); and *Davis v. Hanna Holdings, Inc.*, No. 2:24-cv-2374 (E.D. Pa.) ("*Davis*"). "*Batton* Cases" collectively refers to these four cases. "*Batton* Defendants" refers to the defendants in each case who have opted into settlements here: the National Association of Realtors® ("NAR") and Anywhere Real Estate Inc.—defendants in *Batton I*; Hanna Holdings, Inc.—defendant in *Davis*; Douglas Elliman, Inc., HomeServices of America, Inc., BHH Affiliates, LLC, and HSF Affiliates, LLC—defendants in *Lutz*; and Compass, Inc., eXp World Holdings, Inc., and United Real Estate Holdings, LLC—defendants in *Batton II*. "*Batton* Plaintiffs" refers to the named plaintiffs in those cases. Appendix A lists the *Batton* Plaintiffs.

of dollars in time and expenses. Accordingly, although *Batton* Counsel oppose the *Batton* Defendants' settlements here, *Batton* Counsel are entitled to reasonable attorneys' fees and expenses if the Court grants approval over their objection.

Under the Seventh Circuit's *ex ante* approach to fees, the market price of *Batton* Counsel's litigation services is a percentage of the fund reflecting the work they agreed to undertake and the risk of nonpayment they bore. *Batton* Counsel are the only attorneys who undertook the work and risk required to litigate against the *Batton* Defendants. With no preexisting buyer cases, judicial opinions upholding buyer-based antitrust claims arising from the alleged conspiracy, or summary judgment practice or trial verdicts in the preexisting seller-side cases, *Batton* Counsel undertook substantial risk of nonpayment by: conducting an extensive pre-suit investigation, filing the first homebuyer cases in the country, defeating ten motions to dismiss in four different courts, obtaining and reviewing hundreds of thousands of documents, serving approximately 70 third-party subpoenas, purchasing a database of more than a terabyte of home sale data, preparing for and defending depositions of five *Batton I* Plaintiffs, retaining leading experts, and preparing and filing a motion for class certification supported by two expert reports totaling 824 pages demonstrating a class-wide methodology for calculating pass-through damages. Only after years of costly litigation and an ever-increasing threat of trial in the *Batton* Cases did the *Batton* Defendants pay into the *Tuccori* settlement fund.

To date, *Batton* Counsel have spent five years and expended 31,914.20 hours amounting to $24,583,785 in lodestar and $1,554,345.14 in unreimbursed expenses litigating against the *Batton* Defendants. This work and expense created the "real and significant exposure" that produced the *Batton* Defendants' $114.29 million settlement fund. Declaration of Charles Silver at 7 ("Silver Decl."). As Professor Silver, a leading expert on attorneys' fees, notes, "defendants

must be convinced to part with money—and it is the fear of losing at trial that does the convincing." *Id.* That fear existed only in the *Batton* Cases. Indeed, according to *Tuccori* Counsel, resolving the *Batton* Cases was a "necessary" precondition to the *Batton* Defendants' settlements. ECF No. 98 at 6. *Tuccori* Counsel also relied on *Batton* Counsel's expert analysis to estimate the percentage of homebuyers covered by their settlement classes. *See* ECF No. 168, at 6 n.7; ECF No. 110, at 6 (citing *Batton* Counsel's expert submissions in *Batton I*). And *Batton* Counsel's early filing and statute-of-limitations briefing incentivized the settling parties to extend the settlements' class period to include the *Batton* Cases, enhancing the settlement fund with years' worth of additional damages. ECF No. 98 at 6; ECF No. 168 at 10. *Tuccori* counsel could never have extracted these settlements from the *Batton* Defendants on their own without the much larger exposure the *Batton* Cases generated.

Accordingly, *Batton* Counsel respectfully request attorneys' fees equal to one-third of the $114,297,500 common fund created by the *Batton* Defendants' settlements ($38,099,166); $1,554,345.14 in unreimbursed expenses incurred litigating *Batton II*, *Davis*, and *Lutz*; and $5,000 service awards for each named plaintiff in *Batton II*, *Davis*, and *Lutz* ($115,000 total). These requests are reasonable and consistent with complex class action practice in this District.

## FACTUAL BACKGROUND

### I. *Batton* Counsel Provided All of the Litigation Services and Undertook 100% of the Litigation Risk Against the *Batton* Defendants

#### a. *Batton I*

*Batton* Counsel filed the first homebuyer case, *Batton I,* in January 2021 against *Batton* Defendants NAR, HomeServices, and Anywhere, alleging federal antitrust violations based on the Defendants' creation and enforcement of anticompetitive buyer-broker commission rules. Before filing, *Batton* Counsel researched the NAR rules, analyzed their economic impact, and

concluded that the conspiracy harmed homebuyers by inflating home prices through higher commissions. Decl. of Vincent Briganti & Randall Ewing ¶¶ 5-6 ("Briganti-Ewing Decl.").

After the *Batton* court initially held that homebuyers are indirect purchasers (*Batton I*, ECF No. 81), *Batton* Counsel researched the antitrust and consumer protection laws of 50 states to replead as indirect purchasers under state law, developed additional facts, and added plaintiffs in several states. Briganti-Ewing Decl. ¶ 9; *Batton I*, ECF No. 84. *Batton* Counsel then defeated the defendants' second and third motions to dismiss. *Id.*, ECF No. 185.

*Batton* Counsel propounded three sets of document requests, resulting in numerous meet-and-confers and the review of more than 200,000 documents. Briganti-Ewing Decl. ¶¶ 12-13. Given the *Batton* Defendants' repeated arguments that state-law claims cannot be advanced without a representative from each state, *Batton* Counsel vetted claims of numerous potential plaintiffs from additional states, and added them to *Batton II*, *Davis*, and *Lutz*. *Id.* ¶ 15. Because expert analysis is critical to indirect purchaser claims, *Batton* Counsel retained Dr. Abrantes-Metz, one of the most-sought after antitrust experts in the country, to develop a model assessing antitrust impact on homebuyers and a common methodology to establish damages. *Id.* ¶ 17. To provide the required data, *Batton* Counsel served approximately 70 third-party subpoenas on MLS providers for vast quantities of home purchase information and purchased a database of government property records, resulting in more than a terabyte of transaction data for their experts' use. *Id.* ¶ 14. *Batton* Counsel also hired real estate industry expert Dr. Norman Miller to analyze the impact of the conspiracy on class members. *Id.* ¶ 17. *Batton* Counsel then filed a motion for class certification with expert reports from Dr. Abrantes-Metz and Dr. Miller totaling 824 pages. *Id.* ¶¶ 18-19. *Batton* Counsel also prepared five of the eight *Batton I* plaintiffs for depositions, taken by NAR and Anywhere, and responded to discovery requests. *Id.* ¶ 16.

On February 2, 2026, after months of adversarial and arm's-length negotiations, the *Batton I* Plaintiffs announced a $20 million icebreaker settlement with Keller Williams. *Id.* ¶ 21. As part of that settlement, Keller Williams agreed to provide valuable trial cooperation against the remaining *Batton* Defendants. *Id.* Shortly thereafter, *Batton I* Plaintiffs reached an $8.5 million settlement with RE/MAX, LLC. *Id.* ¶ 24. Defendant Anywhere mediated with *Tuccori* Counsel two days after the Keller Williams settlement was announced and opted-in to *Tuccori* within twenty days—after mediating with and obtaining a settlement demand number from *Batton* Counsel. *Id.* ¶ 23. Similarly, after receiving a settlement demand from *Batton* Counsel at their request on March 17, 2026, NAR ended ongoing settlement discussions with *Batton* Counsel, mediated with *Tuccori* Counsel instead on March 27, 2026, and executed a settlement agreement in this case on April 9, 2026. *Id.* ¶ 25.

**b. *Batton II***

*Batton* Counsel and *Batton* Plaintiffs also litigated vigorously against the remaining *Batton* Defendants in three other cases. On November 3, 2023, after the seller-side cases revealed additional evidence against other brokerages, *Batton* Counsel filed *Batton II* against Compass Inc., eXp World Holdings, Inc., Redfin Corporation, Weichert Realtors, United Real Estate Group, Howard Hanna Real Estate Services, and Douglas Elliman Inc. The *Batton I* court later found that it lacked personal jurisdiction over defendant HomeServices of America, Inc. Based on that decision and defendants' representations, *Batton II* plaintiffs dismissed their claims against HomeServices, Douglas Elliman, and Howard Hanna (who had similar jurisdictional defenses), then refiled against those defendants where personal jurisdiction could be found. *See Lutz* (naming HomeServices and Douglas Elliman); *Davis* (naming Hanna).

The *Batton II* Defendants moved to dismiss for failure to state a claim and lack of jurisdiction, and to strike class allegations. After extensive briefing, the court denied defendants' motions, finding that the *Batton II* plaintiffs plausibly and timely pleaded a horizontal conspiracy and upholding nearly all of plaintiffs' claims. *Batton II*, 2026 WL 810976 (N.D. Ill. Mar. 24, 2026). Within a month, Compass, United, and eXp initiated mediation with *Tuccori* Counsel and settled in this case.

**c. *Davis***

Meanwhile, in the Eastern District of Pennsylvania, Hanna filed three separate rounds of motions to dismiss, including motions for failure to mediate, failure to state a claim, lack of standing, and to apply the rule of reason. While awaiting the court's rulings, *Batton* Counsel engaged in discovery by serving initial disclosures, propounding and responding to document requests, and meeting and conferring. Briganti-Ewing Decl. ¶ 52. After more than 130 pages of briefing, three amended complaints, and two rounds of oral argument, the *Davis* court denied all of Hanna's motions to dismiss and concluded that *Batton* Plaintiffs plausibly pleaded horizontal and vertical conspiracies. *Davis*, 822 F. Supp. 3d 494 (E.D. Pa. 2026). Hanna mediated with *Tuccori* Counsel four days later and executed a settlement agreement ten days later.

**d. *Lutz***

*Batton* Counsel also litigated against HomeServices and Douglas Elliman in the Southern District of Florida. *See Lutz*. *Batton* Counsel propounded 5 sets of document requests and approximately 70 third-party subpoenas to obtain data for Dr. Abrantes-Metz's expert report. Briganti-Ewing Decl. ¶ 41. This led to numerous meet-and-confers and three contested discovery hearings, resulting in the production and review of approximately 80 deposition transcripts, more than 330,000 documents, several gigabytes of transaction data from defendants, and more than a

terabyte of transaction data from third parties. *Id.* at ¶ 40. Based on their combing of this evidence, *Batton* Counsel amended their complaint with scores of evidentiary citations. *Lutz*, ECF No. 145. *Lutz* plaintiffs responded to multiple discovery requests and collected, reviewed, and produced more than 45,000 documents. Briganti-Ewing Decl. ¶ 43. The collections included in-person document collections in 15 states. *Id.*

*Batton* Plaintiffs also worked with their experts to update their *Lutz* reports. During an April 1, 2026 discovery status conference, the Magistrate Judge confirmed that the *Lutz* Defendants had to file their expert reports within two weeks of the conference on the same day as *Batton* Plaintiffs. *Id.* ¶ 44. Five days later, Douglas Elliman executed a settlement here. *Id.* ¶ 45. On April 13, 2026, the *Lutz* court modified the case schedule, suggesting that it would soon deny the defendants' motion to dismiss. *Lutz*, ECF No. 189. On April 17, 2026, the *Lutz* court denied their motion to dismiss. *Id.*, ECF No. 191. HomeServices executed its settlement agreement that same day.

All told, *Batton* Counsel invested 31,914.2 hours equal to a lodestar of $24,583,785 and $1,554,345.14 in unreimbursed expenses litigating these cases, in addition to the time the *Batton* Plaintiffs spent advancing the homebuyer claims being settled here.[3] Briganti-Ewing Decl. ¶ 56.

**e. *Tuccori* Settled with the *Batton* Defendants**

For the entire period *Batton* Counsel performed the work detailed above, no other attorneys filed homebuyer claims against the *Batton* Defendants. Three years after the filing of *Batton I*, *Tuccori* Counsel filed a case against a single, different defendant in state court. The

[3] This time and expense excludes work related to *Batton* Plaintiffs' settlements in *Batton I*, challenges to the scope of releases in the seller-side settlements (since the settlement classes here exclude members of the seller-side settlement classes), and activities opposing the *Batton* Defendants' settlements here. *Id.* Also excluded are $4,538,466.31 in expenses *Batton* Counsel incurred litigating *Batton I* because reimbursement for those expenses was awarded in connection with final approval of *Batton* plaintiffs' settlements with Keller Williams and RE/MAX. *Batton I*, ECF No. 352.

state court case was then removed and related to several other cases against brokerages with small market share compared with the *Batton* Defendants. The case was immediately stayed until, 20 months later, the parties announced their first settlements and "opt-in procedure." *Tuccori* Counsel then settled with the *Batton* Defendants and added them to this litigation in February and May 2026 "solely to facilitate" the settlements. ECF No. 97 at 3. For the *Batton* Defendants only, "the Class Period was extended to include … homebuyer antitrust litigation such as *Batton*[.]" *Tuccori*, ECF No. 98, at 6; ECF No. 168 at 10 (noting same for other *Batton* Defendants). The total *Batton* Defendant settlement fund is approximately $114.29 million.

## ARGUMENT

### I. *Batton* Counsel are Entitled to Reimbursement Because Their Work Created, Maintained, and/or Enhanced the Common Fund

The Federal Judicial Center provides that "an applicant for fees need not be a plaintiff or a named class representative in the litigation. The central question is whether the actions of those seeking fees helped create or enhance the common fund." Fed. Jud. Ctr., *Awarding Attorneys' Fees and Managing Fee Litigation* at 71 (2015); *see also* Fed. R. Civ. P. 23(h), Comm. Notes on 2003 Amendment ("there may be a basis for making an award to other counsel whose work produced a beneficial result for the class, such as attorneys who acted for the class before certification but were not appointed class counsel[.]"). As the *Batton I* court observed and the facts above demonstrate, *Batton* Counsel have "done the bulk of the work here and done a tremendous job." Briganti-Ewing Decl., Ex. A, Hr'g Tr. dated Apr. 16, 2026 at 13:20-24. The details and timing of the *Batton* Defendants' settlements prove the court's statement true.

Each *Batton* Defendant settled after *Batton* Counsel filed highly detailed amended complaints, defeated multiple motions to dismiss, argued several discovery disputes, obtained significant discovery, disclosed their class certification evidence and expert methodology, and

reached a settlement with Keller Williams that provided for valuable cooperation to further bolster the *Batton* Plaintiffs' evidence against the remaining *Batton* Defendants. Briganti-Ewing Decl. ¶ 20. Indeed, all *Batton* Defendants settled after this settlement was announced, and most settled here only days, and in some cases hours, after losing motions to dismiss.

Applying well-established restitution principles, Professor Charles Silver, a leading expert in attorneys' fees, concluded that *Batton* Counsel provided the *most important* services for the Class because they created the "fear of losing at trial" that convinced the *Batton* Defendants "to part with money." Silver Decl. at 7. He concluded that "*Batton* defendants faced real and significant exposure" in the *Batton* Cases but "faced no liability" in *Tuccori* "because they had not been sued" in that case. *Id.* at 7. Accordingly, *Batton* Counsel deserve "credit for pressuring the Defendants to pay" because "[w]hat reason, other than avoiding higher payments in the *Batton* cases, can explain the Defendants' decision to opt into *Tuccori*?" *Id.* at 7.

As the Tenth Circuit aptly stated, the work of counsel "on whose shoulders class counsel" stands should not go uncompensated. *Gottlieb v. Barry*, 43 F.3d 474, 489 (10th Cir. 1994) (reversing the denial of fees to non-class counsel and finding it "implausible that all of sixteen months of work, pursued on multiple fronts by multiple counsel, suddenly becomes worthless upon the selection of a few counsel to serve as class counsel."); *accord Arkin v. Pressman, Inc.*, 38 F.4th 1001, 1009 (11th Cir. 2022) ("non-class counsel is generally entitled to a portion of a common fund recovered in a class action as attorneys' fees under Rule 23(h) if non-class counsel confers a substantial and independent benefit to the class[.]"); *Victor v. Argent Classic Convertible Arbitrage Fund L.P.*, 623 F.3d 82, 87 (2d Cir. 2010) ("when a substantial benefit has been conferred on the class, non-lead counsel are entitled to reasonable compensation.").

*Batton* Defendants entered negotiations here with not only a powerful incentive—created by *Batton* Counsel—to escape litigation risk in the *Batton* Cases, but also extensive price discovery that expedited the usual settlement process. Briganti-Ewing Decl. ¶ 20. Indeed, *Tuccori* Counsel's negotiations with the *Batton* Defendants lasted only two-and-a-half months.

Moreover, *Batton* Counsel also provided the settlement classes years of additional damages as leverage in settlement negotiations by unilaterally advancing homebuyer claims for three years before *Tuccori*. *Arkin*, 38 F.4th at 1010 ("non-class counsel may provide a substantial benefit to the class merely by preserving a substantial portion of the class's claims through early filing."). None of the *Tuccori* plaintiffs had timely claims against the *Batton* Defendants (except for Anywhere) because the most generous operative state claims have "four-year or three-year statutes of limitation." *Lutz*, 2026 WL 2247856, at *10 (S.D. Fla. Apr. 17, 2026). Second Amended Complaint, ECF No. 167 ¶ 30 (reflecting that the last of the *Tuccori* plaintiffs' home purchases occurred in "April 2022"). Because *Batton* Counsel filed and litigated the *Batton* Cases years earlier, *Tuccori* Counsel presumably demanded significantly more money to extend the class period "to include … concurrent homebuyer antitrust litigation such as *Batton* [*I*]." ECF No. 98 at 6; ECF No. 168-2. In fact, *Tuccori* Counsel confirmed that eliminating the *Batton* Defendants' exposure in the *Batton* Cases was a "necessary" precondition of the *Batton* Defendants' settlements. ECF No. 98 at 6.

Accordingly, *Batton* Counsel's work led directly to and benefited the fund, entitling them to a reasonable attorney fee. *See, e.g., In re Southwest Airlines Voucher Litig.*, 898 F.3d 740, 745–46 (7th Cir. 2018) (reversing the denial of fees to non-class counsel whose work benefited the class); *In re Trans Union Corp. Priv. Litig.*, 629 F.3d 741, 747 (7th Cir. 2011) (reversing fee award for providing inadequate compensation to non-class counsel); *Cnty. of Suffolk v. Long*

*Island Lighting Co.*, 907 F.2d 1295, 1327 (2d Cir. 1990) (reversing the denial of fees to non-class counsel who "conducted, to the benefit of the class, virtually all of the pre-trial discovery and motion practice, including motions for class certification"); *Elliott v. Sperry Rand Corp.*, 680 F.2d 1225, 1227 (8th Cir. 1982) (reversing the denial of fees because "these individuals are not simply dissenters, but the plaintiffs who initially brought this action. Accordingly, they deserve some compensation for their attorneys' fees.").

*Batton* Counsel's opposition to the settlements also does not affect their entitlement to fees because, if the settlements are approved, their work nonetheless benefitted the common fund. *Trans Union*, 629 F.3d at 743 (while "class lawyers may try to fend off interlopers who oppose a proposed settlement as insufficiently generous to the class … their requests for fees must not be slighted"); *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 288 (7th Cir. 2002) (it is "desirable to have a broad range of participants in the fairness hearing because of the risk of collusion over attorneys' fees and the terms of settlement generally"); *Suffolk*, 907 F.2d at 1327 (reversing denial of fees on the grounds that counsel objected to the settlement because counsel's work benefitted the class); *Elliott*, 680 F.2d at 1227 (non-class counsel deserved fees even though they objected to the settlement).

## II. The Market Rate for *Batton* Counsel's Litigation Services is Based On the Risk of Nonpayment They Faced at the Inception of the Litigation

"[W]hen deciding on appropriate fee levels in common fund cases, courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *Synthroid I*, 264 F.3d at 718. This rate must reflect the market value of the services had the fee been established at the outset. *Id.*

The most important factor here is the risk of loss the lawyers faced at the case's outset: "[t]he greater the risk of loss, the greater the incentive compensation required." *Id.* at 719; *see*

*also Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) ("Contingent fees compensate lawyers for the risk of nonpayment. The greater the risk of walking away empty-handed, the higher the award must be to attract competent and energetic counsel.").

### A. The Market Value of *Batton* Counsel's Contingent Litigation Services With Significant Risk of Nonpayment Is One-Third of the Common Fund

"[T]he approach favored in the Seventh Circuit" for valuing services performed on contingency is a percentage of the common fund. *In re Ky. Grilled Chicken Coupon Mktg. & Sales Pracs. Litig.*, No. 09 C 7670, 2011 WL 13257072, at *3 (N.D. Ill. Nov. 30, 2011); *accord Gaskill v. Gordon*, 160 F.3d 361, 362 (7th Cir. 1998) ("When a class suit produces a fund for the class, it is commonplace to award the lawyers for the class a percentage of the fund[.]"); *T.K. Through Leshore v. Bytedance Tech. Co.*, No. 19-CV-7915, 2022 WL 888943, at *24 (N.D. Ill. Mar. 25, 2022) ("the percentage method is employed by the vast majority of courts in the Seventh Circuit.").

The Seventh Circuit has held that fee awards "from analogous class action settlements are indicative of a rational relationship" between the percentage sought and the value of the legal services provided. *Taubenfeld v. AON Corp.*, 415 F.3d 597, 600 (7th Cir. 2005); *In re Dairy Farmers of Am., Inc.*, 80 F. Supp. 3d 838, 845 (N.D. Ill. 2015) ("As a barometer for assessing the reasonableness of a fee award in common-fund cases, courts look to the going market rate for legal services in similar cases."). In this Circuit, one-third is the norm in complex antitrust class actions like this one. *Walker v. Walgreens Specialty Pharmacy, LLC*, No. 1:21-CV-05780, 2024 WL 6998005, at *2 (N.D. Ill. Dec. 3, 2024) ("[c]ourts routinely hold that one-third of a common fund is an appropriate attorneys' fees award in class action settlement[.]"); *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2021 WL 5709250, at *4 (N.D. Ill. Dec. 1, 2021) ("Most persuasive are the large number of antitrust cases in this circuit that have awarded one-third of

the common fund as attorney's fees."); *In re Lithotripsy Antitrust Litig.*, No. 98 C 8394, 2000 WL 765086, at *2 (N.D. Ill. June 12, 2000) ("33.3% of the fund plus expenses is well within the generally accepted range of attorneys['] fees in class-action antitrust lawsuits.").

The high-risk *Batton* Counsel assumed with respect to the *Batton* Defendants further justifies their fee request. *Batton* Counsel filed the first case in the country on behalf of homebuyers, without the benefit of seller-side successes. The *Batton I* court then held that homebuyers are indirect purchasers, requiring *Batton* Counsel to research and vet claims in 50 states and retain experts to develop a class-wide damages model for the states under which the *Batton* Plaintiffs pleaded claims. They defeated multiple motions to dismiss and obtained massive amounts of documents and data. *Batton* Counsel are the *only* counsel to have taken on this risk. None of their work duplicated the work undertaken in this case, as *Tuccori* Counsel did not engage in discovery or motion practice against their defendants and did not name the *Batton* Defendants until after *Batton* Counsel's work was performed. In other words, "[w]hen this suit got under way, no other law firm was willing to serve as lead counsel." *Silverman*, 739 F.3d at 958. "[L]ack of competition not only implies a higher fee, but also suggests that most members of the [bar] saw this litigation as too risky for their practices." *Id. Batton* Counsel, in contrast, assumed all of the nonpayment risk for tens of millions of dollars in attorney time and millions in expenses. Accordingly, *Batton* Counsel satisfy the key factor in determining attorneys' fees. *Sutton*, 504 F.3d at 693 (emphasizing the severity of the risk counsel assumed).

### B. A Lodestar Cross-Check Supports *Batton* Counsel's Request

The Seventh Circuit does not require a lodestar cross-check when using the percentage method. *See Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011) ("[C]onsideration of a lodestar check is not an issue of required methodology."); *In re Synthroid Mktg. Litig.*, 325 F.3d 974, 979–80 (7th Cir. 2003) ("*Synthroid II*") (criticizing the lodestar

methodology). Nevertheless, if considered, the lodestar multiplier supports *Batton* Counsel's request. An award of one-third of the common fund to *Batton* Counsel produces a lodestar multiplier of approximately 1.936, well within the acceptable range.[4] *See Florin v. Nationsbank of Georgia, N.A.,* 34 F.3d 560, 565 (7th Cir. 1994) ("Because class counsel have requested a multiplier of 1.53, the district court need not worry about exceeding what we have suggested is a sensible ceiling of double the lodestar."); *Standard Iron Works v. ArcelorMittal*, No. 08 C 5214, 2014 WL 7781572, at *2–3 (N.D. Ill. Oct. 22, 2014) (approving a fee award of one-third, with a lodestar multiplier of approximately 1.97).

## III. The Request for Payment of Litigation Expenses is Reasonable

"It is well-established that counsel who create a common fund are entitled to reimbursement of litigation costs and expenses." *Beesley v. Int'l Paper Co*., No. 06-703, 2014 WL 375432, at *3 (S.D. Ill. Jan. 31, 2014) (citing Fed. R. Civ. P. 23; citing *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)). As set forth above, *Batton* Counsel's five-year litigation push created the $114.29 million common fund. *Supra*, pp. 3-7. The Seventh Circuit has held that costs and expenses should be awarded based on the types of "expenses private clients in large class actions (auctions and otherwise) pay." *Synthroid I*, 264 F.3d at 722. All of *Batton* Counsel's expenses are of the type necessary to effectively litigate and routinely reimbursed, such as expert fees, filing, postage, research, and travel fees. Briganti-Ewing Decl. ¶ 60. *City of Greenville v. Syngenta Crop Prot., Inc.*, 904 F. Supp. 2d 902, 910 (S.D. Ill. 2012) (awarding expense reimbursement finding "the costs sought here are of the type that are routinely reimbursed by paying clients, such as experts' fees, other consulting fees, deposition expenses, travel, and

---

[4] To avoid double-counting hours, *Batton* Counsel calculate the multiplier using $47,599,166, which includes the $9.5 million in fees awarded to them from the Keller Williams and RE/MAX settlements.

photocopying costs"); *Burr v. Loadsmart, Inc.*, No. 23 C 3708, 2026 WL 892554, at *2 (N.D. Ill. Mar. 25, 2026) (Hunt, J.) (same).

### IV. ***Davis*, *Lutz*, and *Batton II* Plaintiffs Deserve Modest Service Awards**

"Incentive awards are justified … to induce individuals to become named representatives." *Synthroid I*, 264 F.3d at 722. *Davis*, *Lutz*, and *Batton II* Plaintiffs[5] have kept apprised of their cases and provided *Batton* Counsel with essential facts, produced 45,000 documents, responded to multiple interrogatory requests, and exposed themselves to multiple depositions in three different fora to advance these claims. These Plaintiffs are the only ones to have done this work and taken on this risk. *Batton* Counsel therefore request awards of $5,000 each, totaling $115,000. *See In re Broiler Chicken Antitrust Litig.*, 2021 WL 5709250, at *5 ("[I]ncentive awards are now paid in most class suits and average between $10,000-$15,000."). This total incentive award request of $115,000 amounts to just 0.10% of the total *Batton* Defendant settlement fund, well within the range of reasonable incentive awards. *See Beesley*, 2014 WL 375432, at *4 ("Plaintiff awards of less than one percent of the fund are well within the ranges that are typically awarded in comparable cases.").

## CONCLUSION

For these reasons, the undersigned respectfully request $38,099,166 (one-third of the *Batton* Defendant common fund) in attorneys' fees, $1,554,345.14 in unreimbursed expenses, and $5,000 service awards for each named Plaintiff in *Lutz*, *Davis*, and *Batton II*.

---

[5] *Batton I* Plaintiffs Mya Batton, James Mullis, Irene Kim, Theodore Bisbicos, Aaron Bolton, Anna James, Daniel Parsons, and Michael Brace are excluded from this request because the *Batton I* court granted each an incentive award in connection with the Keller Williams and RE/MAX Settlements.

Dated: August 18, 2026

Respectfully submitted,

*/s/ Randall P. Ewing*
George A. Zelcs (Ill. Bar No. 3123738)
Randall P. Ewing, Jr. (Ill. Bar No. 6294238)
Ryan Z. Cortazar (Ill. Bar No. 6323766)
**KOREIN TILLERY, LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
(312) 641-9750
gzelcs@koreintillery.com
rewing@koreintillery.com
rcortazar@koreintillery.com

Vincent Briganti (*pro hac vice*)
Margaret MacLean (*pro hac vice*)
Noelle Forde (*pro hac vice*)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
(914) 997-0500
vbriganti@lowey.com
mmclean@lowey.com
nforde@lowey.com

Steven M. Berezney (N.D. Ill. Bar No. 56091)
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
(314) 241-4844
sberezney@koreintillery.com

*Attorneys for Batton Counsel and Batton Plaintiffs*

**APPENDIX A**

| Named Plaintiff | Plaintiff in *Batton I* | Plaintiff in *Batton II* | Plaintiff in *Davis* | Plaintiff in *Lutz* | Requested Service Award |
|---|---|---|---|---|---|
| Niall Adams | | X | X | X | $5,000 |
| Mya Batton | X | X | X | X | N/A |
| Theodore Bisbicos | X | X | X | X | N/A |
| Aaron Bolton | X | X | X | X | N/A |
| Jason Boomsma | | X | X | X | $5,000 |
| Michael Brace | X | X | | X | N/A |
| Thomas Braun | | X | X | X | $5,000 |
| Timothy Caruso | | X | | X | $5,000 |
| Sabrina Clark | | X | X | X | $5,000 |
| Scott Davis | | X | X | X | $5,000 |
| Colleen Duval | | X | | X | $5,000 |
| James Edwards | | X | | X | $5,000 |
| Ryan Eisner | | X | X | X | $5,000 |
| Steven Ewald | | X | X | X | $5,000 |
| Carson Fairbourn | | X | | X | $5,000 |
| John Garrett | | X | X | X | $5,000 |
| Brennon Groves | | X | X | X | $5,000 |
| Darin Hendry | | X | X | X | $5,000 |
| Anna James | X | X | X | X | N/A |
| Do Yeon Irene Kim | X | X | X | X | N/A |
| Jordan Kullmann | | X | X | X | $5,000 |
| James Lutz | | X | X | X | $5,000 |
| James Mullis | X | X | X | X | N/A |
| Daniel Parsons | X | X | X | X | N/A |
| Joshua Putt | | X | X | X | $5,000 |
| John Sannar | | X | X | | $5,000 |
| Robert Sayles | | X | X | | $5,000 |

| **Named Plaintiff** | **Plaintiff in *Batton I*** | **Plaintiff in *Batton II*** | **Plaintiff in *Davis*** | **Plaintiff in *Lutz*** | **Requested Service Award** |
|---|---|---|---|---|---|
| Ben Shadle | | X | X | X | $5,000 |
| Lisa Shankus | | X | | X | $5,000 |
| Christine Van Woerkon | | X | X | X | $5,000 |
| Sherrie Wohl | | X | X | X | $5,000 |
| Total | | | | | $115,000 |

**CERTIFICATE OF SERVICE**

I hereby certify that on August 18, 2026, a true and correct copy of the foregoing was filed electronically through the Court's CM/ECF system, which will send notification of the same to all counsel of record in this matter.

*/s/ Randall P. Ewing, Jr.*