FILED
10/22/2026
THOMAS G BRUTON
CLERK, U.S. DISTRICT COURT
BC
Case No: 1:24-CV-00150

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

JAMES TUCCORI, et al.,
Plaintiffs,

v.

AT WORLD PROPERTIES, LLC, et al.,
Defendants.

Case No. 1:24-cv-00150
Judge Lindsay C. Jenkins

**MOTION TO INTERVENE FOR THE LIMITED PURPOSE OF REQUESTING LEAVE TO EXCLUDE FROM THE SETTLEMENT CLASS AFTER THE DEADLINE**

Nathaniel Wayne, pro se, moves under Fed. R. Civ. P. 24(b), 6(b)(1)(B), and 23(c)(2)(B), and Local Rule 5.6, to intervene solely to request acceptance of his late individual exclusion from the settlement. Alternatively, he requests his individualized notice history and leave to supplement before final approval. He seeks relief for himself alone.

## I. BACKGROUND AND EVIDENCE

1. The settlement website establishes September 17, 2026 as the exclusion deadline, October 27, 2026 as the claim deadline, and November 2, 2026 as the scheduled final approval hearing. Movant acknowledges that his exclusion request is late. See Homebuyer Antitrust Settlement, Frequently Asked Questions, https://www.homebuyersettlement.com/en/Home/FAQ (last accessed Oct. 22, 2026).

2. Movant has a documented connection to a November 2016 acquisition of residential property in Jefferson County, Alabama. The recorded mortgage instrument identifies the conveyance of 7791 Indian Gap Trail, McCalla, Alabama, to Nathaniel Wayne and Amanda P. Wayne by deed

dated November 22, 2016, recorded November 28, 2016, as Instrument No. 2016123603. Exhibit C. This is evidence of acquisition, not proof of an MLS listing or commission.

3. The settlement administrator defines the class by reference to purchase of an MLS-listed property with a brokerage commission during a relevant class period. Whether the 2016 transaction satisfies those remaining elements has not yet been established. Movant requests an individual determination if necessary, not an assumption of class membership.

4. Movant first learned of this settlement and its September 17, 2026 exclusion deadline on October 22, 2026, when he found a September 29, 2026 settlement reminder in his Gmail Spam folder. The message was marked unread when inspected. Exhibit A. Another reminder dated October 20, 2026 was present in his Gmail Inbox, but Movant states that he did not learn about the settlement before October 22. Exhibit B. Both identified reminders were sent after the published opt-out deadline.

5. Movant states that he received no physical letter or mailed notice about this settlement before October 22, 2026, and was unaware of the settlement and the September 17 deadline until finding the Spam email that day. He does not claim that the Settlement Administrator never sent an earlier notice: he lacks its records of whether, when, how, and to what address any earlier notice was dispatched or delivered. He seeks that individualized notice history.

6. Movant promptly pursued exclusion upon learning of the settlement on October 22, 2026. He expressly elects exclusion, not compensation under the settlement. His individual Request for Exclusion is included as Attachment 1. This filing does not represent that a separate copy has already been received by the Settlement Administrator. He does not request relief for any co-owner or purport to sign for another person.

**II. LEGAL AUTHORITY**

The Seventh Circuit recognizes discretion to allow a late class-settlement opt-out where delay is excusable. DRASC, Inc. v. Navistar, Inc., 990 F.3d 1048, 1051-52 (7th Cir. 2021); Burns v. Elrod, 757 F.2d 151, 155 (7th Cir. 1985). DRASC affirmed denial where counsel had actual pre-deadline notice. Movant instead states he first learned of this settlement on October 22; the two notices located in his Gmail postdate the opt-out deadline, and he received no paper letter. The administrator's individualized notice records remain unknown. These facts support consideration of excusable delay, but do not guarantee relief.

Movant acknowledges that properly addressed first-class mail can satisfy due process without proof of actual receipt. DRASC, 990 F.3d at 1051; Dusenbery v. United States, 534 U.S. 161, 168-71 (2002). Spam placement alone does not invalidate the notice program.

Rule 6(b)(1)(B) permits enlargement of certain expired deadlines for excusable neglect. Relevant factors include the delay's cause, length and effect, prejudice, and good faith. Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership, 507 U.S. 380, 395 (1993). The Court may evaluate those factors to the extent applicable to this settlement deadline.

Rule 24(b) permits intervention on a timely motion presenting a question common to the case without undue prejudice or delay. Settlement exclusion administration is such a question. Local Rule 5.6 permits a nonparty to tender a motion to intervene. Attachment 1 supplies the limited pleading contemplated by Rule 24(c). Rule 24(c) also requires service on the parties in accordance with Rule 5; Movant requests recognition of any effective CM/ECF service upon registered counsel and direction concerning any additional service necessary.

**III. REQUEST FOR EXPEDITED AND LIMITED RELIEF**

Movant seeks a single, prompt exclusion election before the scheduled November 2, 2026 fairness hearing, rather than settlement compensation and separate litigation. He first discovered the settlement on October 22 and seeks relief that same day. He requests identification of any notice addressed to him before September 17, including its dispatch date, mailing or email destination, and available returned, bounced, or suppressed status. Only his individual exclusion should be adjudicated.

**IV. PRAYER FOR RELIEF**

Movant asks the Court to (1) permit limited-purpose intervention; (2) accept his late exclusion request if the standards are met; or (3) direct disclosure of individualized notice records and allow prompt supplementation before final approval. He further asks the Court to recognize effective service by any CM/ECF Notice of Electronic Filing transmitted to registered counsel, and to allow a reasonable time for any additional service the Court finds necessary. Expedited consideration is requested because the fairness hearing is scheduled for November 2, 2026.

Respectfully submitted,

Nathaniel Wayne

Nathaniel Wayne, pro se

7791 Indian Gap Trail

McCalla, AL 35111

Telephone: 205-267-9509

Email: nathan.gay53@gmail.com

Dated: October 22, 2026

## ATTACHMENT 1 — LIMITED-PURPOSE PLEADING AND INDIVIDUAL REQUEST FOR EXCLUSION UNDER RULE 24(c)

1. I am Nathaniel Wayne. I seek intervention only to request late exclusion from the settlement class; I assert no antitrust damages claim in this limited proceeding.

2. If I am a class member and the Court grants leave, I unequivocally state: "I hereby request to be excluded from the Settlement Class in Tuccori et al. v. At World Properties, LLC et al., Case No. 1:24-cv-00150."

3. I understand that exclusion forfeits any distribution from this settlement. I do not seek both a settlement payment and the benefit of separate litigation.

4. This individual election applies to Nathaniel Wayne only; it does not apply to any co-owner.

7791 Indian Gap Trail, McCalla, AL 35111 | 205-267-9509 | nathan.gay53@gmail.com

Signature: Nathaniel Wayne Nathaniel Wayne, pro se

## DECLARATION OF NATHANIEL WAYNE UNDER 28 U.S.C. § 1746

I, Nathaniel Wayne, declare under penalty of perjury under the laws of the United States that the following is true and correct to the extent of my personal knowledge:

1. My name is Nathaniel Wayne. I reside at 7791 Indian Gap Trail, McCalla, Alabama 35111, and seek relief only for myself.

2. On October 22, 2026, I found a September 29, 2026 Homebuyer Antitrust Litigation settlement email in the Spam folder of my Gmail account. It was unread when I found it. The message identified a September 17, 2026 opt-out deadline.

3. October 22, 2026 was the first day I learned about this settlement or its exclusion deadline. I did not receive a physical letter or mailed notice about this settlement before that day.

4. I understand that my failure to receive notice does not prove that the Settlement Administrator never sent an earlier notice. I do not possess the administrator's notice transmission records.

5. Exhibit C reproduces pages of a mortgage instrument describing the November 2016 deed conveying the property to me and Amanda P. Wayne. I request late exclusion from the settlement class, not a settlement payment, for myself only.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 22, 2026, in Alabama.

Signature: Nathaniel Wayne Nathaniel Wayne

## NOTICE REGARDING ELECTRONIC SERVICE AND REQUEST FOR DIRECTION

Nathaniel Wayne submits this motion to the Clerk for filing. Once the Clerk dockets a qualifying filing in CM/ECF, the Court's electronic-filing system ordinarily transmits a Notice of Electronic Filing to registered filing users in the case. Under Fed. R. Civ. P. 5(b)(2)(E) and the Northern District of Illinois General Order on Electronic Case Filing, § X(B)–(C), transmission of that notice constitutes service upon registered users who receive it, subject to the governing rules. This notice does not certify that the motion has already been docketed or electronically served; that all parties or counsel are registered filing users; or that any non-electronic service has occurred. The undersigned has limited financial resources and requests that the Court recognize any effective electronic service upon registered counsel and advise whether additional service is required. If additional service is required, he requests reasonable time to complete it pursuant to Fed. R. Civ. P. 24(c) and 5.

Dated: October 22, 2026

Signature: Nathaniel Wayne Nathaniel Wayne, pro se

7791 Indian Gap Trail, McCalla, AL 35111

Telephone: 205-267-9509 Email: nathan.gay53@gmail.com

## INDEX OF EXHIBITS

Exhibit A — Original Gmail printout of September 29, 2026 settlement reminder (3 pages).

Exhibit B — Original Gmail printout of October 20, 2026 settlement reminder (3 pages).

Exhibit C — Original recorded mortgage document, including the legal-description page referring to the November 2016 conveyance (19 pages).

The exhibits following this index are attached as original PDF pages without retyping or alteration.

Gmail

Nate Wayne <nathan.gay53@gmail.com>

**Reminder Homebuyer Antitrust Litigation Settlement Notice**
1 message

**Homebuyer Antitrust Litigation** <homebuyersettlement@e.epiqnotice.com> Tue, Sep 29, 2026 at 3:08 AM
To: nathangay53@gmail.com

# Notice of Homebuyer Class Action Settlement

**If you purchased a home that was listed on a Multiple Listing Service in the United States, and a commission was paid to any brokerage as part of the transaction, you may be entitled to a cash payment from a class action settlement.**

**Submit a Claim by October 27, 2026.**

**Submit Your Claim**

You may be eligible for a cash payment from a **$120,334,500 class action settlement** involving the National Association of REALTORS® ("NAR") and a number of residential real estate brokerage companies (together, "Defendants"). A lawsuit entitled *Tuccori et al. v. At World Properties, LLC et al.*, No. 1:24-cv-00150 (N.D. Ill.) asserts that the Defendants engaged in unlawful, anticompetitive conduct to raise, fix, and maintain real estate broker commissions at heightened amounts in violation of federal and state laws. The individuals who brought the lawsuit allege that the Defendants' anticompetitive conduct harmed homebuyers by inflating home prices and reducing the quality of buyer-broker services. The Defendants deny having violated the law, and no Court or jury has decided who is right or wrong. The Parties have agreed to settle the legal claims in the lawsuit and avoid the uncertainties and costs of continuing the lawsuit.

## Who is Included?

The Settlement includes all persons who (1) purchased a home that was listed on a Multiple Listing Service ("MLS") anywhere in the United States; (2) where a commission was paid to any brokerage in connection with the transaction (3) during the Class Periods, subject to certain exclusions. The date ranges for the Class Periods vary by state. Please visit www.HomebuyerSettlement.com to confirm whether you are a Settlement Class Member and are eligible to submit a claim.

## Does this Settlement include home sellers?

No. There are different settlements that cover people who sold a home, even if they have also purchased a home. The home seller settlements were reached in other lawsuits such as *Burnett et al. v. The Nat'l Ass'n of Realtors*, No. 19-cv-00332 (W.D. Mo.) and *Gibson et al. v. The Nat'l Ass'n of Realtors® et al.*, No. 4:23-cv-00788-SRB (W.D. Mo.). If you are a class member in one of the home seller settlements, you are

excluded from the Settlement here and may not receive a payment from the Settlement.

## What Does the Settlement Provide?

If you are a Settlement Class Member, you can submit a Claim online or by mail postmarked by **October 27, 2026** for a **Cash Payment from the $120,334,500 Global Settlement Fund.**

At this time, it is not known how much each Settlement Class Member will receive or when payments will be made. The amount of each payment will depend on the number of valid claim forms, the number of properties purchased, and the amount of commissions paid in those transactions.

## Other Options

**Opt Out postmarked by September 17, 2026.** Submit an opt out request if you do not want to be part of the Settlement Class. The Court will exclude Settlement Class Members who request to opt out. The Long Form Notice on the Settlement Website explains how to opt out. If you do *not* opt out, you will be bound by the Settlement and any orders or judgments.

**Object by September 17, 2026.** You may object to the Settlement if you do not opt out. The Long Form Notice on the Settlement Website explains how to object.

**Do Nothing.** You will not get a payment from the Settlement, and you will be bound by the Settlement and any orders or judgments.

This notice is a summary. Learn more here or call toll-free 1-877-417-7662.

## Which real estate brokerages are named in the Settlement?

There are 25 residential real estate companies named in the Litigation that have agreed to the Settlement. For a full list, please visit https://homebuyersettlement.com/home/FAQ. Additionally, the Settlement releases all Released Claims that the Settlement Class members have against the NAR and its affiliates as well as the following entities provided they meet certain conditions, including that they agree to abide by certain practice changes: (i) NAR Members, Associate Members, and Member Boards that do not operate an unincorporated MLS; (ii) Realtor MLSs and non-Realtor MLSs, as described in the Opt-In Agreement; and (iii) real estate brokerages that have a REALTOR® as a Principal with membership in the NAR on the date of Class Notice and a Principal who was a Participant in any MLS during the Class Period, provided that they had not settled or been named as a defendant in any lawsuit or action alleging claims that share the same factual predicate as those asserted in the Litigation as of April 10, 2026.

## When will the Settlement be approved?

**On November 2, 2026,** the Court will hold a final fairness hearing to decide whether to approve the Settlement, an award of attorneys' fees to Class Counsel of up to one-third of the Global Settlement Fund plus costs, service awards, and any objections. The Court will also consider service award payments of up to $7,500 to each of the Class Representatives. You or your lawyer may ask to appear at the hearing if you'd like to, but you do not have to attend.

**Submit Your Claim**

*La versión en español de este Aviso está disponible aquí.*

If nathangay53@gmail.com should not be subscribed or if you need to change your subscription information for Tuccori v. At World Properties, please use this preferences page.

Tuccori v. At World Properties is located at PO Box 4258 97208-4258.

AM964_v03

Gmail

Nate Wayne <nathan.gay53@gmail.com>

## Reminder Homebuyer Antitrust Litigation Settlement Notice

**Homebuyer Antitrust Litigation** <homebuyersettlement@e.epiqnotice.com> Tue, Oct 20, 2026 at 11:54 AM
To: nathangay53@gmail.com

# Notice of Homebuyer Class Action Settlement

**If you purchased a home that was listed on a Multiple Listing Service in the United States, and a commission was paid to any brokerage as part of the transaction, you may be entitled to a cash payment from a class action settlement.**

**Submit a Claim by October 27, 2026.**

**Submit Your Claim**

You may be eligible for a cash payment from a **$120,334,500 class action settlement** involving the National Association of REALTORS® ("NAR") and a number of residential real estate brokerage companies (together, "Defendants"). A lawsuit entitled *Tuccori et al. v. At World Properties, LLC et al.*, No. 1:24-cv-00150 (N.D. Ill.) asserts that the Defendants engaged in unlawful, anticompetitive conduct to raise, fix, and maintain real estate broker commissions at heightened amounts in violation of federal and state laws. The individuals who brought the lawsuit allege that the Defendants' anticompetitive conduct harmed homebuyers by inflating home prices and reducing the quality of buyer-broker services. The Defendants deny having violated the law, and no Court or jury has decided who is right or wrong. The Parties have agreed to settle the legal claims in the lawsuit and avoid the uncertainties and costs of continuing the lawsuit.

## Who is Included?

The Settlement includes all persons who (1) purchased a home that was listed on a Multiple Listing Service ("MLS") anywhere in the United States; (2) where a commission was paid to any brokerage in connection with the transaction (3) during the Class Periods, subject to certain exclusions. The date ranges for the Class Periods vary by state. Please visit www.HomebuyerSettlement.com to confirm whether you are a Settlement Class Member and are eligible to submit a claim.

## Does this Settlement include home sellers?

No. There are different settlements that cover people who sold a home, even if they have also purchased a home. The home seller settlements were reached in other lawsuits such as *Burnett et al. v. The Nat'l Ass'n of Realtors*, No. 19-cv-00332 (W.D. Mo.) and *Gibson et al. v. The Nat'l Ass'n of Realtors® et al.*, No. 4:23-cv-00788-SRB (W.D. Mo.). If you are a class member in one of the home seller settlements, you are

excluded from the Settlement here and may not receive a payment from the Settlement.

## What Does the Settlement Provide?

If you are a Settlement Class Member, you can submit a Claim online or by mail postmarked by **October 27, 2026** for **a Cash Payment from the $120,334,500 Global Settlement Fund.**

At this time, it is not known how much each Settlement Class Member will receive or when payments will be made. The amount of each payment will depend on the number of valid claim forms, the number of properties purchased, and the amount of commissions paid in those transactions.

## Other Options

**Opt Out postmarked by September 17, 2026.** Submit an opt out request if you do not want to be part of the Settlement Class. The Court will exclude Settlement Class Members who request to opt out. The Long Form Notice on the Settlement Website explains how to opt out. If you do *not* opt out, you will be bound by the Settlement and any orders or judgments.

**Object by September 17, 2026.** You may object to the Settlement if you do not opt out. The Long Form Notice on the Settlement Website explains how to object.

**Do Nothing.** You will not get a payment from the Settlement, and you will be bound by the Settlement and any orders or judgments.

This notice is a summary. Learn more here or call toll-free 1-877-417-7662.

## Which real estate brokerages are named in the Settlement?

There are 25 residential real estate companies named in the Litigation that have agreed to the Settlement. For a full list, please visit https://homebuyersettlement.com/home/FAQ. Additionally, the Settlement releases all Released Claims that the Settlement Class members have against the NAR and its affiliates as well as the following entities provided they meet certain conditions, including that they agree to abide by certain practice changes: (i) NAR Members, Associate Members, and Member Boards that do not operate an unincorporated MLS; (ii) Realtor MLSs and non-Realtor MLSs, as described in the Opt-In Agreement; and (iii) real estate brokerages that have a REALTOR® as a Principal with membership in the NAR on the date of Class Notice and a Principal who was a Participant in any MLS during the Class Period, provided that they had not settled or been named as a defendant in any lawsuit or action alleging claims that share the same factual predicate as those asserted in the Litigation as of April 10, 2026.

## When will the Settlement be approved?

**On November 2, 2026,** the Court will hold a final fairness hearing to decide whether to approve the Settlement, an award of attorneys' fees to Class Counsel of up to one-third of the Global Settlement Fund plus costs, service awards, and any objections. The Court will also consider service award payments of up to $7,500 to each of the Class Representatives. You or your lawyer may ask to appear at the hearing if you'd like to, but you do not have to attend.

**Submit Your Claim**

*La versión en español de este Aviso está disponible aquí.*

If nathangay53@gmail.com should not be subscribed or if you need to change your subscription information for Tuccori v. At World Properties, please use this preferences page.

Tuccori v. At World Properties is located at PO Box 4258 97208-4258.

AM964_v03

**Judges Alan L. King & Sherri C. Friday**
Judge of Probate
Bessemer Courthouse
1801 3rd Avenue North
Bessemer, AL 35020
(205) 481-4100

Wayne
GNMA AB
AZ7471

CUSTOMER INFORMATION

MTG CONNECT

TRANSACTION INFORMATION

| | | | |
|---|---|---|---|
| Transaction #: | 5556429 | Source Code: | Mail |
| Receipt #: | 841752 | Return Code: | |
| Cashier Date: | 04/04/2017 | Comments: | |
| Print Date: | 04/04/2017 | | |
| Cashier By: | KKBESS | | |

**MTG OR AMEND OF MTG** **Instrument.: 2017032969** **MTG Amount** **$300,655.00**

**From:** WAYNE NATHANIEL **To:** MORTGAGE ELECTRONIC RE

| | |
|---|---|
| RECORDING FEE | $56.00 |
| MTG TAX | $451.05 |
| ARCHIVAL FEE | $11.00 |
| **Document Total:** | **$518.05** |

**PAYMENT: CHECK** 6339 **AMOUNT:** **$67.00**
**Void / Revised Reason:**

**PAYMENT: CHECK** 6340 **AMOUNT:** **$451.05**
**Void / Revised Reason:**

**Total Payments:** **$ 518.05** **Total Fees:** **$ 518.05** **Shortage:** **$ 0.00**
**Overage:** **$ 0.00** **Total Change Returned:** **$ 0.00**

18

67.00
451.05
518.05

When Recorded Mail To:

RETURN TO:
Mortgage Connect, LP
260 Airside Drive
Moon Township, PA 15108

This document prepared by:
Ashley Holloway
Homebridge Financial Services, Inc.
194 Wood Avenue South, 9th floor
Iselin, NJ 08830

County Division Code: AL039
Inst. # 2017032969 Pages: 1 of 18
I certify this instrument filed on
4/4/2017 9:26 AM Doc: MTG
Alan L.King, Judge of Probate
Jefferson County, AL. Rec: $67.00
MtgTx: $451.05
Clerk: KKBESS

[Space Above This Line For Recording Data]

# MORTGAGE

868531

Wayne
Loan #: HB0046758
MIN: 100288220000629100
MERS Phone: 1-888-679-6377
PIN:
Case #: 22-22-6-0701866

**NOTICE: THIS LOAN IS NOT ASSUMABLE WITHOUT THE APPROVAL OF THE DEPARTMENT OF VETERANS AFFAIRS OR ITS AUTHORIZED AGENT.**

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)"Security Instrument"** means this document, which is dated March 24, 2017, together with all Riders to this document.

**(B)"Borrower"** is NATHANIEL WAYNE AND AMANDA P. WAYNE, AS JOINT TENANTS WITH RIGHT OF SURVIVORSHIP. Borrower is the mortgagor under this Security Instrument.

**(C)"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(D) "Lender"** is **HomeBridge Financial Services, Inc.**. Lender is a **Corporation** organized and existing under the laws of **New Jersey**. Lender's address is **194 Wood Avenue South, 9th Floor, Iselin, NJ 08830**.

**(E) "Note"** means the promissory note signed by Borrower and dated **March 24, 2017**. The Note states that Borrower owes Lender **Three Hundred Thousand Six Hundred Fifty-Five And 00/100** Dollars (U.S. $**300,655.00**) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **April 1, 2047**.

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ Biweekly Payment Rider |
| ☐ 1-4 Family Rider | ☐ Other(s) [specify] ______________ | |
| ☒ VA Rider | | |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non -appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan"

under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably mortgages, grants and conveys to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the COUNTY of Jefferson.

**See Attached Legal Description, Tax ID #: 43-24-3-000-001.021**
**AKA: McCalla**

which currently has the address of 7791 Indian Gap Trail, Mc Calla, Alabama 35111 ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at

such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be

obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This

insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an

amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount**

**Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration

has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's

right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental

Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall give a copy of a notice to Borrower in the manner provided in Section 15. Lender shall publish the notice of sale once a week for three consecutive weeks in a newspaper published in** Jefferson **County, Alabama, and thereupon shall sell the Property to the highest bidder at public auction at the front door of the County Courthouse of this County. Lender shall deliver to the purchaser Lender's deed conveying the Property. Lender or its designee may purchase the Property at any sale. Borrower covenants and agrees that the proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waivers.** Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

HB0046758

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

3/24/17
- BORROWER - Nathaniel Wayne - DATE -

3/24/17
- BORROWER - Amanda P. Wayne - DATE -

[Space Below This Line For Acknowledgment]

STATE OF AL

COUNTY OF Jefferson

I, Tranitra S. Avery (name and style of officer), hereby certify that NATHANIEL WAYNE AND AMANDA P. WAYNE, AS JOINT TENANTS WITH RIGHT OF SURVIVORSHIP, whose name is signed to the foregoing conveyance, and who is known to me, acknowledged before me on this date that, being informed of the contents of the conveyance, he/she/they executed the same voluntarily on the day the same bears date.

Given under my hand this 24th day of March, 2017.

Notary Public

TRANITRA S AVERY
Notary Public
Alabama State at Large

My Commission Expires: 10-11-2019

Mortgage Loan Originator Timothy Brock Davidson
Nationwide Mortgage Licensing System and Registry Identification Number 296101
Mortgage Loan Origination Company Atlantic Mortgage and Funding, Inc.
Nationwide Mortgage Licensing System and Registry Identification Number 14355

## V.A. GUARANTEED LOAN AND ASSUMPTION POLICY RIDER

# NOTICE: THIS LOAN IS NOT ASSUMABLE WITHOUT THE APPROVAL OF THE DEPARTMENT OF VETERANS AFFAIRS OR ITS AUTHORIZED AGENT.

Wayne
Loan #: HB0046758
MIN: 100288220000629100
Case #: 22-22-6-0701866

THIS V.A. GUARANTEED LOAN AND ASSUMPTION POLICY RIDER is made this 24th day of March, 2017, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Deed to Secure Debt (herein "Security Instrument") dated of even date herewith, given by the undersigned (herein "Borrower") to secure Borrower's Note to HomeBridge Financial Services, Inc. (herein "Lender") and covering the property described in the Security Instrument and located at 7791 Indian Gap Trail, Mc Calla, AL 35111 (Property Address).

**V.A. GUARANTEED LOAN COVENANT:** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:
If the indebtedness secured hereby be guaranteed or insured under Title 38, United States Code, such Title and Regulations issued thereunder and in effect on the date hereof shall govern the rights, duties and liabilities of Borrower and Lender. Any provisions of the Security Instrument or other instruments executed in connection with said indebtedness which are inconsistent with said

Title or Regulations, including, but not limited to, the provision for payment of any sum in connection with prepayment of the secured indebtedness and the provision that the Lender may accelerate payment of the secured indebtedness pursuant to Covenant 18 of the Security Instrument, are hereby amended or negated to the extent necessary to conform such instruments to said Title or Regulations.

**LATE CHARGE:** At Lender's option, Borrower will pay a "late charge" not exceeding **Four** percent (**4.000**%) of the overdue payment when paid more than **Fifteen (15)** days after the due date thereof to cover the extra expense involved in handling delinquent payments, but such "late charge" shall not be payable out of the proceeds of any sale made to satisfy the indebtedness secured hereby, unless such proceeds are sufficient to discharge the entire indebtedness and all proper costs and expenses secured hereby.

**GUARANTY:** Should the Department of Veterans Affairs fail or refuse to issue its guaranty in full amount within 60 days from the date that this loan would normally become eligible for such guaranty committed upon by the Department of Veterans Affairs under the provisions of Title 38 of the U.S. Code "Veterans Benefits," the Mortgagee may declare the indebtedness hereby secured at once due and payable and may foreclose immediately or may exercise any other rights hereunder or take any other proper action as by law provided.

**TRANSFER OF THE PROPERTY:** This loan may be declared immediately due and payable upon transfer of the property securing such loan to any transferee, unless the acceptability of the assumption of the loan is established pursuant to Section 3714 of Chapter 37, Title 38, United States Code.

An authorized transfer ("assumption") of the property shall also be subject to additional covenants and agreements as set forth below:

(a) ASSUMPTION FUNDING FEE: A fee equal to one half of one percent (0.50%) of the balance of this loan as of the date of transfer of the property shall be payable at the time of transfer to the loan holder or its authorized agent, as trustee for the Department of Veterans Affairs. If the assumer fails to pay this fee at the time of transfer, the fee shall constitute an additional debt to that already secured by this instrument, shall bear interest at the rate herein provided, and at the option of the payee of the indebtedness hereby secured or any transferee thereof, shall be immediately due and payable. This fee is automatically waived if the assumer is exempt under the provisions of 38 U.S.C. 3729 (c).

(b) ASSUMPTION PROCESSING CHARGE: Upon application for approval to allow assumption and transfer of this loan, a processing fee may be charged by the loan holder or its authorized agent for determining the creditworthiness of the assumer and subsequently revising the holder's ownership records when an approved transfer is completed. The amount of this charge shall not exceed the maximum established by the Department of Veterans Affairs for a loan to which Section 3714 of Chapter 37, Title 38, United States Code applies.

(c) ASSUMPTION INDEMNITY LIABILITY: If this obligation is assumed, then the assumer hereby agrees to assume all of the obligations of the veteran under the terms of the instruments creating and securing the loan. The assumer further agrees to indemnify the Department of Veterans Affairs to the extent of any claim payment arising from the guaranty or

HB0046758

insurance of the indebtedness created by this instrument.

IN WITNESS WHEREOF, Borrower(s) has executed this V.A. Guaranteed Loan and Assumption Policy Rider.

Nathaniel Wayne 3/24/17

\- BORROWER - Nathaniel Wayne - DATE -

Amanda P Wayne 3/24/17

\- BORROWER - Amanda P. Wayne - DATE -

EXHIBIT A

THE FOLLOWING DESCRIBED REAL ESTATE, SITUATED IN JEFFERSON, ALABAMA, TO-WIT:

LOT 6, ACCORDING TO THE SURVEY OF HEARTHSTONE, AS RECORDED IN MAP BOOK 42, PAGE 80 AND 80A, IN THE PROBATE OFFICE OF JEFFERSON COUNTY, ALABAMA, BESSEMER DIVISION.

BEING THE SAME PROPERTY CONVEYED TO NATHANIEL WAYNE AND AMANDA P. WAYNE, AS JOINT TENANTS WITH RIGHT OF SURVIVORSHIP FROM PARRISH BUILDING COMPANY, LLC., AN ALABAMA LIMITED LIABILITY COMPANY BY DEED DATED 22-NOV-2016 AND RECORDED ON 28-NOV-2016 IN INSTRUMENT NO. 2016123603 IN THE COUNTY RECORDER'S OFFICE OF JEFFERSON COUNTY, AL.

APN: 43-24-3-000-001.021

Commonly known as:

7791 Indian Gap Trail, McCalla, AL 35111