**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MARK TUCCORI, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>AT WORLD PROPERTIES, LLC, et al.,<br><br>Defendants. | Case No. 1:24-cv-00150<br><br>Hon. Lindsay C. Jenkins |

**OBJECTOR HUANG'S RESPONSE TO COURT ORDER [269]**

Huang briefly responds, but still takes no position on settlement approval overall.

**(1) Given that the home seller settlements resolved both home buyer and home seller claims and accounted for context-specific factors like ability to pay, whether and how those settlements provide a good benchmark for assessing the substantive adequacy of the proposed settlements here. This includes information on the support for any assumptions about relative class size and the value of seller versus buyer claims that underlie the comparison. On this topic, the court emphasizes a concern raised at the hearing—namely that resolving 1/8 of all claims for 1/8 of what you paid to resolve the other 7/8 of all claims does not imply you valued the 1/8 and 7/8 equally on a per claim basis.**

*First,* the Court's starting logic is sound: If *Burnett* carved out 7/8 of all buyer claims, then the leftover 1/8 should be one-seventh of *Burnett* (7/8 divides the 1/8 = 7).

But Huang cautions that it may create an error to the governing legal standard.

It seems persuasive that *Burnett's* buyer *plus* seller claims may be more valuable without the *Illinois Brick* hurdle, but it is for Parties to explain. Because *Burnett* as a denominator included seller claims, but did not split the dollars between pure sellers versus seller-and-buyer classes, apples-to-orange analysis hits its limit fast for multiple reasons. It cannot be the primary yardstick, and as a secondary one it remains dubious.

*Batton* objectors heavily relied on the so-called *Buyers / Burnett* ratio. *See* Dkt. 207 at 21. While a data table *looks* persuasive, it is analytically a *blind-on-top-of-blind* exercise. For example, take *Batton* objectors' own Keller Williams deal: it is far closer to *Burnett* as it includes 100% buyers and (50%?) sellers too, so by *Batton's* own logic, their $20 million deal would be a sellout to cover *most* claims costing Keller Williams $70 million in *Burnett*—a view Huang takes *no position*. But it is why that ratio *doesn't work*.

More problems relate to the *Burnett* ratio: each defendant negotiated its dual deals and faced a variety of factors. But the ratio blends them all into only one number.

Suppose Defendant X thought $50-$150 can be "fair" settlements in *Burnett:*

- If $50 was the deal in *Burnett* (versus $150 it feared), the so-called *Burnett* ratio here will look great, *only because* they got a good deal in *Burnett* to start.
- Suppose $150 in *Burnett* was overpaying anyhow (if it thought $50 should've been enough), a "fair" deal here now looks collusive solely as a ratio to *Burnett*.

This is why *Batton*'s position will *cause a legal error*: A single *data point* in *Burnett* settlements *cannot* govern a tolerable *range* of outcomes to review *Tuccori* settlements.

The instinct is perhaps sound, as *Burnett* assumed ~7/8 of the buyer claims. But analytically, apples-to-oranges analysis require even more speculative steps as to, e.g., **(1)** how was the range calculated as to *Burnett's* "net expected value of continued litigation" (*see Question 5*); **(2)** whether each *Burnett* settlement was at higher/lower end of a *range*; **(3)** buyer/seller split for Defendant X's *Burnett* settlement between seller/buyer claims (40/60 or 60/40 as to each defendants' buyer/seller volumes), plus **(4)** what is the ultimate "incremental benefit" for the class after all deadweight losses.

While intuitive, Huang fears the *Burnett ratio* idea will distort the legal standard.

Additionally, if this Court believes the expected value is slightly under this Court's own ballpark estimates, the Court can approve the settlement but reduce the fees so that the net recovery to the *class* is equivalent to a better *Burnett* ratio, net of fees/expenses.

**(2) How each settling Defendant's or Opt-in's ability to pay and transaction volume influenced their proposed settlement.**

Huang first observes that the dollar values of lower-end settlements are rarely the kind of dollars he observes in federal court class-actions settlements—with caveats.

Huang does ***not*** view it as collusive itself: they may end up in various state courts (as to why CAFA was enacted), or they lack the economy of scale in notice outreach ($7 million notice expenses here easily surpass many individual defendants' settlement amounts for meaningful notice). While the dollars are low, it is not *itself* a collusive concern. But it does point to the necessity for early-stage litigation discounts as in *In re Stericycle Sec. Litig.,* 35 F.4th 555 (7th Cir. 2022) (reversing a 25% fee award because "early stage" discount was not applied when the case only involved a *pending* motion to dismiss); *In re Broiler Chicken Antitrust Litig.,* 142 F.4th 568, 576 (7th Cir. 2025) (setting 26.6% fee made while class certification was pending (*before they were granted, not summarily stricken as it did to Batton objectors' hopeless class certification inclusive of Burnett's buyer claims*) because "[t]his is not a case where 'no real litigation' occurred).

In *In re Clearview AI Inc., Cons. Priv. Litig.,* 181 F.4th 785, 796 (7th Cir. 2026), the court called it a "significant concern" to not have defendants' financial conditions available. If the Parties do address them, then this Court may alleviate such concerns.

**(3) Apart from the home seller settlements, the information from which the court can arrive at the "net expected value of continued litigation," including potential recoveries at trial. *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 285 (7th Cir. 2002).**

The "ballpark valuation" standard under *Reynolds* is exactly the right legal standard to apply. As to the facts, Huang leaves it to the Parties to supply. The pure rhetoric of "nothing" without settlement, or "bankrupt" if defense lose at trial would be unhelpful; but more information may indeed affect privilege or confidential materials.

Huang agrees with the legal standard, but has no data for the factual disputes.

**(4) Any relevant benchmarks for substantive adequacy from other indirect purchaser class actions.**

Huang will leave it to the billable parties. He only notes that in *Broiler Chicken,* direct purchasers recovered about 50% of all indirect purchasers' recoveries, because they took it to trial and lost. So the figure is not necessarily an all-settlement yardstick.

There may be other electronics or meat industry-wide settlements useful for the Court's consideration (e.g., Optical Disk, Lithium-Ion Batteries, Resistors, Chicken, Pork, Turkey, etc.), but the Settling Parties owe that obligation and they should meet them.

**(5) An estimation of per claimant and per class member recovery based on the proposed settlements.**

Huang agrees that per-class member recovery is objective, even if unrealistic as barred by claims rate. Huang cautions on per-claimant analysis because it necessarily based on the notice performance: an inferior notice suppresses claimant turnouts as *Batton*'s own deals did. Lower denominator inflates per-claimant recovery, while leaving more potential claimants empty-handed, and it is the wrong metric for comparisons.

Date: November 6, 2026

Respectfully Submitted,

/s/ Shiyang Huang
Shiyang Huang
2813 SW Rother Rd.,
Topeka, KS 66614
(314) 669-1858
defectivesettlement@gmail.com

**CERTIFICATE OF SERVICE**

I certify that on or before November 6, 2026, I filed the foregoing via CM/ECF.

/s/ Shiyang Huang